# EXHIBIT E

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY**

RECEIVED

JUL 1 2 2021

NYS SUPREME COURT - CIVIL
EX-PARTE OFFICE

THE STATE OF NEW YORK *ex rel.* AMERICAN
ADVISORY SERVICES LLC,

Index No. 100115/2017

        *Plaintiff,*

v.

EGON ZEHNDER INTERNATIONAL, INC. and
EGON ZEHNDER INTERNATIONAL AG,

        *Defendants.*

**AMENDED SUMMONS**
**WITH NOTICE**

**TO:**

**Egon Zehnder International, Inc.**
520 Madison Avenue
New York, New York 10022

**Egon Zehnder International AG**
Toblerstrasse 80
Zurich
8044
Switzerland

       PLEASE TAKE NOTICE THAT YOU ARE SUMMONED to appear in this action by serving a notice of appearance on the plaintiff at the address set forth below, and to do so within 20 days after service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

       YOU ARE HEREBY NOTIFIED THAT should you fail to appear, a judgment will be entered against you by default for the relief demanded below.

DATED:     New York, New York
           July 12, 2021

                    KIRBY McINERNEY LLP

                By:

                    Randall M. Fox

250 Park Avenue, Suite 820
New York, New York  10177
(212) 371-6600
rfox@kmllp.com

*Counsel for Plaintiff Relator*

**Notice**:  The nature of this action is a suit under the New York False Claims Act, N.Y State
Finance Law §§ 187-194, alleging that defendant knowingly made and used, or caused to be
made and used false records and statements that were material to obligations to pay taxes, and
avoided and decreased their obligation to pay money to New York State and New York City.
The relief sought includes treble damages and penalties.  Should defendants, or either of them,
fail to appear, judgment will be entered by default for in excess of $13.25 million, trebled, plus
up to $22,363.00 per violation, plus attorney's fees and costs pursuant to the New York False
Claims Act.

**Venue**:  Plaintiff designates New York County as the place of trial.  The basis for this
designation is that Defendants reside and/or do business in New York County.  CPLR 503(a) and
(c).

Randall M. Fox
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, New York 10177
(212) 371-6600
rfox@kmllp.com

*Counsel for the Plaintiff-Relator*

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY**

| | |
|---|---|
| THE STATE OF NEW YORK *ex rel.* AMERICAN ADVISORY SERVICES LLC,<br><br>      *Plaintiff,*<br><br>     v.<br><br>EGON ZEHNDER INTERNATIONAL, INC. and EGON ZEHNDER INTERNATIONAL AG,<br><br>      *Defendants.* | Index No. 100115/2017<br><br>**AMENDED COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u><br><br>**[FILED UNDER SEAL]** |

**TABLE OF CONTENTS**

NATURE OF THIS ACTION ............................................................................................. 1

JURISDICTION AND VENUE ....................................................................................... 4

PARTIES ........................................................................................................................... 5

FACTUAL ALLEGATIONS ............................................................................................ 7

I.   EZI USA'S NEW YORK TAX OBLIGATIONS .................................................. 7

II.  EZI'S "OFF-SHORING" OF INCOME SCHEME TO UNDER-REPORT TAXABLE
     INCOME ............................................................................................................... 10

     A. EZI USA's Revenues from Services Performed on Joint Assignments with Foreign EZI
        AG Offices ...................................................................................................... 10

     B. EZI USA Withheld from Its Outside Tax Preparer Data about Its Revenues from Joint
        Assignments with Foreign EZI AG Offices ................................................... 16

     C. The Incomplete Revenue Data EZI USA Provided to Its Tax Preparer for Use on Its Tax
        Returns ............................................................................................................. 20

III. EZI'S "ON-SHORING" OF COSTS SCHEME TO TAKE ILLEGAL TAX
     DEDUCTIONS ..................................................................................................... 29

IV.  EZI USA AND EZI AG DISREGARDED MULTIPLE INTERNAL WARNINGS THAT
     IT WAS COMMITTING TAX FRAUD, AND THEY REPEATEDLY MISLED
     GOVERNMENT TAX AUDITORS ..................................................................... 36

V.   EZI USA AND EZI AG MADE AND USED FALSE RECORDS AND STATEMENTS
     MATERIAL TO EZI USA's OBLIGATIONS TO PAY NEW YORK TAXES .............. 79

VI.  EZI USA KEPT NEW YORK TAX MONEY FOR ITSELF ................................. 81

VII. EZI USA AND EZI AG ACTED WITH KNOWLEDGE .................................... 81

VIII. EZI USA AND EZI AG HAVE DAMAGED NEW YORK STATE AND NEW YORK
     CITY .................................................................................................................... 83

FIRST CAUSE OF ACTION ......................................................................................... 84

SECOND CAUSE OF ACTION .................................................................................... 85

PRAYER FOR RELIEF ................................................................................................. 86

JURY DEMAND ............................................................................................................ 87

Plaintiff-Relator American Advisory Services LLC ("Plaintiff-Relator"), acting on behalf of the State of New York, makes the following allegations upon information and belief against defendants Egon Zehnder International, Inc. ("EZI USA") and Egon Zehnder International AG ("EZI AG," and collectively "EZI") to recover damages, penalties, and attorneys' fees and costs for violations of the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq*.

## NATURE OF THIS ACTION

1.      This action arises out of a decade of tax frauds committed by global executive search (or "headhunter") firm Egon Zehnder orchestrated out of its home office in Zurich, Switzerland and executed in New York City.  Under the direction and with the assistance and encouragement of its Swiss parent company, EZI USA grossly understated its taxable income and deprived New York State and New York City of millions of dollars in taxes that the company owed.

2.      During at least the ten years prior to this action, EZI USA knowingly filed false tax returns and made and used other false records and statements that were material to its obligations to pay New York State and New York City taxes on EZI USA's business income from November 1, 2003 through October 31, 2013.  EZI USA knowingly kept for itself (to date) approximately $13.25 million dollars that it was obligated to pay to the government.  EZI USA's Swiss parent company, EZI AG, directed and caused EZI USA to file the false returns and to make and use the false records and statements.

3.      To accomplish these violations, EZI USA kept two sets of books.  One set included EZI USA's real revenues and costs and was used internally to conduct the company's business and evaluate its actual performance; the other set undercounted EZI USA's revenues and overstated its deductible costs and was used to prepare EZI USA's tax returns.

4.      The tax evasion schemes took two forms.  One was for EZI USA to "off-shore" revenues so that EZI USA could illegally avoid counting as taxable income about $86 million of its approximately $128 million in U.S. revenues from client assignments where it worked jointly with foreign EZI AG offices.

5.      EZI USA recorded its real revenues from the joint assignments in one set of books that it called its "performance" books.  It recorded only a fraction of those revenues in a second set of books that it called its "legal" books.  EZI USA used only the so-called "legal" books to prepare its tax returns, which resulted in its understating its taxable income and underpaying its taxes.  As one 2003 EZI AG internal e-mail put it when describing the so-called "legal" books: "let's be honest, [the accounting mechanisms used] are a tax and cash planning instrument and nothing else."

6.      EZI AG required EZI USA to maintain these two sets of books and to use only the so-called "legal" books to prepare its tax returns.  EZI AG directed its offices around the world to shift taxable profits and deductible losses among offices to lower its worldwide tax liabilities. As the EZI USA's Co-Managing Partner summed it up in 2008, the practice was about "our shifting of billings to the appropriate geography for tax reasons," which was so "we don't have to pay taxes on [the billings]."

7.      EZI USA's other scheme to illegally lower its tax liabilities was to take tax deductions for about $7 million in costs that did not belong to it.  Rather, the costs belonged to foreign EZI offices and were not properly deductible by EZI USA.

8.      This "on-shoring" of affiliates' costs tax scheme was also directed by EZI AG. As one member of EZI AG's F&C group stated, "it is our policy to leave as much expenses in the offices as possible to minimize the tax on profit."

2

9.      EZI USA's and EZI AG's off-shoring and on-shoring tax schemes did not happen by mere mistake or negligence.  Instead, they were accomplished with clear and actual knowledge by EZI USA and EZI AG.

10.     The companies were repeatedly warned that their conduct was improper, illegal, and even fraudulent.  These warnings went up to the highest executives of the companies, including to EZI AG's Global Chairman and CEO, EZI AG's CFO, and several of EZI USA's Managing Partners.  Several of these warnings were made in writing or in recorded conversations.  EZI USA's top financial employee even warned an EZI USA Co-Managing Partner that "You know, it's fraud when it comes right down to it. . .."

11.     Rather than heed these clear warnings, EZI USA and EZI AG dismissed them and affirmatively continued the schemes for years.  They also acted to conceal their schemes to avoid detection.  One way they did that was by lying to EZI USA's outside tax preparer, who would not have gone along had he known of the schemes.  They never informed the tax preparer that there were books describing EZI USA's real revenues and costs, nor that the records they provided to the tax preparer did not include all of the revenues or the correct costs.

12.     EZI USA and EZI AG also misled IRS auditors to conceal the schemes.  When asked by the auditors about how EZI USA recognized income on the joint assignments with foreign affiliates, EZI USA, acting at the direction of EZI AG, described the so-called "legal" books, while concealing the "performance" books.  In contemporaneous internal communications, EZI USA and EZI AG personnel discussed how EZI USA should "deflect attention" from the under-reported income, and that they expected that the auditors, as outsiders, would not find EZI USA's real practices.  EZI USA's Co-Managing Partner summarized the situation by saying "This was a conscious effort.  This is just a risk we've been taking for years

and they've [the IRS] just never figured it out." He even suggested that if the IRS auditors did discover the issue, the company could pretend to be surprised and tell the auditors that "we didn't realize that this is not OK."

13.    By engaging in this knowing misconduct, EZI USA and EZI AG have damaged New York State and New York City, and they have repeatedly violated the New York False Claims Act. Under that Act, EZI USA and EZI AG are jointly and severally liable for three times the damages, plus penalties.

14.    The New York False Claims Act permits and encourages whistleblowers to file suit and pursue claims on behalf of the government when they know of information concerning knowingly false or fraudulent conduct that victimizes the government through, among other things, the failure to pay taxes.

15.    In this action, Plaintiff-Relator seeks to redress for New York's benefit EZI USA's and EZI AG's violations of the New York False Claims Act.

## JURISDICTION AND VENUE

16.    This Court has personal jurisdiction over EZI USA and EZI AG because they can be found, reside, and transact business in New York State and in this county.

17.    This Court has subject matter jurisdiction over the claims asserted in this action under N.Y. State Finance Law § 190(2)(b).

18.    Venue is proper in New York County pursuant to CPLR § 503.

19.    Relator's allegations are not substantially similar to publicly disclosed information, and Relator and its member are original sources of the information provided herein. Prior to filing this Complaint, Relator voluntarily provided the government with written disclosure of substantially all material evidence and information in Relator's possession and with

the information on which the allegations and transactions herein are based.  The government was not aware of the claims or allegations herein prior to their disclosure by Relator.  Relator possessed the evidence and information and transmitted them to the government for the sole purpose of furthering efforts to stop Defendants' violations.

## PARTIES

20.     Plaintiff-Relator American Advisory Services LLC is a Wyoming limited liability company that brings this case on behalf of the State of New York pursuant to the False Claims Act to recover tax monies and interest lost to the State of New York and the City of New York by Defendants' knowing misconduct, plus multiples thereof and penalties thereon.  Plaintiff-Relator's sole member is a resident of the State of New York.

21.     Defendant Egon Zehnder International, Inc. ("EZI USA") is a corporation formed under the laws of Delaware, with its headquarters located at 520 Madison Avenue, New York, New York, 10022.

22.     Defendant Egon Zehnder International AG ("EZI AG") is a Swiss limited company with its headquarters at Toblerstrasse 80, Zurich, Switzerland.  At times, including during some of the years at issue in this action, EZI AG's Global CEO resided in New York City and worked out of EZI USA's office in New York City.

23.     EZI AG is operated as a global partnership.  Each partner in any of the EZI offices, including each partner in EZI USA, has an equal equity share and an equal vote in the management of EZI AG.

24.     EZI AG's high executives routinely travel to New York State and New York City to conduct the company's business affairs and to conduct oversight of EZI USA.

25.    EZI AG has dominated and controlled EZI USA, including by setting accounting policies for EZI USA, by instructing EZI USA how to calculate its taxable income in the preparation of its tax returns, and by instructing EZI USA how to respond to tax agency auditors.

26.    EZI USA is the United States subsidiary of EZI AG.  The United States is the largest market in which EZI AG and its subsidiaries operate.

27.    EZI USA and EZI AG do not view themselves as separate corporate entities. Rather, they view themselves as part of one company with offices and thousands of employees all over the world.

28.    Clients hire EZI AG and its subsidiaries, including EZI USA, to find candidates to fill high-level executive and corporate board of director positions.  EZI AG, together with its subsidiaries and affiliates, has over 68 offices in 40 countries around the world, including in Europe, Asia, Africa, the Middle East, and the Americas.

29.    EZI USA has offices in New York City, Atlanta, Boston, Chicago, Dallas, Los Angeles, Miami, Palo Alto, San Francisco, Houston, and Washington DC.  EZI USA's largest office is in New York City.

30.    EZI USA had a strong accounting function located in New York City, led by the EZI USA Controller, through at least 2012.  Subsequently, the function was led by the Head of Financial Operations.

31.    While the accounting function was led by the Controller, through 2012, the leadership of EZI USA had confidence in the Controller's views on tax returns.

32.    The EZI USA Controller reported primarily to EZI AG's Chief Financial Officer on financial matters, but he also reported during most of the relevant time period to the EZI USA's Managing Partner (or Co-Managing Partners during certain years).  The EZI USA

Controller was required to, and did, follow the directions from EZI AG's CFO and his finance group in Zurich.

33. Since before 2003, EZI USA's New York City office has been its only or predominant business location in New York State.

34. EZI USA's tax year runs from November 1 to October 31.

35. Both EZI USA and EZI AG had net income and sales of well over $1 million in each of the tax years at issue.

## FACTUAL ALLEGATIONS

### I.   EZI USA'S NEW YORK TAX OBLIGATIONS

36. At all times since at least 2003, EZI USA has been subject to New York State corporate franchise taxes, the Metropolitan Commuter Transportation Mobility Tax (the "MTA Surcharge"), and the New York City general corporation taxes.

37. The New York State corporate franchise tax has applied during the relevant years (and still does apply) to domestic and foreign corporations that do business, employ capital, own or lease property in a corporate or organized capacity, or maintain an office in New York State. *See* N.Y. Tax Law § 209; 20 NYCRR § 1-1.1.

38. The MTA Surcharge has applied during the relevant years (and still does apply) to domestic and foreign corporations that do business in the Metropolitan Commuter Transportation District, which includes New York City and certain other counties. *See* N.Y. Tax Law § 209-B(1); N.Y. Pub. Auth. Law § 1262.

39. The New York City general corporation tax has applied during the relevant years (and still does apply) to domestic and foreign corporations that employ capital, own or lease property in a corporate or organized capacity, or maintain an office in New York City. *See* N.Y.C. Admin. Code § 11-603(1). The New York State corporate franchise tax, the MTA

7

Surcharge, and the New York City general corporation tax are referred to collectively herein as the "New York taxes."

40.    A taxpayer who underpays the New York taxes is obligated to pay interest on the amount of taxes not paid. *See* N.Y. Tax Law § 1416; N.Y.C. Admin. Code § 11-675.

41.    EZI USA receives revenue for the provision of personal services to its clients. Such compensation, where the personal services are performed in the United States, is counted as gross income from sources within the United States and is subject to taxation in the United States. That compensation counts toward a taxpayer's federal taxable income that is used in calculating the New York taxes. *See* 26 U.S.C. § 861(a); 26 C.F.R. § 1.861-4; N.Y. Tax Law § 208.9(ii). Similarly, expenses associated with such income and the ratable part of global expenses can be deducted in calculating federal taxable income and thus the New York taxes. *See* 26 U.S.C. § 861(b).

42.    For each tax year from its tax year ending on October 31, 2004 through its tax year ending on October 31, 2013, EZI USA submitted, or caused to be submitted, to the New York State Department of Taxation & Finance or the New York City Department of Finance tax returns and statements concerning the New York taxes.

43.    Among other things, EZI USA has submitted, or caused to be submitted, returns or statements on the following forms, or their electronic equivalents: annual returns for New York State corporate franchise taxes on Form CT-3; annual returns for the MTA Surcharge on Form CT-3M/4M; quarterly estimates of corporate franchise taxes and MTA Surcharges on Form CT-400; annual returns for New York City general corporation taxes on Form NYC-3L; and quarterly estimates of general corporation taxes on Form NYC-400. Similarly, EZI USA

submitted, or caused to be submitted, federal income tax returns on IRS Form 1120 and Form 1120-W.

44.      On the returns and statements EZI USA prepared for the New York taxes, it recorded or relied upon the federal taxable income that it calculated for purposes of determining its federal tax liability.

45.      Under federal tax law, "[c]ompensation for labor or personal services performed in the United States" "shall be treated as income." 26 U.S.C. § 861(a)(3). Further, after making any permissible and proper deductions, all income from compensation "shall be included *in full* as taxable income from sources within the United States." 26 U.S.C. § 61(b) (emphasis added).[1] According to Internal Revenue Service regulation: "Gross income from sources within the United States includes compensation for labor or personal services performed in the United States irrespective of the residence of the payer, the place in which the contract for service was made, or the place or time of payment." 26 C.F.R. § 1.861-4(a).

46.      To calculate its liability (or estimated liability) for the New York taxes each tax year or quarter, EZI USA determined the portion of federal taxable income that was taxable in New York State and New York City by calculating an allocation percentage on its tax returns. For each of the relevant years and quarters, approximately one-third of EZI USA's federal taxable income was subject to taxation under the New York taxes.

---

[1] For federal tax purposes, "taxable income" means "gross income minus the deductions allowed" by the Internal Revenue Code. *See* 26 U.S.C. § 63(a).

II.    **EZI'S "OFF-SHORING" OF INCOME SCHEME TO UNDER-REPORT TAXABLE INCOME**

47.      As part of EZI USA and EZI AG's tax evasion schemes, EZI USA under-reported its taxable income by not counting on its tax returns all of the revenues it earned from the services it performed in the United States on joint assignments with foreign EZI offices.  At EZI AG's direction, EZI USA left those revenues with foreign offices, thus "off-shoring" them.

A.    **EZI USA's Revenues from Services Performed on Joint Assignments with Foreign EZI AG Offices**

48.      EZI USA has marketed itself and held itself out as part of a global executive search firm with a "one firm" philosophy that is expert at working across borders to find suitable executives and board members for its clients.

49.      EZI USA and EZI AG consider themselves to be parts of an elite global executive search firm with a culture and business that is not comparable to other executive search firms.  It charges clients for its services differently than other executive search firms and has a management structure and partner participation different from other executive search firms.

50.      As part of their business, the various EZI AG offices around the world, including the EZI USA offices in the United States, enter into contracts with clients to find candidates for specified positions, such as executive jobs or seats on corporate boards.  Clients typically agree to pay a set price for these services in monthly installments, and also to pay EZI's expenses.

51.      Between November 1, 2003 and October 31, 2013, EZI USA worked on thousands of client assignments together with foreign EZI AG offices.

52.      On these joint assignments, the EZI USA offices in the United States worked with EZI AG offices in, among other locations, Amsterdam, Berlin, Belgium, Calgary, Copenhagen, Dubai, Dusseldorf, Frankfurt, Geneva, Hamburg, Helsinki, Hong Kong, London, Melbourne,

Milan, Montreal, Mumbai, New Delhi, Paris, Sao Paulo, Shanghai, Singapore, Sydney, Tokyo, Toronto, and Zurich.

53.     To illustrate EZI USA's work on these joint assignments, in early 2008, it worked on a client assignment for an international hotel chain to find that company a new President for the Americas.  On that assignment, EZI USA worked with EZI AG's London office.  The London office billed the client approximately $196,000 for fees and expenses on the project, and half of that, or about $98,000, was credited to the New York office to recognize the New York office's work on the assignment.

54.     Between November 1, 2003 and October 31, 2013, EZI USA earned revenues of about $128 million for its services on joint projects for which foreign EZI AG offices handled the billing.

55.     EZI USA maintained accurate records of the services it performed on joint assignments with foreign EZI AG offices.

56.     Those records included identifying information for the assignment, the names of the EZI USA personnel who worked on the projects, the fees billed to the client, and the percentage split of the performance credit for the assignment agreed between the EZI offices.

57.     The percentage split agreed to for EZI USA's work on a joint assignment as multiplied by the fee billed to the client was the arm's-length, fair market value for the services EZI USA performed on the assignment.

58.     When EZI USA worked on an assignment for which a foreign affiliate handled billing the client, EZI USA claimed its share of the performance credit for the joint assignment by sending the billing office what EZI USA and EZI AG called a "fax charge."  The amount of

the fax charge equaled the result from multiplying the percentage split agreed to between the offices working on the joint assignment by the fee billed to the client.

59.     EZI AG required that EZI USA, as well as others of its subsidiaries, use fax charges to divide the credit for work on joint assignments.

60.     EZI AG's requirement to use the fax charge system was set forth in EZI AG's Finance Manual.  That Finance Manual was prepared by EZI AG's Finance & Control ("F&C") group in Zurich, Switzerland, and was circulated to accounting personnel in each office, including the financial personnel in EZI USA's New York office.

61.     As the Finance Manual stated,

> This manual includes rules and standards to ensure that figures are presented uniformly throughout the firm.  It is the duty of all accountants and controllers of the Egon Zehnder International group to enforce these rules and adapt the reporting continually to the new version.  In case of any discrepancies in the reporting, F&C must be informed on any account.

62.     Throughout the tax years at issue in this case, EZI USA maintained a copy of the most current Finance Manual at its New York City office.

63.     With respect to fax charges and revenue recognition, EZI USA followed the policies and procedures set forth in the Finance Manual.

64.     The Finance Manual described the fax charges as calculating "the real performance of an office."  Specifically, it stated as follows:

> Fax charges are used to calculate the real performance of an office. E.g. local billings plus fax billings net (can be positive or negative) results in performance billings.  Or generally: local plus fax results in performance.
>
> **A real money transfer is not taking place when doing a fax charge.**
>
> Fax charges are intercompany transactions and are being reconciled on a monthly basis (except fax billings backlog). [*bolding in original*].

12

65.     Under EZI AG's required procedures for these intercompany transactions, when two offices worked on a joint assignment, one office was the billing office, and the other was the non-billing office. The billing office sent invoices to and received payment from the client. The non-billing office, in order to get credit for its work on the joint assignment, had to send a fax charge on the form required by EZI AG.

66.     The fax charge intercompany transactions measured each office's revenues from joint assignments.

67.     As the Finance Manual states, "Fax billings are used to claim the appropriate part of the revenue (fees and expenses), if two or more EZI offices are involved in the same assignment," and "The sending office is claiming its part of the revenue from the receiving office. The receiving office is invoicing the client."

68.     The fax charges that EZI USA sent to its foreign affiliates are the best and most reliable record of its revenue during the period of November 1, 2003 through October 31, 2013 from providing services in the United States on joint assignments with foreign EZI offices where the assignments were billed by the foreign offices.

69.     EZI USA did not in the ordinary course of its business maintain any other records measuring or describing the full extent of that revenue.

70.     The fax charges EZI USA sent to its foreign affiliates represented the time and effort contributed by EZI USA to the joint assignment, and those fax charges were a way for EZI USA to demonstrate its performance.

71.     Referencing the division of fees shown by fax charge intercompany transactions, EZI USA's Co-Managing Partner Greig Schneider described the company's long-standing

philosophy in an October 15, 2013 e-mail: "The philosophy is that the fee goes where the work is done."

72.    EZI AG developed the system of fax charges in about the 1970s. At the time, the non-billing office working on a joint assignment claimed performance credit by sending a form using a telex machine. At the time, the procedure was known as a "telex charge."

73.    When fax machines came into popular usage in about the 1980s, the name of the procedure was changed to a "fax charge." Even after the forms began to be sent by e-mail rather than fax machines, the name "fax charge" stuck, and the organization continued to refer to the procedure as a "fax charge."

74.    EZI USA and EZI AG incorporated data about the fax charges into their electronic data systems. They were capable of running reports about the fax charges, and they were capable of using fax charge data in financial and accounting reports.

75.    EZI USA and EZI AG incorporated the fax charge intercompany transactions into numerous reports that they used to manage their business. The companies referred to these reports that included the fax charges as their "performance" records. These reports included, among others, Billing Statistics Reports, Performance Key Figures Reports, and Performance Profits & Losses (P&L) reports. On the Billing Statistics reports, for example, EZI USA listed assignments by categories, including "local assignments, billed locally," "other assignments, billed locally," and "work done for other offices (fax sent) – increases billing statistics."

76.    EZI USA and EZI AG used reports that incorporated the fax charge intercompany transactions to make decisions about their various offices and the personnel in those offices. For example, they were used in setting budgets, and they helped inform management whether offices

and individuals were performing at expected levels, and whether action should be taken when they were not.

77.     EZI AG, for example, used the performance P&Ls, which were generated using the fax charges, to evaluate the performance of its offices in each country.

78.     The senior personnel in each country's offices, including in the United States, had a strong motivation to ensure that their offices' contributions were reflected by the fax charges, and thus by the performance P&Ls. Those employees would hear in annual reviews if they or their offices were not pulling their weight. Their non-performance or low performance could lead to their offices' not obtaining resources or in their employees' not advancing or being exited from the firm.

79.     For some years, EZI AG announced in press releases its worldwide and United States (*i.e.*, EZI USA's) revenues that were calculated using the fax charges, so that EZI USA could publicly display its total revenues, including its revenues from all joint assignments with foreign EZI AG offices. It issued such press releases, for example, on or about January 9, 2007 and January 30, 2009.

80.     The revenues EZI USA listed in its press releases were millions of dollars in excess of the revenues EZI USA listed on its tax returns. The difference was that the press releases reported revenues that included the revenues represented by fax charges, while the tax returns did not include all of the fax charge revenues.

81.     For each tax year during the period of November 1, 2003 through October 31, 2013, EZI USA was capable of calculating its overall revenues from services it performed in the United States by using the fax charge intercompany transactions to count its revenues from its joint assignments with foreign EZI AG offices.

15

82.     For each tax year during the period of November 1, 2003 through October 31, 2013, EZI USA was also capable of generating reports showing the dollar value of all fax charges it sent during the tax year.

83.     For each tax year during the period of November 1, 2003 through October 31, 2013, EZI USA was capable of providing its tax preparer with reports detailing the fax charge intercompany transactions it sent during the tax year.

**B.      EZI USA Withheld from Its Outside Tax Preparer Data about Its Revenues from Joint Assignments with Foreign EZI AG Offices**

84.     EZI USA used one firm to prepare its taxes since at least the early 1980s up until 2014.

85.     For each tax year from at least November 1, 2003 through October 31, 2013, EZI USA did not provide the tax preparer with data about all of its revenues.

86.     In particular, EZI USA did not inform the tax preparer of all of its revenues from its joint assignments with foreign EZI AG offices.

87.     Rather than providing its tax preparer with data about all of its fax charge intercompany transactions, EZI USA provided the tax preparer with data about revenues from only some of its joint assignments with foreign EZI AG offices.

88.     During EZI USA's tax year starting on November 1, 2003 and ending on October 31, 2004, for example, EZI USA sent fax charges to its foreign affiliates for 110 joint assignments with the foreign EZI offices, but it did not count the revenues from any of them in the revenue data it sent to the tax preparer to prepare the tax returns.  During that tax year, EZI USA had revenues of about $5.3 million from those 110 assignments, but told its tax preparer about none of it.

89.     During its tax year ending on October 31, 2005, EZI USA sent fax charges for 130 joint assignments with foreign EZI AG offices, but it counted the revenues from only 13 of them in the revenue data it sent to the tax preparer to prepare the tax returns.  During that year, EZI USA had revenues of about $7.4 million from those 130 assignments, but told its tax preparer of only about $1.4 million (or 18.7%) of it.

90.     During its tax year ending on October 31, 2006, EZI USA sent fax charges for 194 joint assignments with foreign EZI AG offices, but it counted the revenues from only 16 of them in the revenue data it sent to the tax preparer to prepare the tax returns.  During that year, EZI USA had revenues of about $10.6 million from those 194 assignments, but told its tax preparer of only about $1.7 million (or 15%) of it.

91.     During its tax year ending on October 31, 2007, EZI USA sent fax charges for 164 joint assignments with foreign EZI AG offices, but it counted the revenues from only 10 of them in the revenue data it sent to the tax preparer to prepare the tax returns.  During that year, EZI USA had revenues of about $9 million from those 164 assignments, but told its tax preparer of only about $0.6 million (or 6.4%) of it.

92.     During its tax year ending on October 31, 2008, EZI USA sent fax charges for 227 joint assignments with foreign EZI AG offices, but it counted the revenues from only 21 of them in the revenue data it sent to the tax preparer to prepare the tax returns.  During that year, EZI USA had revenues of about $17.4 million from those 227 assignments, but told its tax preparer of only about $2.6 million (or 14.9%) of it.

93.     During its tax year ending on October 31, 2009, EZI USA sent fax charges for 220 joint assignments with foreign EZI AG offices, but it counted the revenues from only 42 of them in the revenue data it sent to the tax preparer to prepare the tax returns.  During that year,

EZI USA had revenues of about $13.8 million from those 220 assignments, but told its tax preparer of only about $2.8 million (or 20.3%) of it.

94.     From the entire period of November 1, 2003 through October 31, 2013, EZI USA sent fax charges for its joint assignments with foreign EZI AG offices for about $128.2 million in revenue, but EZI USA told its tax preparer of only about $42.5 million (or 33.2%) of it.

95.     The tax preparer firm used the data EZI USA provided to prepare EZI USA's tax returns and other tax submissions, as EZI USA and EZI AG knew it would.

96.     On EZI USA's federal tax returns, on IRS Form 1120, the tax preparer used the revenue data provided by EZI USA to report EZI USA's "gross receipts or sales" (on Line 1). On the Form 1120s, the tax preparer then calculated EZI USA's federal "taxable income" (on Line 30) for that year.  Based on the federal taxable income, the tax preparer determined EZI USA's liability for federal taxes.

97.     EZI USA's tax preparer used the federal taxable income it determined from EZI USA's Form 1120s to prepare EZI USA's returns and other statements concerning the New York taxes.  For each of the New York taxes, the tax preparer used the federal taxable income to determine the amount of income subject to the tax, and then used that amount of income to calculate EZI USA's tax liability.

98.     EZI USA attached its federal tax returns to its New York tax returns when it filed its New York tax returns.

99.     EZI USA's liability for the New York taxes was required to be calculated based on its federal taxable income, which was then reduced using a business allocation percentage representing how much of its United States business was related to or sourced in New York. Accordingly, the report of its gross receipts or sales and its calculation of EZI USA's federal

taxable income on its federal tax forms was material to the calculation of its New York tax liabilities and its obligation to pay the New York taxes.

100.   EZI USA did not inform its tax preparer of the existence of EZI USA's fax charge intercompany transactions.

101.   When the relationship partner at the tax preparer firm was informed of the existence of fax charges during testimony in 2018, he testified that he would have wanted to know about those fax charges for purposes of preparing EZI USA's tax returns and financial statements.

102.   The relationship partner testified that if he learned that a client had a separate system that booked a number of inter-company engagements previously unknown to him, he would have advised the client that he would have to look into the activity and consider resigning from the engagement.

103.   The relationship partner also testified that the revenues from work done in the United States should be allocated to the United States.

104.   By not informing its tax preparer of the fax charge intercompany transactions, EZI USA followed EZI AG's explicit direction to all of its offices to keep fax charges secret.

105.   The EZI AG Finance Manual called for strict confidentiality about fax charges, stating (in bold letters): "**Fax charges are internal EZI procedures and must not be shown or communicated to third parties**."

106.   EZI AG further instructed EZI USA, and other subsidiaries, that the entire Finance Manual, which described fax charges, had to be kept secret, particularly from tax inspectors and auditors.  On the manual's first page it said:

> This Finance Manual is **strictly confidential** in its entire nature. It must not be accessible to outside parties, such as auditors, tax inspectors etc.

The manual must be locked up at all times when it is not in use. No further copies of this manual must be made. [*bolding in original*].

107.    EZI USA's tax preparer firm, including its relationship partner, never saw the Finance Manual before 2018, and the relationship partner testified that this confidentiality provision was unusual, that he had never seen one like that before, and that he would not counsel clients to have a policy of keeping a finance manual from auditors or tax inspectors.

108.    EZI AG's F&C group reinforced the instruction not to disclose fax charges. In a March 5, 2005 e-mail, a member of the F&C group, confirming that the company maintains two sets of books, wrote that the fax charges "works like an inter-company account off the records of the local books, but reported in [EZI AG's accounting system] Hyperion. Also the important thing to be noted is that 'DO NOT INFORM THE LOCAL EXTERNAL AUDITORS FOR THIS ACTIVITY' because these transactions are not recognized by the local authorities."

109.    In an August 19, 2010 e-mail, a member of F&C addressed an upcoming tax audit of the Helsinki office, and wrote: "Please take care of the Fax charges? Do not show them …"

110.    A few months later, members of F&C intervened in an e-mail discussion about a joint project where the Copenhagen office did the billing and the Sao Paulo office did 100% of the work. It appeared from the conversation that fax charges were mentioned to auditors, and an F&C member expressed his anger: "I am more then [*sic:* than] surprised to read that you are talking to your auditors about fax charges. Let's have a call regarding this."

## C.    The Incomplete Revenue Data EZI USA Provided to Its Tax Preparer for Use on Its Tax Returns

111.    With respect to its revenue from joint assignments with foreign EZI AG offices, EZI USA provided the tax preparer with revenue only from what it and EZI AG called "international assistance" or "I/A" billings.

112.    EZI USA described as its "legal" records the financial records that included the

I/A billings, but did not include the fax charges.

113.   EZI USA sent I/A billing invoices to its foreign affiliates for only some of its joint assignments with them.  It did not issue I/A billings for every joint assignment that had fax charge intercompany transactions.

114.   I/A billings relied on the same percentage splits between EZI offices as the fax charges.  Where two offices working on a project agreed to a 50/50 split, then that split applied to both the fax charges and the I/A billings for that project.  Accordingly, the price for EZI USA's services was the same regardless of whether only fax charges were sent or both fax charges and I/A billing were sent.

115.   EZI USA sent its tax preparer data about the I/A billings, using its so-called "legal" records, so that the tax preparer could prepare EZI USA's tax returns.  Those records did not include the fax charges and did not report all of the revenues reflected by the fax charges.

116.   EZI AG had its offices throughout the world use I/A billings to recognize revenue for tax reporting purposes and to transfer money among offices.

117.   It was the duty of EZI AG's F&C group to analyze fax charges and determine when offices should send or not send I/A billings.  The F&C group was the only group within EZI AG that could see the full, detailed financial picture for all offices in all countries.

118.   When an office needed money, EZI AG's F&C group sometimes instructed it to send I/A billings.  The F&C group reviewed the situations of other offices and then told the requesting office where to send the I/A billing(s).  The requesting office was the "sending" office, for it sent the request for I/A billing; the other office was the "receiving" office, for it received the request.  Most I/A billing was coordinated through EZI AG's F&C group.

119.    EZI AG offices have been using I/A billing for many years.  In earlier years, EZI USA and EZI AG referred to I/A billings as "OARs."

120.    Often, the motivation for I/A billing was to even out or reduce taxes, shift revenues to lower-taxing jurisdictions, or to make an office's financial records look consistent with prior years so they would not raise red flags or "raise a few eyebrows" with tax authorities.

121.    In an October 6-7, 2009 e-mail chain, EZI AG F&C group member Kurt Gnaegi, while in New York, told the controller in EZI's Australia office that he was looking for I/A billings that the United States offices (*i.e.*, EZI USA) could make.  The Australia controller responded that sending the I/A billings would "raise a few eyebrows":

> Quite frankly we have enough cash and a high taxable profit to take on the close to CHF 1.1 million [*i.e.*, 1.1 million Swiss Francs] you have outlined in your email and the US offices have performed the work.  My concern is how does the CHF 1.1 from the US look in our local accounts.  In the past we have had regular transactions with Singapore so that is ok and the ad hoc office (two years ago Milan, this year Berlin) but the CHF 1.1 is quite large and we have not show transactions in the local books with the US for quite some time and 1.1 million of transactions might raise a few eyebrows regarding "profit shifting" and the question why have there not been transactions before.

> I am about to work on the September month end and will work out roughly how much all the intercompany transactions will come to with the US amount.  If it comes in around the 10 to 15 of total expenses I will let you know.  Otherwise we might need to look at reducing the amount.

122.    In a July 14, 2010 e-mail, EZI AG's F&C group authorized I/A billing to be sent by EZI USA to the Toronto office.  The Toronto office was concerned that it had too much revenue apparent on its books, which would be a "red flag" to tax authorities because "in recent years Canada has been expensing rather than taking revenue."

123.    So that it could move revenues among offices to minimize overall taxes, EZI AG's F&C group kept track of each office's profits or losses and how each office might be affected by taxes.  It did that tracking on various spreadsheets, including its "tax planning"

spreadsheet, on which it compared revenues using both fax charges, in one column, and I/A billings, in another column, and then listing the effective tax rates for all countries where EZI AG had offices.

124.    In an August 27-28, 2008 e-mail chain, for example, members of the F&C group discussed that it was time to fill in the tax planning spreadsheet as they considered possible I/A billing between EZI USA and the Toronto office because "Toronto's cash situation is very good" and because EZI USA "is whining about 'hammering the P&L' for non-discretionary costs." (The non-discretionary costs referred to apportioned global costs.) The response referred to the F&C group's engaging in global planning of I/A billing using their tax planning spreadsheet: "I would be glad if we could look at the whole OAR planning together. Do you already have our big spreadsheet filled out?"

125.    By shifting revenues among offices through I/A billings, EZI AG decreased its overall taxes. By shifting revenues, it would reduce or eliminate taxable profits in one country by shifting losses from another country. To illustrate, where the office in one country showed a large profit, the F&C group could have an office in a different country that was facing a large loss send I/A billing to the first office. The result would be that the first office would decrease the amount of profits that would be taxed, and the second office would not incur tax liabilities because it would still not show a profit.

126.    I/A billings were typically issued toward the end of the tax year, which was after EZI AG could make a judgment about the various offices' anticipated tax liabilities and shift billings, and thus taxable profits, to reduce overall tax liabilities.

127.    One of many examples of the profit and tax motivations for I/A billings was in a September 18, 2003 e-mail from a member of the F&C group, who wrote to EZI USA "I need to

know the maximum amount possible to do some other Fax received at your end.  For Canada,

Mexico, Singapore and Hong Kong we probably need to have OARs.  Please let me know your

estimated profit at October 31st and how much would be possible to not have problem with the

IRS."

128.    Another example was in an October 24, 2005 e-mail in which a member of the

F&C group wrote: "Zurich & Geneva would need to have some additional profit. . . .  If you

need this profit we could add some I/A billings with Canada as they have a huge profit."

129.    Another example was in an October 2006 e-mail in which a member of the F&C

Group wrote: "This I/A billing from Dallas was meant to reduce the profit of EZI Seoul to avoid

excessive income taxes that your [sic] mentioned in a previously sent email."

130.    Another example was in a May 24, 2011 e-mail that discussed how to reduce a

country's possible year-end loss, a member of the F&C group wrote: "I suggest you begin to

charge [i.e., issue I/A billings for] Fax charges as the profit at year end for Canada could be

negative."

131.    At times, EZI AG's F&C group ordered I/A billings to give the appearance of

consistency from year to year, because big changes could catch the attention of tax auditors.

132.    One illustration of this motive appears in an October 11, 2006 e-mail from the

F&C group's Gnaegi to EZI USA, which states as follows:

> If I check our estimate for October 06 it seems to me that the US will
> show less (legal) profit (approx. CHF 2.4 mio [i.e. 2.4 million Swiss
> Francs], compared to CHF 2.8 mio of last year) then last year even though
> the billing was higher. This might not be too comprehensible to the tax
> authorities, what is your idea?  In case you would need some additional
> profit you could generate some I/A billings with Canada. They have a
> huge profit and we would like to reduce it to some extend [sic] if ever
> possible. Thanks for your feedback.

24

133.    In the October 6-7, 2009 e-mail chain that the F&C group's Gnaegi had with the controller of the Australian office (described above), Gnaegi again confirmed that shifting profits was a motivation of the I/A billings, and he punctuated the point with a smiley face. Upon instructing EZI USA to send I/A billings, he wrote that "the supporting documents [to accomplish the I/A billings] are not urgent but of course the [I/A] invoice. Sorry for all of this work … but it's for the sake of the US profit. :-)."

134.    In a December 2009 e-mail exchange, members of EZI AG's F&C group again tried to determine how to use I/A billing to give the false appearance of consistency from year to year, for they were worried about "IRS problems." One wrote the following:

> If each year the USA 'legally' billed [*i.e.*, issued I/A billing] millions too little (2009 around CHF 8 mil), then it can't turn out well. You do already have a net-net problem. We, F&C, would then need to make sure that we do not create an additional problem. Can we make up for the I/A billings that were missed? Please reactivate the 'forgotten tax sheet' so that this does not happen any more.

The response was as follows:

> We have to ask [the EZI USA Controller], but I think it is not a good idea to settle the 2009 fax charges [*i.e.*, issue I/A billing] in 2010. That will result in IRS problems. We are not going to be able to generate the 8 million which the USA now needs as an additional loan. In many cases, we are shifting only the problem of I/A billings from the USA to other offices. I re-calculated it again and I am still at a CHF 6 mil. difference between fax sent and received and not at 8 mil for the USA.

135.    In an August 15-17, 2011 e-mail chain, a member of EZI AG's F&C group reported that "in the US we need to generate I/A traffic," and "We try to issue every year a similar amount for the IA's because they want to be consistent. During the financial year I check with other offices which one can send invoices to the US and which one can receive, depending on the FAX sent and received and also considering the cash situation in the office. In the US

generally it is not a matter of cash." The reason the F&C group was looking to send I/A billings was related to taxes on EZI USA's profits.

136.    When the relationship partner of EZI USA's long-time tax preparer was asked whether moving revenues between offices to give the appearance of consistency from year to year was a proper method of allocating revenue for a global company such as EZI AG, he testified "no." Neither EZI USA nor EZI AG had informed him that the cash balances of the various EZI AG offices was a factor in whether EZI USA chose to recognize income from joint assignments with foreign EZI AG offices.

137.    A member of the F&C group demonstrated the tax motivation of I/A billings even as early as 2003, for in a September 18, 2003 e-mail, he wrote "Let's be honest. OARs [*i.e.* I/As] are a tax and cash planning instrument and nothing else."

138.    In 2009, another member of the F&C group again referred to the tax motivation of I/A billings, writing "As you know, we often use IA billings as a 'tax and cash optimizing tool'. ... In the last couple of years, more and more countries experienced difficulties in justifying Intercompany billings to the tax authorities. Germany for example has therefore started to send IA billings for every fax charge. It looks like we will have to reconsider our Intercompany processes globally in the coming years."

139.    While I/A billing was at times also used for cash management purposes for some foreign EZI AG offices, that motivation rarely applied to EZI USA because it usually did not need cash from other offices.

140.    EZI USA and EZI AG used the I/A billings for tax purposes. At the direction of EZI AG, EZI USA recorded the I/A billings in its general ledger, which it then provided to its tax preparer. The fax charge intercompany transactions were not included in the general ledger.

141.    EZI USA and EZI AG made sure that only I/A billings, and not the fax charges, were visible to persons outside the company, whom they referred to as "externals."  In an October 17, 2003 email, a member of the F&C group approved of I/A billing between Canadian offices and EZI USA, and, while confirming that the company maintains two sets of books, cautioned the offices to keep the fax charge documents separate from the I/A billings so the fax charges would not become known to tax auditors and others.  He wrote: "Regarding the back-up documentation: Never use internal fax documents for I/A billings as back-up documents.  FAX documents may not be shown to externals in any way. [...]  The FAX documents are only a basis to see the volume. [...] I hope this is fine for you.  US-offices and CND-offices must have proper documents if one day a tax auditor comes by ...."

142.    EZI USA issued I/A billings for only a portion of the joint assignments it performed with foreign EZI AG offices.  Accordingly, there was a gap between revenues shown by the fax charges and revenues shown by the I/A billings.

143.    The table below illustrates some of EZI USA's joint assignments with foreign EZI AG offices for which it sent fax charges, but not I/A billings:

| Client | Engagement | Foreign Office Partner | US Revenue (as shown by fax charges) | I/A Billings |
|---|---|---|---|---|
| ZU0720 [large financial institution] | GE0584GEN:  Managing Director/Head of Global Marketing Capabilities | Geneva | $105,906.28 | $0 |
| LO0341 [large travel-related company] | ME0008ME:  CEO | Melbourne | $72,706.57 | $0 |
| DU0059 [large manufacturing company] | BN0130FRB:  Board Search | Frankfurt | $251,989.23 | $0 |
| NY1773 [large retail company] | MX0012HKD:  VP Global Food Supply Chain | Hong Kong | $88,246.25 | $0 |

| NY1797 [large technology company] | CO0075PO: Industry Head Finance, Sweden | Copenhagen | $16,652.42 | $0 |
| HK0069 [large financial institution] | LO0076LON: Investment Director, Emerging Markets | London | $124,954.3 | $0 |
| NY0231 [large food company] | LO0271LON: Succession Planning – CEO | London | $51,558.62 | $0 |

144.    From November 1, 2003 through October 31, 2013, EZI USA sent more than $85 million in fax charges that did not have any I/A billings.

145.    The following chart shows the disparity between the dollar values of the fax charges that EZI USA sent and the I/A billings it sent in each tax year from November 1, 2003 through October 31, 2013:



146.    The I/A billings were not an accurate measure of EZI USA's total revenues from the services it performed in the United States on joint assignments with foreign EZI AG offices.

147.    When it sent I/A billings, and thus recognized United States revenue on the records used for tax purposes, EZI USA understood that it was allocating the income to where it

belonged. EZI USA's current Controller (formerly its Assistant Controller), when asked about an I/A billing invoice sent by EZI USA to a foreign office, said "we were actually taking income and moving it to where it belonged in the US."

148.    EZI USA did not, however, move all of its income to "where it belonged" because it did not issue I/A billings for all of its joint assignments with foreign EZI AG offices between November 1, 2003 and October 31, 2013.

149.    When EZI USA sent revenue data to its tax preparer, it sent data about the I/A billings, but not the fax charge intercompany transactions.

150.    The tax preparer incorporated the data into several tax forms, including into New York and federal tax forms. Among the forms was IRS Form 5472, which is a form on which EZI USA was required to submit information about the value of its transactions with affiliates in other countries. EZI USA was required to submit a separate Form 5472 for each country where it had transactions with an affiliate, and it attached numerous forms to its tax returns each year. The Form 5472 data on those transactions, however, was mostly false because it was based on I/A billing data, and it did not include those transactions for which there were fax charges but no I/A billings sent. EZI USA submitted hundreds of false Form 5472s for the tax years from November 1, 2003 through October 31, 2013.

## III.    EZI'S "ON-SHORING" OF COSTS SCHEME TO TAKE ILLEGAL TAX DEDUCTIONS

151.    EZI USA, at the direction of EZI AG, also manipulated its deductible costs to evade taxes. It did that by taking deductions that belonged to foreign EZI AG offices, thereby "on-shoring" costs that it could not properly deduct on its tax returns. With this scheme, EZI AG and EZI USA again illegally lowered EZI USA's tax liabilities.

152.    During the tax years relevant to this case, EZI USA incurred costs for items and services that related to operating its own business as well as for "global costs" that related to the operation of EZI AG's business throughout the world.

153.    The usual policy within EZI AG and its offices worldwide was for the offices to distinguish between their own costs and the global costs, and to "recharge" the global costs to EZI AG. EZI AG, in turn, was supposed to aggregate the global costs and then allocate them among its many offices so that each was responsible only for its share of the global costs.

154.    EZI AG purported to allocate global costs among offices based exclusively on office headcount.

155.    In fact, EZI AG did not allocate global costs based exclusively on office headcount, and some offices around the world were not allocated their proportional share of global costs. As a result, some offices, including EZI USA's offices, were allocated excessive costs. Some offices were not allocated any global costs.

156.    According to an analysis of cost allocations that KPMG did for EZI AG in 2016, EZI USA was a "loser" because it was burdened with more than its proportionate share of global costs, and KMPG calculated EZI USA's resulting "potential adjustment risk."

157.    For the tax years at issue in this case, EZI AG generally allocated to EZI USA approximately 17% of the recharged global costs.

158.    To illustrate, if EZI USA incurred a $100 global cost, it was supposed to recharge EZI AG the full $100, then EZI AG would allocate $17 of it to EZI USA. EZI USA could then claim the $17 as a deduction on its tax return for that year, thus reducing its taxable income by $17.

159.    EZI USA tracked its global costs on its general ledger using unique general ledger accounts.  For example, it had separate general ledger accounts where it recorded global costs spent for EZI AG's business on, among other things, salaries, bonuses, external support staff, social charges, pensions, training, subscriptions, memberships, information technology, travel expenses, promotion, bank charges, legal, bad debt, and interest expenses.

160.    The classifications of EZI USA's expenses was dictated by EZI AG in the Finance Manual, which states that "All classifications to corporate [*i.e.*, global] expenses must be agreed with F&C and mentioned on the Corporate Expenses Report (Excel file)."

161.    Each month, and each year, EZI USA generated a spreadsheet entitled "Residual Schedule C Eliminations" setting forth the global costs it incurred.  The spreadsheet was commonly referred to within the company as "Schedule C."  EZI USA sent this spreadsheet to EZI AG's F&C group to show the global costs that it was recharging to EZI AG.

162.    The Schedule C spreadsheets had separate tabs that each showed the global costs incurred by different areas of the company, such as the global costs for the "life sciences" or "board" practices (*i.e.*, the practice groups that focused on placing executives for life science companies or on placing persons on corporate boards of directors).

163.    On the "total" tab of the Schedule C spreadsheets, EZI USA summarized the data from the other tabs of the spreadsheet and then calculated how much in global costs EZI USA was recharging to EZI AG for the period covered by that spreadsheet.

164.    On the Schedule C spreadsheets, EZI USA explicitly excluded certain global costs from the amounts it recharged to EZI AG.  Specifically, it excluded global costs listed on the spreadsheet tabs entitled "ADM" and, later, the tabs entitled "Misc."

165.    Prior to EZI USA's tax year ending on October 31, 2003, EZI USA did not charge any of its global costs to EZI AG, and it deducted all of the global costs it incurred on its tax returns.

166.    In 2002, the EZI USA Controller raised with EZI AG's CFO Tomas Hurcik and the F&C group that the global costs should be recharged to EZI AG.

167.    In a June 10, 2003 e-mail, a member of EZI AG's F&C group gave approval for EZI USA to start recharging some global costs to EZI AG.

168.    In the June 10, 2003 e-mail, however, the F&C member raised the concern that the change might catch the attention of tax authorities: "There is also the question whether we will have to face questions from the tax authority when we start now. There will be a bigger change in the P&L [profit & loss statement] from 2001/2002 to this year.  We should know if the IRS will look into the books more detailed from the past years when we have such a big change in the current year."

169.    Starting in EZI USA's tax year ending on October 31, 2003, EZI USA began to recharge some global costs to EZI AG.

170.    Although EZI USA started recharging global costs to EZI AG, CFO Hurcik ordered the EZI USA Controller not to recharge the global costs related to EZI AG's Global Chairman and CEO, A. Daniel Meiland.  As a result, EZI USA subtracted out certain global costs on the Schedule C spreadsheets' "ADM" tab.

171.    Meiland resided in New York City and worked out of EZI USA's New York City office.  The global costs included on the ADM tab of the Schedule C spreadsheets included, for example, Meiland's salary, his car allowance, his executive bonus, his insurance and retirement

benefits, the salary and bonus of his assistant, global training expenses, global travel expenses, global promotion expenses, and global legal fees.

172.    The exclusion of the "ADM" costs was open and explicit on the Schedule C spreadsheets. On the "total" tab, the company added up all of the global costs, including the ones from the ADM tab, and then subtracted out the global costs from the ADM tab.

173.    In EZI USA's tax year ending on October 31, 2005, for example, the global costs listed on the "ADM" tab added up to $1,973,358.

174.    On the "total" tab, EZI USA calculated the "total global costs" to be $3,408,164. It then subtracted the $1,973,358 on a line entitled "Less ADM Costs," thereby reducing the total global costs being recharged to EZI AG by more than half.

175.    If EZI USA had recharged the ADM global costs to EZI AG, then EZI AG would have re-charged only about 17%, or $335,471, back to EZI USA.

176.    On its tax returns for tax year ending on October 31, 2005, EZI USA deducted the full $1,973,358 in ADM global costs, but it was entitled to deduct only about $335,471. Accordingly, it illegally reduced its taxable income by about $1,637,887 by over-deducting global costs in that year.

177.    On its Schedule C spreadsheets for the tax years ending on October 31, 2004, 2005, 2006, and 2007, EZI USA kept all of the global costs on the "ADM" tab for itself and deducted the full amount of these global costs on its New York taxes.

178.    Meiland retired at the end of calendar year 2006, which was during EZI USA's tax year that ended on October 31, 2007.

179.    After Meiland's retirement, EZI USA changed the name of the "ADM" tab to "Misc." It included on the "Misc" tab global expenses for such items as global travel, global training, global promotion, and global legal fees.

180.    After Meiland's retirement, EZI USA briefly tried to start recharging EZI AG for all global costs, including the ones on the "ADM"/"Misc" tab.

181.    EZI AG CFO Hurcik put a stop to that, and ordered that EZI USA continue to exclude global costs on the "ADM"/"Misc" tab from the Schedule C global costs recharged to EZI AG.

182.    CFO Hurcik ordered this action even after the EZI USA Controller protested that he could not justify that action to IRS auditors. The Controller wrote in an e-mail: "So, I guess when the IRS audits us and asks why the USA is absorbing travel expenses for consultants working on global projects, I will send them to you for an explanation since I will be unable to justify…"

183.    The EZI USA Controller continued "I just don't see how we can argue charging back some, but not all, of the global costs. What is so different about these costs that makes us not charge them back as we do with the others? It could lead one to think that we are purposely not charging back so we have additional expenses, thus less taxes, in the USA."

184.    Hurcik nevertheless required that the global costs be left with EZI USA, without recharging them to EZI AG. A member of EZI AG's F&C group reported that Hurcik chose this path because leaving EZI AG global costs in the local offices was company policy for tax reasons: "it is our policy to leave as much expenses in the offices as possible to minimize the tax on profit." He added: "I know what you [the Controller] want, but I don't believe I can give you a justification which you (respectively the tax auditors) are happy with."

34

185.   In 2010, EZI USA and EZI AG were reminded that EZI USA could not properly claim deductions for all of the global costs.  A member of EZI AG's F&C group, in a June 2, 2010 e-mail, wanted all costs for a global partner meeting in Chicago to be included on the "Misc" tab of Schedule C, and thus left entirely with EZI USA for tax purposes.  The EZI USA Controller responded that "This could very well be an issue with an audit, therefore I am not comfortable [putting it on the Misc tab]."

186.   The F&C group member responded in an August 20, 2010 e-mail that EZI AG's CFO Hurcik still wanted the costs left with EZI USA for tax reasons.  He wrote: "Coming back to our discussion about the central costs for the PM [*i.e.*, Partners Meeting] held in Chicago, we would like that as much costs as possible stay in your local accounts (of course using the corporate ones).  This is for tax reasons. …"  In the end, in this instance, EZI USA kept only the charges for the EZI USA partners as local costs.

187.   EZI USA continued to keep for itself, and deducted, the global charges on the Schedule C "Misc" tab through at least the end of its tax year ending on October 31, 2011.

188.   For each of EZI USA's tax years from November 1, 2003 through October 31, 2011, EZI USA provided data to its tax preparer that described the "ADM" or "Misc" global costs as the expenses of EZI USA, expecting that the tax preparer would use those global costs as deductions on EZI USA's tax returns, which it did.

189.   EZI USA did not share the Schedule C spreadsheets with its tax preparer.

190.   In each year, EZI USA was capable of informing the tax preparer that not all of the "ADM" or "Misc" global costs were deductible by EZI USA.  EZI USA, however, did not inform the tax preparer of that fact.

191.    For tax year ending on October 31, 2012, EZI AG's F&C group finally agreed to allow EZI USA to recharge to EZI AG the global costs on the Misc. tab of Schedule C.

**IV.    EZI USA AND EZI AG DISREGARDED MULTIPLE INTERNAL WARNINGS THAT IT WAS COMMITTING TAX FRAUD, AND THEY REPEATEDLY MISLED GOVERNMENT TAX AUDITORS**

192.    Starting by at least the early 2000s, EZI USA and EZI AG received repeated internal warnings that it was illegally under-counting its taxable revenues from its joint assignments with foreign EZI AG offices.

193.    The issue of the discrepancy between fax charges and I/A billings came up one, two, or three times a year.

194.    In the early 2000s, the EZI USA Controller complained to EZI AG's CFO Hurcik that the way EZI USA was recognizing revenues from the joint assignments was both wrong and risky. Hurcik dismissed the concerns and expressed little faith in government auditors' ability to find the issue.

195.    In about the summer of fall of 2006, the EZI USA Controller had a lengthy conversation with EZI USA Co-Managing Partner Marc Schappell in which the Controller raised the fact that the company had accepted performance credit for a joint assignment with a foreign affiliate, but had not recognized the revenue from the project for tax purposes. The Controller explained that by doing so, EZI USA was cheating on its taxes and putting the company at risk. Schappell responded that it was ridiculous to take on that risk, especially because it had a small impact when its financial benefits were spread across all of the global partners. At the Controller's suggestion, Schappell agreed to take the issue up with EZI AG's Global Chairman and CEO Meiland. Schappell left the company shortly after that conversation.

196.    In approximately late 2006, the EZI USA Controller raised the issue of under-reporting taxable revenue with EZI AG's Global Chairman and CEO Meiland.

197.    The Controller informed Meiland that the company was under-reporting taxable revenue, which put the firm at risk. The Controller presented Meiland with a written analysis showing a multi-million dollar differential between revenues based on a comparison of fax charges and I/A billings. Meiland said he would give the matter some thought. He handed the analysis back to the Controller and said to destroy it.

198.    In March 2007, members of the EZI AG's F&C group took up the warning conveyed by Chairman/CEO Meiland. They noted in a March 24, 2007 e-mail that Meiland was concerned that many assignments that were done by US consultants in the USA are invoiced from other offices.

199.    By April 2007, the Controller raised the issue again, this time with one of the recently appointed Co-Managing Partners of EZI USA, Gabriel Sanchez Zinny. Sanchez Zinny reported that he had already heard about the issue and asked the Controller for his written recommendation on how to fix it.

200.    On April 11, 2007, the Controller responded to Sanchez Zinny by e-mail, saying that a solution was to issue I/A billings (which he referred to by their old name, OARs) for every fax charge, which would eliminate the under-reporting. Specifically, he stated the following:

> You asked me to provide a written recommendation regarding our use of
> OAR's (international assistance invoices). We know what the issues are so
> I won't get into them in this e-mail. My recommendation is short and
> succinct: I suggest that OARs are issued for all fax charges between
> foreign and US offices.

201.    Sanchez Zinny understood that the Controller was trying to comply with the tax and accounting regulations and was being very conscientious.

202.    After the Controller sent his e-mail, Sanchez Zinny, with the Controller in the room, called EZI AG's CFO Hurcik to raise the issue.  Hurcik, however, refused to hold the discussion, saying he did not think they should discuss it over the phone.

203.    The EZI USA Controller, on the same day, also warned Co-Managing Partner Sanchez Zinny that the tax violations subjected the company to the risk that a disgruntled employee might file a whistleblower claim against the company in the then-new IRS whistleblower program.  This subject arose because part of their discussion was about the possibility of firing one of the EZI USA finance employees.  After the conversation, the Controller e-mailed an article about the IRS whistleblower program to Sanchez Zinny.

204.    The next month, the issue of the undercounted revenues came up again during the F&C group's annual audit of EZI USA.  In a May 2007 draft of the internal audit report, the F&C group's Gnaegi recognized the disparity between fax charges and I/A billings, and suggested an increase in I/A billings "in order to minimize the possible negative tax impact."  The negative tax impact he contemplated was that the IRS would discover that EZI USA had been under-reporting its revenues and underpaying its taxes.

205.    The May 2007 draft audit report stated the following:

**International Assistance (I/A) Billings (for board only, will be on a separate memo)**

Over the past three years the International Assistance billings sent to and received from other offices decreased in comparison to the total Fax charges sent and received.  The future priority objective should be increasing the I/A billings with other offices (invoices sent and received) in order to minimize the possible negative income tax impact.  Another goal is to make the benefit of the use of the global EZI network for the offices in the USA official.

In order to keep the discussion secret, however, this language was not included in the final audit report.

206.    The separate memo to the board, dated June 5, 2007, highlighted and quantified
the disparity between the fax charges and the I/A billings.  It again proposed that a "future
priority objective" be "increasing I/A billings" with other offices "in order to minimize the
possible negative income tax impact," and it laid out a calculation of the disparities for the tax
years ending on October 31, 2004, 2005, and 2006 and part of the tax year ending on October 31,
2007.  For those years, it noted the following, among other things:

|  | 2003/04 | 2004/05 | 2005/06 | 2006/07 (April) |
|---|---|---|---|---|
| Fax charges sent | 6,478,748 | 8,919,988 | 13,222,888 | 6,090,012 |
| I/A billings sent | 0 | 1,861,739 | 2,104,056 | 74,900 |
| I/A billings in % to fax charges sent | 0% | 20.9% | 15.9% | 1.2% |

207.    On or about July 16, 2007, EZI USA signed and submitted federal, New York
State, and New York City tax returns for the tax year starting on November 1, 2005 and ending
on October 31, 2006.  Those returns were based on a report of "gross receipts or sales" that did
not count those revenues from services EZI USA performed in the United States on joint
assignments with foreign EZI AG offices where EZI USA had sent fax charges but not I/A
billings.  In addition, those returns were based on a report of deductions that included global
costs listed on the ADM tab of EZI USA's Schedule C spreadsheet.

208.    Despite the prior internal discussions, EZI AG continued to order I/A billings to
minimize tax liabilities.  In an October 30, 2007 e-mail discussing I/A billing for the Jakarta
office, one of the F&C group members noted, "the question is how much profit do we want to
show in Jakarta.  Last year we had a loss."

209.    In February 2008, as described above, the EZI USA Controller warned EZI AG's
CFO Hurcik and his F&C group that he could not justify to the IRS keeping the ADM/Misc

global costs with EZI USA and deducting them, but Hurcik required that the practice continue because he wanted to keep global costs in local offices for tax reasons.

210.    On or about July 15, 2008, EZI USA signed and submitted federal, New York State, and New York City tax returns for the tax year beginning on November 1, 2006 and ending on October 31, 2007. Those returns were based on a report of "gross receipts or sales" that did not count those revenues from services EZI USA performed in the United States on joint assignments with foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings. In addition, those returns were based on a report of deductions that included global costs listed on the ADM tab of EZI USA's Schedule C spreadsheet.

211.    Near the end of October 2008, the IRS began an audit of EZI USA's tax year ending on October 31, 2007.

212.    As the audit approached, EZI USA's Controller again raised his concerns with Sanchez Zinny, who was around the time concluding his role as a Co-Managing Partner of EZI USA. They discussed raising the issue with Brian Reinken, who around that time became the sole Managing Partner of EZI USA. The Controller learned that Sanchez Zinny had already informed Reinken that EZI USA had been under-counting revenues for tax purposes.

213.    In the Controller's conversation with Sanchez Zinny, Sanchez Zinny tried to quantify the amount of revenue that was being off-shored. The conversation with Sanchez Zinny was recorded, and included the following statements:

CONTROLLER:    OK. I just, I know Brian's [Reinken] coming in today and I just wanted to know if I—if you had that conversation or—

SANCHEZ ZINNY:    Yes, I did. Yes, I did. I did have the conversation with him. He asked me a question, that is, "How do we decide, if we decide, what is the reasonable amount? Is it something we have a discussion or we have, um, we have, uh, if you want, a target for the amount of our fax charges, I mean?"

CONTROLLER:        You mean for the amount of the—

SANCHEZ ZINNY:    How do we decide what is the reasonable amount?  You know, a million, two millions or three millions or whatever, that we, uh—how do we make that decision?  Or does it just happen to, you know—is it, just, you know—

CONTROLLER:        That's all handled by F&C.

SANCHEZ ZINNY:    You mean by Tomas [Hurcik]?

CONTROLLER:        Tomas and Kurt [Gnaegi], yeah.

SANCHEZ ZINNY:    OK.

CONTROLLER:        I understand—I think that they look at the overall picture and decide.

SANCHEZ ZINNY:    Ah, OK.  So it's them that decide [on I/A billing].  They decide for us.

CONTROLLER:        They decide for us, yeah.

SANCHEZ ZINNY:    But they don't check with you?

CONTROLLER:        Uh, no, no.  They'll only check like, if, uh, they'll sometimes say, "Oh, do you need cash or something."  And then they might do it for that reason.  But generally it's them who decide.

SANCHEZ ZINNY:    OK.

CONTROLLER:        So what was [Reinken's] reaction?

SANCHEZ ZINNY:    Well, I don't know.  He was very happy.

CONTROLLER:        Happy?

SANCHEZ ZINNY:    Yeah.  [Laughter].

CONTROLLER:        Yeah, that's because he's not gonna be in that meeting [with the IRS auditors].

SANCHEZ ZINNY:    Right, right, right. . . .  What time is he getting here?

CONTROLLER:        Brian?

SANCHEZ ZINNY:    Yes.

CONTROLLER:        I don't know.

SANCHEZ ZINNY:    All right.  All right.

CONTROLLER:        All right, I just wanted to make sure—

SANCHEZ ZINNY:    Yeah, yeah, yeah, I talked to him, I talked to him.

41

CONTROLLER:        OK.

SANCHEZ ZINNY:  Yeah.

CONTROLLER:        Thank you.

SANCHEZ ZINNY:  OK, bye-bye.

214.    The Controller then spoke with Reinken, and Reinken reported that he had

already been aware of the problem of shifting EZI USA billings to other countries to avoid taxes

and that he was fine with this as long as someone else signs the returns.  Reinken said that the tax

risk was the same in every geography, and was not just a U.S. risk.

215.    Rather than take action to fix the violations in 2008, Reinken did nothing about it,

and he advocated a wait-and-see attitude.  He said, "Let's see what comes out of this audit."

216.    The conversation with Reinken was recorded and included the following

statements:

CONTROLLER:  So, uh, I understand Gabriel [Sanchez Zinny] opened up the inner sanctum to
                      you, huh?

REINKEN:        Oh, about our shifting of billings to the appropriate geography for tax
                      reasons?  I was aware of that before, I just didn't know the magnitude.

CONTROLLER:  Oh, you were aware?

REINKEN:        Yeah.  We try to do searches even with office [inaudible] to figure out if we
                      should bill it in China or the U.S.

CONTROLLER:  You do?

REINKEN:        So I know it goes on.  I'm assuming that's what Tomas [Hurcik]—that's what
                      they do in Zurich.   They do some stuff in the United States, right?

CONTROLLER:  Yeah.  And decide which—

REINKEN:        Which for us is $1 million of fees which is applied elsewhere—

CONTROLLER:  Uh-huh.

REINKEN:        —that we don't have to pay taxes on.

CONTROLLER:  Right.

42

REINKEN:        I'd prefer that number to be a lot lower than a million.  So when is the [IRS] audit?

CONTROLLER:     It's starting on the 30th, a two-hour question-and-answer session.

REINKEN:        You and Gabriel?

CONTROLLER:     No, Gabriel won't be in it.  It will be me and [the partner from the outside accounting & tax preparation firm] on the telephone.

REINKEN:        I just told Gabriel I'm fine with that as long as he's the one signing the return. [He laughs].  I said, "Now, I have second thoughts about changing that ever. Why don't you just keep [signing] until you retire?"  Let's see what comes out of this audit.

CONTROLLER:     I mean, it is frightening because, you know they can spot something.  They could start asking for documentation, for billings.  And they focus on transfer issues.  It's obviously, you know, they're aware of that kind of stuff. . . .  You know, we talk about how global we are, how we're collegial, how we share. Meanwhile, we have hardly any of these things booked.

REINKEN:        So, we'll see.  The risk, I'm sure, is the same in every geography, too.  It's not just a U.S. risk.

CONTROLLER:     Right.  Well, some go the other way, so their auditors are not going to. . . [inaudible].  Did Gabriel tell you what Tomas said the first thing we got on the phone with him:  "I don't think we should be talking about this over the phone."  [Laughter].  That was a little scary. . .

REINKEN:        [Inaudible].  I'll mention that to Damien [O'Brien, EZI AG's new Global Chairman and CEO].  [Inaudible].  Yes, I was aware. . . .

CONTROLLER:     All it can take is one slip-up, you know?  [Inaudible].  And the thing is, it's planned, it's not a mistake.  You know, it's fraud when it comes right down to it. . . .

REINKEN:        So, I'll bring it up.

217.     Although Reinken promised to follow up with EZI AG's Global Chairman and

CEO, he does not recall doing so.

218.     On October 21, 2008, while the IRS audit was being discussed, the EZI USA

Controller also raised concerns with the F&C group's Gnaegi.  In an e-mail, the Controller wrote

that EZI USA's outside tax preparer, who also represented the company for the audit,

"mentioned that one of the highest audit priorities of the IRS is to examine transfer pricing.  He

43

is convinced that they will ask for documentation for the management fee, intercompany charges, etc. I thought a 'head's up' would help in case you wanted to get started on this."

219.    Gnaegi responded, in an October 24, 2008 e-mail that the Controller forwarded to Sanchez Zinny and Reinken, writing that EZI USA should "keep a low profile" about the I/A billings, and should describe the issues to the IRS in a way that would deflect attention away from fax charges and the under-reported income. Gnaegi wrote: "I/A billings: I would argue on a 'low profile' (if they will ask): that the EZI US are working primary for the local market and is providing support on some international assignments (to put it bluntly). Good luck!"

220.    At the opening conference for the IRS audit, on October 30, 2008, the IRS representatives asked EZI USA's representatives if there were any known errors or omissions on EZI USA's return. EZI USA answered "no."

221.    EZI USA's answer was false, for it had just been discussed within EZI USA and EZI AG that the tax return under-counted EZI USA's revenues.

222.    Also at the October 30, 2008 opening conference, the IRS representatives asked about the large related-party transactions shown on the tax return. EZI USA's answer was accurately reported by the IRS auditor as follows: "The number represents a sum of all payments that company received from related parties and payments paid to related parties. They don't have formal study for transfer pricing but the amount represents arm's length transactions at the fair market value."

223.    EZI USA's answer to the IRS representative was accurate in that the percentage splits agreed to with its foreign affiliates about the joint assignments represented arm's length transactions at the fair market value.

44

224.    EZI USA's answer to the IRS representative was otherwise misleading because it suggested that the amounts shown on the tax returns showed the totality of the related party transactions, when, in fact, they represented only a portion of them—those where there had been I/A billing.

225.    In about early November 2008, as part of the audit, the IRS representatives posed several questions to EZI USA, including a request for an explanation of the fees sent and received among EZI offices.

226.    In response to the questions, EZI USA sent a letter dated November 26, 2008 to the IRS, signed by Sanchez Zinny, stating the following:

> Egon Zehnder shares client revenue in transactions where the US assists or is assisted by an Egon Zehnder office outside the United States. Revenue "sent" or "received" is determined based on each office's relative contribution to the client engagement. This method approximates the *profit split method*. …
>
> The methods selected represent the best method for determining the intercompany transfer price. The company did not consider any alternative method for calculating the transfer prices. …
>
> The company's procedure for sharing client revenue when assistance is received to/from another (non-US) office. Requires the following information to be maintained in the file engagement or invoice:
> ➢ Dates of interviews and participating interviewers and interviewees
> ➢ Location and name of the company where the interviews took place, and
> ➢ Copies of the proposal and/or engagement letter.

227.    The letter was accurate in that EZI USA did agree to percentage splits with its foreign affiliates for the joint assignments, and in that those splits were the best measure of each office's relative contribution to the engagement. The letter, however, was false in suggesting to the IRS that EZI USA had reported on its tax returns the revenues from all of the split fees. In fact, EZI USA reported on its returns only a fraction of those revenues: only the ones from joint assignments where there was I/A billing.

228.    EZI USA knew not to mention the fax charges to the IRS because EZI AG had instructed it to conceal the existence of the fax charges.  Those instructions came not only from EZI AG's Finance Manual, but also directly from EZI AG's F&C group.

229.    While EZI AG and EZI USA were working on the response to the IRS that was contained in the November 26, 2008 letter, the F&C group's Gnaegi, in a November 25, 2008 e-mail, instructed EZI USA to misdirect the IRS to the I/A billings only, and to say as little as possible about EZI USA's income from joint assignments with foreign EZI AG offices. Specifically, he wrote the following:

> I would comment that you send and/or receive invoices for cross-border (international) assignments.  The less you write the better it is.  You should document I/A invoices with supporting documents of the office that sent you the invoice (e.g. copies of interview records, proposal and confirmation letter, etc.).  On the other hand you should have copies of assignment documents of which you sent invoices to other offices.

230.    Gnaegi was instructing EZI USA to mislead the IRS by describing the fax charge process as if it resulted in the gross receipts or sales listed in the tax returns, and by giving examples of I/A billing while claiming that they were representative of all joint assignments with foreign offices, when he knew they were not.

231.    EZI USA's tax preparer worked on the November 26, 2008 letter, but without knowing about the fax charge system.  The relationship partner at the tax preparer firm testified that he would not have recommended submission of this letter to the IRS had he known that EZI USA used the fax charge system to measure performance on international assignments and that the fax charge system captured international assignments that were not accounted for by the I/A billing.

232.    Even though Reinken was told in October 2008 that the company had not been properly accounting for its transactions with other EZI AG offices, in November 2008, Reinken

signed a "Representation Letter" to a Swiss external auditing firm representing that the company

had properly recorded and disclosed such transactions.

233.    In the November 2008 Representation letter, Reinken represented the following:

In conformity with generally accepted accounting principles, we confirm,
to the best of our knowledge and belief, the following representations
made to you: …

The following have been properly recorded or disclosed in the financial
statements:
a. Related party transactions and related amounts receivable or payable,
including sales, purchases, loans, transfers, leasing arrangements and
guarantees …

234.    During the course of the IRS audit that was conducted in 2008, EZI USA and EZI

AG did not disclose to the IRS the existence or effect of fax charges.

235.    The IRS auditors concluded the audit without learning that EZI USA had earned

revenues from its work in the United States on joint assignments with foreign EZI AG offices

that were not counted toward EZI USA's taxable income for the tax year under audit.

236.    On or about July 15, 2009, EZI USA signed and submitted federal, New York

State, and New York City tax returns for the tax year for November 1, 2007 through October 31,

2008.  Those returns were based on a report of "gross receipts or sales" that did not count those

revenues from services EZI USA performed in the United States on joint assignments with

foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings.  In addition,

those returns were based on a report of deductions that included global costs listed on the Misc

tab of EZI USA's Schedule C spreadsheet.

237.    On or about July 15, 2010, EZI USA signed and submitted federal, New York

State, and New York City tax returns for the tax year for November 1, 2008 through October 31,

2009.  Those returns were based on a report of "gross receipts or sales" that did not count those

revenues from services EZI USA performed in the United States on joint assignments with foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings. In addition, those returns were based on a report of deductions that included global costs listed on the Misc tab of EZI USA's Schedule C spreadsheet.

238.    Together with its tax filings on or about July 15, 2010, EZI USA filed an election to carry back to its tax returns for the previous five years a net operating loss incurred during the tax year that ended on October 31, 2009. Accordingly, EZI USA effectively amended and restated its returns for the tax years going back to its returns for the tax year beginning on November 1, 2003 and ending on October 31, 2004.

239.    For each of those prior five tax years, on or about July 15, 2010, EZI USA submitted revised tax returns. Each of those amended returns were based on reports of "gross receipts or sales" that did not count those revenues from services EZI USA performed in the United States on joint assignments with foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings. In addition, those returns were based on reports of deductions that included global costs listed on the ADM or Misc tab of EZI USA's Schedule C spreadsheet.

240.    In late 2010, the IRS announced another audit, this one arising because EZI USA had reported a large net operating loss for the tax year ending on October 31, 2009, and had amended earlier years' returns, going back to tax year ending on October 31, 2004, to apply the loss retroactively.

241.    As the audit approached, the EZI USA Controller again raised with the F&C group's Gnaegi his concern that EZI USA had been under-counting revenues and thus cheating on its taxes. Gnaegi wrote that he was "optimistic" about the audit so long as the company did not show fax charges to the IRS because the "legal" books (that is, the general ledger and P&L

statement that excluded the fax charges) were fine.  He also did not expect an outsider like an

IRS auditor to know what to look for.

242.    This conversation was recorded, and the following statements were made:

CONTROLLER:  How are you?

GNAEGI:        I'm fine, yourself?

CONTROLLER:  I'm OK, thank you.

GNAEGI:        Yeah, OK.  Kind of stressed because of the tax audit?

CONTROLLER:  Yeah, that's not gonna be so pleasant, I don't think, huh?

GNAEGI:        Well, no, no.  I'm rather optimistic, I have to admit.

CONTROLLER:  You are?  Why is that?

GNAEGI:        As long as you don't show fax charges.  [Laughter].  You know, the legal
               books are fine.  I don't see a problem in the legal books.

CONTROLLER:  Oh, no, there's no problem in the legal books.  The problem would be if they
               start wondering why we do so little international—

GNAEGI:        Yeah, yeah.

CONTROLLER:  Right?  'Cause we are such a global firm, and we are so collegial, and we
               share, and blah, blah, blah.  Right?

GNAEGI:        Yeah, I know what you mean.  But he's an outsider, so he doesn't really know
               how we're working.  But of course we shouldn't underestimate them.

CONTROLLER:  No, I know, I know.  And then, of course, if they want to start getting samples
               of documents and stuff—

GNAEGI:        Yeah, yeah.  Files from assignments, and all that—

CONTROLLER:  We have to be careful about any references to fax charges.

GNAEGI:        Are they doing the audit in your office?

CONTROLLER:  Yeah, I tried—it's funny you asked that.  A couple of years ago we got a call
               from the IRS saying they wanted to do an audit.  And I told them, "Well, we
               have all of our audits handled out of Chicago, where our CPA firm is."  So
               they said, "OK, we'll transfer the audit over to our Chicago IRS audit—IRS
               office."  And it fell through the cracks.  We never heard from them again.

GNAEGI:        Ah, OK, OK.

| | |
|---|---|
| CONTROLLER: | So I tried to do the same thing this time, and [the relationship partner at the tax preparation firm in Chicago] was telling me that they changed the rules, whereby they don't change jurisdiction for the convenience of the CPA firm. They will stick to— |
| GNAEGI: | Oh, we have to adapt. |
| CONTROLLER: | —the office where the principal accounting function is occurring.  So unfortunately, it's gonna be held in New York. |
| GNAEGI: | Yeah, because . . . when we have an audit in Zurich, we always do it outside. It's much easier.  But if it's not possible, it's not possible. |
| CONTROLLER: | No.  I'm going to make sure though, that whatever—whatever documents they ask for, they do it in writing.  And I'm gonna try to do everything by either e-mail or sending them stuff rather than having them look through our files. |
| GNAEGI: | Ah, they do it out of the office.  They don't come in your office? |
| CONTROLLER: | Well, he's coming in our office next week.  He's coming in on Thursday for a two-hour question-and-answer session. |
| GNAEGI: | Ah, OK, OK. |
| CONTROLLER: | So that's the start. |
| GNAEGI: | I see, I see.  Depending on your answers— |
| CONTROLLER: | Yeah— |
| GNAEGI: | —they may be so happy that, "Oh, that's all right." |
| CONTROLLER: | Hopefully, I should—maybe I should not drink too much water so I don't perspire that day. |
| GNAEGI: | Yeah, yeah.  [Laughter]. |

243.    On or about January 24, 2011, EZI USA copied the letter that it had sent to the IRS on November 26, 2008, changed the signature line to have it signed by Alan Hilliker, an officer of EZI USA and the head of its New York office, and sent the letter again to the IRS auditor purporting to explain its revenue recognition practices for the new audit.

244.    The letter was false for the same reasons the 2008 version had been false, as described above.

245.    On January 26, 2011, EZI USA's Controller met with Greig Schneider, who had recently become EZI USA Co-Managing Partner.  The Controller again raised his concerns that the company was engaging in tax fraud and that the tax auditors might discover the problem.  He told Schneider that the company had for years been "deliberately understating profits" as a "conscious effort" to save on taxes.  Schneider's response was not to fix the problem, but to plan to deny knowing about the issue if the company got caught, by saying to the IRS "we didn't realize that this is not OK."

246.    The January 26, 2011 conversation was recorded, and the following statements were made:

SCHNEIDER:      Fire away, what's happening.

CONTROLLER:  So, just on these audits.

SCHNEIDER:      Ah, ha, ha, ha.

CONTROLLER:  You know, I wanted to, you know, since you are the new head, we should …

SCHNEIDER:      So this is the IRS in here.

CONTROLLER:  Yeah.  This is the first time the guy is going to do a field audit.  He did an audit a couple of years ago, but basically did everything by e-mail, so . . .

SCHNEIDER:      So, he's actually in the building.  When's he coming?

CONTROLLER:  This Friday

SCHNEIDER:      OK. So this is the first one you've ever had?

CONTROLLER:  No, no.  We had one a couple of years ago, but we did it all electronically.

SCHNEIDER:      This is the first them they've been here, though.

CONTROLLER:  First time physically, yeah.  I mean, I met with the guy a couple of times last time, but what I tried to do was to keep them pushed down to our audit firm in Chicago and have them sort of do some of it too so that, you know, it keeps them out of here.

SCHNEIDER:      Right.

CONTROLLER:  Um.  So what I want to tell you is obviously very confidential and …

SCHNEIDER:   Right.

CONTROLLER:   ... and you may already be aware of some of this already, but are you aware of ... and I'm telling you this because you should know and you also are going to have to handle it very sensitively because I don't want to, I don't want to be a problem cause I'm telling you something.

SCHNEIDER:   If I'm leading the USA, it sounds like I've got to know anyway.

CONTROLLER:   So basically what we do from a revenue standpoint, fax charges, and then we have interoffice billings with different countries, different foreign countries ...

SCHNEIDER:   Yeah.

CONTROLLER:   We don't bill out in the US all the fax charges.

SCHNEIDER:   How does that, which is, so give me one more layer on that, so gimme, just use an example 'cause that'll help me figure it out.

CONTROLLER:   So let's say we're splitting a search with London, right.

SCHNEIDER:   Right. We're doing half the work, we're fax charging them and crediting ourselves internally for having executed it, but we're not, but they're billing it so it's living on their tax. They're being taxed. At the London tax rate, and we're not being taxed in the US. So the issue is, is that actually going to be OK with the IRS.

CONTROLLER:   Which it won't be.

SCHNEIDER:   OK.

CONTROLLER:   Obviously.

SCHNEIDER:   OK.

CONTROLLER:   So, you know, this has been going on for years.

SCHNEIDER:   But isn't that true in the other direction as well?

CONTROLLER:   Yeah, but it's all tax rate driven, and if you listened to the State of the Union last night, you know, we have a very high corporate tax rate in the US.

SCHNEIDER:   Yeah.

CONTROLLER:   So, F&C does their thing and decides which countries are going to get all the funds.

SCHNEIDER:   Ah, OK. So the likely outcome to expect is a big tax bill saying you're doing it wrong?

CONTROLLER:   If they find it. Yeah, or ...

SCHNEIDER:      OK

CONTROLLER:    ... potentially is it fraud because we deliberately understated profit.

SCHNEIDER:      Well we're, but, I, well ...

CONTROLLER:    They [the IRS] don't care about other countries.  They don't care if they're overstating profit in Switzerland because they have a 15% tax rate.  All they care about is the revenue here.

SCHNEIDER:      Right.  I guess we'll have to see what happens.  I'm running through in my head, you know, I'm defending myself, in my head.  But it doesn't matter.  There's a law and we'll find out, I guess.  Um.  So let me read this back.  Um.  Searches come in all over the world.  We tend to bill them where they come in.  Although, I guess what you're saying is maybe not.  If it came in here but we could bill it out of London at a lower tax rate we might bill it out of London and record those revenues in London even though we were working on them here.  The tricky part here, I'm sure the lawyers have to get involved, what I'm thinking is everything we do is global.  We're always involved in our colleagues and there's no way of recording that.  When I get in a huddle and I have people in ten different countries, what are we supposed to bill that time because that took, you know, I mean ...

CONTROLLER:    Here's the problem.  Why are we billing some of the fax charges and not all of them?

SCHNEIDER:      That's a good question.

CONTROLLER:    And that's the bottom line.

SCHNEIDER:      And why are we?  [Laughing]  Purely for tax reasons.  OK.  So did we know, I'm not a tax planner, so did we know we were doing this?

CONTROLLER:    Oh yeah, it's been going on ...

SCHNEIDER:      This was a conscious effort.  This is just a risk we've been taking for years and they've [the IRS] just never figured it out.

CONTROLLER:    And it's a very lucrative risk and we saved millions of dollars in taxes over the years.

SCHNEIDER:      OK.

CONTROLLER:    I'm sorry to raise this.

SCHNEIDER:      That's all right.  You know what, it's not my fault.

CONTROLLER:    [laughs]

SCHNEIDER:      So, I guess what's important that Switzerland, that everyone knows this, everyone knew, everyone knows and everyone's ready if the shit hits the fan.

Because what I don't what to have happen is do I, you know, is Damien [O'Brien, EZI AG CEO] saying what the hell is the US doing? Everyone knows what the hell the US is doing and we're all kind of hoping that we can keep doing it. Now, there's a whole other ...

CONTROLLER: Damien knows.

SCHNEIDER: Damien knows, Tomas [Hurcik] knows ...

CONTROLLER: Tomas knows.

SCHNEIDER: George knows. [George Davis, member of EZI AG Executive Committee]

CONTROLLER: I don't know if George knows.

SCHNEIDER: I'll brief George on it.

CONTROLLER: That's your call.

SCHNEIDER: Yeah, I'll let him know. He's going to know anyway. I mean, if the shit hits the fan, he'll know instantly cause the Executive Committee will be talking about it.

CONTROLLER: I knew. Brian [Reinken] knew. People have tried to change this too, and it's gotten nowhere.

SCHNEIDER: And who makes the decisions? It's a firm decision?

CONTROLLER: F&C decides.

SCHNEIDER: What's FNC?

CONTROLLER: Finance & Control. Hurcik's group.

SCHNEIDER: F&C. Oh, ampersand. I see, OK. All right. Well, you know what, I, uh, I, uh, should tell you to worry about that. I think, if we get . . .

CONTROLLER: I'm worried. I'm the one doing the. . .

SCHNEIDER: Of course, of course, and you should. But, um, you know, I'm sure our point of view will be, look, we didn't realize that this is not OK and tell us, you know, we'll work with you and our lawyers will work with your lawyers to figure out what is OK, and then we'll do it that way cause we have no choice. Right. I mean that's, uh.

CONTROLLER: So I'm gonna look like an imbecile?

SCHNEIDER: No, no. Well, to who though?

CONTROLLER: How could I not know?

| | |
|---|---|
| SCHNEIDER: | Yeah. Um. Well, you're part of the global system that brainwashed you. Um. [laughs] And I'm guessing they're going to find it. I mean, it's pretty lame if they missed it. |
| CONTROLLER: | Well, he actually mentioned to me that he wants to do some tests of transactions. Anytime you go and test the transactions, that's a red flag, that's like, OK, that's if he's got any brains, he's going to look at our sales register and say "OK, I want to see the back up for this, this and this." And chances are, you know, he's going to find it. |
| SCHNEIDER: | Right. There's definitely selling in the US. We're billing in the US. It's not like. Let me be clear. We're not making stuff up. We're only billing things in places where at least some of the … |
| CONTROLLER: | We're not making stuff up. |
| SCHNEIDER: | All right, so we're not saying, "we sold it in New York, we're doing all the work in New York, but we're billing out of London to save taxes." That would be awful. We're saying, "if we split it, we're doing an advantageous thing." Sometimes. |
| CONTROLLER: | Um. No. There could be times when the whole thing might be billed in London and we're recognizing the performance here. |
| SCHNEIDER: | You're right. So it could be like, for example, Siemens is an account run out of Germany, and there's global accounts, Bayer, is run out of Germany. Well, it's easier for our clients if we're billing it out of a central place, and we are, but as a result, the net of that is … Now that's interesting. You know, I don't know what the law is. I can see why we do it that … Taxes aside, we'd still want to do it that way from a client perspective. |
| CONTROLLER: | Yeah, but we have to recognize that revenue from a tax standpoint. |
| SCHNEIDER: | Yeah. OK. Good head's up. Thank you. |
| CONTROLLER: | Sorry to hit you with that. |
| SCHNEIDER: | No, that's, uh. |
| CONTROLLER: | I'm always concerned you know, there's somebody, there's people that know about this. A couple of the accountants … |
| SCHNEIDER: | Yeah. |
| CONTROLLER: | What if you have a spiteful employee someday and they blow the whistle. You know, the IRS pays money nowadays to report that, report a company, so, you know, that's another concern. |
| SCHNEIDER: | OK. [Laughs] Ooooh, baby, this is great. |

55

CONTROLLER:   Now Alan [Hilliker, head of the New York office] does not know.  He actually was asking what exposure we have, 'cause he signs everything, and I told him "you don't want to know," basically, and he kind of like, let it go.  So, I don't...

SCHNEIDER:    Well, the risks, well, if it starts Friday, we're going to know fast, but I will talk to George, um, because he's going to, you know ...

CONTROLLER:   You might want to, you may want to talk to Brian and see where he came from, came in on it, because I know that he, I'm pretty sure he spoke to Damien about it years ago.

SCHNEIDER:    OK.

CONTROLLER:   Gabriel [Sanchez Zinny] knew about it also.  [Indecipherable].  Now you can get some ...

SCHNEIDER:    Alright.  The bummer is that, I was just thinking what impact it will have on our margins.  We're immediately going to be taking a big step back if we have to change everything.

CONTROLLER:   Well, it doesn't affect performance.

SCHNEIDER:    Oh, you're right.  It's just, it's ...

CONTROLLER:   Performance will still be the same.  This is what we call a real, the real P&L [laughs].

SCHNEIDER:    I know.  Alright.  I gotta go because I've got to be at a lunch right now.  It's four doors down.  We can keep going and, because, you know, this is great, though, and this is very helpful and the main thing I wanted to hear, you know.  [laughs]

CONTROLLER:   You know, I'm really sorry to hit you with that...

SCHNEIDER:    No, don't be sorry.  Hey, you know what.  It's important to know, but we're all going to know soon anyway.

CONTROLLER:   Right. And if you talk to Hurcik, you gotta handle it, like, sensitively, 'cause I don't want him to come back to me and say what are you blurting this stuff out.

SCHNEIDER:    It's not blurting it out.  I mean, there's three people in the US who have to sign their names as officers, and I'm one of them.  I have to know this.  So there was no choice.  Um.  OK.  To be continued.  Thank you very much.

CONTROLLER:   Alright.  Good luck.  Thanks.

247.    While Schneider demonstrated an understanding of the situation the Controller described during the conversation on January 26, 2011, Schneider testified later that he did not understand the situation at the time because he does not understand accounting.

248.    While Schneider said in the conversation "I'm sure the lawyers have to get involved," he did not get any lawyers or outside accountants involved in evaluating or addressing the situation.

249.    Despite the Controller's explicitly raising in the January 26, 2011 conversation his concerns that EZI USA was deliberately understating profits for tax purposes in a way that would not be alright with the IRS, and despite the Controller's stating that he had brought the issue up previously, Schneider faulted the Controller for not bringing the issue up. Schneider testified, after hearing the recording of the January 26, 2011 conversation, that "if he [the Controller] felt we were doing something wrong, I mean wrong, wrong, he should have said something."

250.    The January 26, 2011 conversation was not the first time that Schneider had heard that the Controller was concerned about EZI USA under-reporting its revenues on its tax returns. Schneider testified that he already had the impression by that time that the Controller was concerned about the issue.

251.    During the course of the IRS audit, EZI USA did not disclose to the IRS the existence or effect of fax charges.

252.    The IRS auditors concluded the audit without learning that EZI USA had earned revenues from its work in the United States on joint assignments with foreign EZI AG offices that were not counted toward EZI USA's taxable income for the tax year under audit. On July 5, 2011, EZI USA and EZI AG learned about this audit result.

253.    In a July 6, 2011 e-mail, the F&C group's Gnaegi expressed relief to one of his colleagues, writing (translated from the original German), "You were not copied. The tax audit in the USA went smoothly up the stage .... again survived a year ..."

254.    On or about July 15, 2011, EZI USA signed and submitted federal, New York State, and New York City tax returns for the tax year for November 1, 2009 through October 31, 2010. Those returns were based on a report of "gross receipts or sales" that did not count those revenues from services EZI USA performed in the United States on joint assignments with foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings. In addition, those returns were based on a report of deductions that included global costs listed on the Misc tab of EZI USA's Schedule C spreadsheet.

255.    In about July 2011, Schneider had a non-accountant employee of EZI USA look for efficiencies in EZI USA's accounting practices. In a July 25, 2011 e-mail to Schneider, he reported 14 thoughts, of which the thirteenth was to "eliminate fax charge system" because it "causes much repetitive work for little apparent benefit. Other system should be capable of tracking local office performance with similar accuracy. Big behavior changes required." He did not, however, address fixing the tax problem, nor did he mention I/A billing.

256.    EZI USA did not act on the initial thought of eliminating the fax charge system as raised in the July 25, 2011 e-mail. It did not even share or discuss the list of initial thoughts or any resulting report with its new Head of Financial Operations after the EZI USA Controller was fired in November 2012.

257.    EZI USA could not, in any event, have eliminated the fax charge system unilaterally, for the system was required by EZI AG, including in the Finance Manual. The July 25, 2011 e-mail and its initial thoughts were not conveyed with EZI AG.

258.    In early October 2011, the EZI USA Controller yet again raised with Schneider his concerns about the under-reporting of revenues.  That conversation was also recorded and the following statements were made:

SCHNEIDER:        Interoffice invoicing is—you own—do you spend much time on that?  Fax charges, right?

CONTROLLER:    Fax charges, that's the whole thing.  Fax charges are different from interoffice invoicing.  That's the whole issue where we're not invoicing out all of our fax charges.  In fact, I put this together, too, just so you could see the exposure if we were to ever get called on this.  [At this point, the Controller handed Schneider a chart that detailed EZI USA's potential exposure for underreporting of income tax return revenue from 2004 through 2009.]

SCHNEIDER:        Now, can I ask you, since we just got the clean audit.  And they just looked at this, right?  We didn't hide anything from them.  I'm sure we weren't lying.  So the fact that they've looked at it year in, year out and not called us on it, does it give us any leg to stand on if they next time say, "Wait a minute, you can't do that?"  We'd say, "Wait a minute.  We told you we've been doing that forever."

CONTROLLER:    Um, it wouldn't be because it would basically be fraudulent.  We're understating income.

SCHNEIDER:        But they know we're doing this.

CONTROLLER:    No, they don't.

SCHNEIDER:        They don't know we're doing this.  And they did an audit and didn't find it?

CONTROLLER:    They didn't focus on the whole interoffice billing area.  [ . . .]

SCHNEIDER:        And so—so what's happening is—we're executing work that's being billed out of another office because that's where the clients are—for example British Telecomm.  We did a big search here for British Telecomm, London would book those revenues, not in New York.

CONTROLLER:    So we would have a fax charge showing performance revenue—

SCHNEIDER:        —for just internal recordkeeping, but not for tax purposes.

CONTROLLER:    Right.

SCHNEIDER:        But does it only go one direction?  Is it ever true that maybe it goes the other way, where AmEx—

CONTROLLER:    It sometimes goes the other way, but it primarily goes that direction because we're a high-income-tax country.

59

SCHNEIDER:      OK.

CONTROLLER:    So they call it tax planning in Switzerland.

SCHNEIDER:      OK, that's tax planning. And what are you doing on that other than tracking it and worrying about it?

CONTROLLER:    Um, well I—

SCHNEIDER:      I raised this. You know, I'm on the risk committee. And I raised this at the very first meeting. I said, "Is there some question about how we do this?" And they said "Oh, no, don't worry about it." This was just last partners' meeting. . . . I didn't want to get you in trouble, so I was a little bit vague, but I said, "Is there any issue with, you know" and they said, "Oh, we've looked at that. It's fine."

CONTROLLER:    It's not really fine because there are countries out there that have been audited and they had to change their methodology. In other words, they had to invoice out all their fax charges.

SCHNEIDER:      But there's nothing we can do. Either we start doing it to ourselves and paying or we wait 'till they tell us to start doing it and we start paying.

CONTROLLER:    Well, if they find it and start telling us to do it, they can then go back and say, "OK, well what have you done in the past and how come you haven't recorded all this revenue?"

SCHNEIDER:      Presumably we have a point of view that says, "That's not illegal, we thought we were doing it right."

CONTROLLER:    You want to go on the stand with that?

SCHNEIDER:      Well, I don't know. I guess this would be a good subject for next week maybe. I mean, no, I want to do it right. I don't have any intention of defrauding the U.S. government. I don't know how this stuff works. I know that when Dan Meiland, [a former global Chairman and CEO who was involved in Schneider's hiring,] explained to me one fine day where all the money went, my head was spinning in about five seconds. And it went on for, like, 45 minutes. . . . I'm not a finance guy. I can't get this stuff. I think it's important that we are—that we have a point of view that this is legal. [Laughter]. We have to be able to say, "We have a defense and we believe this is—" That we truly believe we can put up there.

CONTROLLER:    And what would that defense be?

SCHNEIDER:      I don't know. I don't know about the tax laws.

CONTROLLER:    I don't see how you can defend it, honestly.

SCHNEIDER:      All right, so what does Tomas [Hurcik] say?

CONTROLLER:   I've told them we should change it.  Other people—I think Brian [Reinken] told him.  Gabriel [Sanchez Zinny] had a conversation one time.  The three of us on the phone, and Tomas said, "We should get off the phone and not talk about this."

SCHNEIDER:   So he's ignoring it.

CONTROLLER:   Well, I think they like saving the taxes.

SCHNEIDER:   Of course they do.  But, um—

CONTROLLER:   With Tomas, you gotta be sensitive, too, because I don't want to be like, you know—

SCHNEIDER:   Well, Damien [O'Brien]'s . . . I feel like this is the time, right?  We just got a clean audit.

CONTROLLER:   Second time.

SCHNEIDER:   Second time.  So we've got time now for—some amount of time where we can kind of scale out of this.  And so in a year from now we could not be doing it.  If we decide to do it, now's the time because we won't be audited three months from now . . . Better to do that than to be right in the middle of doing it, and you know, so—OK.  So we need to—I need to talk to Damien.  He's gonna talk to Tomas.  So here's what's gonna happen.  We need to talk about it, obviously.  You're fairly concerned about it.  It makes me a little uncomfortable, but if someone is saying, "We shouldn't be talking about this on the phone," it's just silly.  We're making a lot of money.  We're 38-percent margins.  This is not a giant number.  This is the gap in the billing and there's a percentage of that.  So we're talking, what, a million?

CONTROLLER:   45 percent [*i.e.*, including federal, state and local taxes].

SCHNEIDER:   45 percent of $3 million [*i.e.*, for one year].

CONTROLLER:   Look at the grand total.  [referring to the $19 million-plus in unreported revenue for 2004 to 2009 shown on the analysis].

SCHNEIDER:   The total's big, but I'm saying, that's why we start doing it now.  We, you know, they're not gonna find something that's not there two years from now and go back in our books to see if we changed it, presumably.  Right?  I mean, I'm not suggesting we surrender.  I'm just saying, if we believe we're doing it wrong, let's have a plan for that.  But I want someone to tell me—I want Tomas to tell me—that this is legal.

CONTROLLER:   That should be interesting.  [Laughter].

SCHNEIDER:   So that's, um, I mean, this is simple.  At this level, it's simple.  And so I think I want to say . . . we can say that I asked you about this.  I wasn't sure how fax

charges worked.  And it came up last partners' meeting because of the Copenhagen, because we had this big exposure—

CONTROLLER:  That was discussed?

SCHNEIDER:  Yeah, it was put down as a key reason why we had to do that because they were worried that they're saying, "You guys effectively do have an Oslo office, but you're billing it out of Copenhagen.  So you're not paying taxes in Oslo."  We had this giant exposure.  So we need to open an office so that they don't come down on us.  So I think it's a perfect time, if there ever was a time to raise this, I think we do it now.  And I'm very comfortable when we're here in a week and a half [for a partners' meeting], saying, "Tomas, we just had this conversation a month ago.  I asked for an understanding. . . ."  You probably want to change the wording from "legal underbill" to difference— [referring to the analysis.]

CONTROLLER:  Well, that's just for you.

SCHNEIDER:  Yeah, exactly, but I don't want to have that in my possession.  [Laughter]. You know, shit.  What I'd ask for is, "Tomas, here's my official request to you.  I don't understand how it works.  Can you show me what we are executing but not billing.  So that I can just understand how that works and why we're not illegal."  And if our CFO globally—and I'll bring it up with Damien [O'Brien], too—and say, "I don't understand why this is not a problem.  I've asked our top finance guy in the U.S. and he tells me he's worried about it."  I need someone in this firm to explain to me—to say why it's fine.  I'll believe them.  I'm not an expert.  But, you know, I also don't like the idea that we're sneaking around.  'Cause I did ask.  I did ask, and I might not have asked the right questions.

CONTROLLER:  So that was in front of all the partners?

SCHNEIDER:  That was in front of all the partners—

CONTROLLER:  It could be that's why they didn't want to get into it because it wasn't a small group or something.

SCHNEIDER:  Don't know.

CONTROLLER:  They do try to contain this.

SCHNEIDER:  Yeah, all right.  So that's one thing that's sort of, high importance, not huge time.

259.    The Controller raised his concerns with Schneider yet again later in October 2011, calling it a "classic two sets of books" situation.  The conversation was recorded and included the following statements:

CONTROLLER:   You want to give me the low-down on Kurt, the Kurt Gnaegi conversation?

SCHNEIDER:   Um, yes, just remind me…

CONTROLLER:   You sent me an e-mail, but it seemed like there were more details, the audit persons review.

SCHNEIDER:   Oh yeah, there wasn't a lot more.  So basically what he said was, yeah, we thought that having the tax people and the audit people come in and, it said, usually they're different and so it's not a problem, but if it's the same person then they could be asking questions that, you know, it's just sort of, crossing the streams, you know in Ghostbusters, it's just that, you're right …

CONTROLLER:   I don't really get that.

SCHNEIDER:   I don't get that either.  Either it's OK or it's not.  And so, which is where it ultimately landed.  So I think we decided to push it back and I said well we have a lot going on here, I'm fine with pushing it back.  But my question is, are we doing anything that we shouldn't be doing, and he said "no, we're not doing anything we shouldn't be doing."  I said, "well, let me ask you this, are we going to change anything" because if we're not going to change anything, then we might as well do it now, you know, other than the fact that we have a lot going on at the office and stuff.  And so, I guess I need to work with you to make sure I go back with the right questions.  But that is, my impression was we are going to change something.

CONTROLLER:   Yeah, we are.

SCHNEIDER:   So …

CONTROLLER:   He probably didn't want to say it to you.

SCHNEIDER:   That's good.  So I'm good that we're changing something, I want to be doing things legally please.  And so, it's up to us when we do this.  This is an internally initiated thing and let's make sure we're doing things right and then …

CONTROLLER:   Yeah.

SCHNEIDER:   … and maybe whether it makes sense to get a different tax and audit firm.  I don't know.  I think, intuitively, it does make sense to have separate firms looking at these things.

CONTROLLER:   Why do you think that?

SCHNEIDER:   I don't know.  I just, expertise.  I don't know.  I mean, this is not my field.  So, I think, um…

CONTROLLER:   Cause I'm not real sure about that.  I know that they say, well, that we do that in other offices, but OK, that's OK, but why do you do it?  You know.  Cause it's not clear to me, but . . .

SCHNEIDER:    Yeah.  I don't know what other people do.  Typically, it's . . .

CONTROLLER:   Now, I'm just thinking a good question would be, well, "if we needed you to, would you be willing to sign the tax returns?"

SCHNEIDER:    Yeah.

CONTROLLER:   Let's see what the answer is.

SCHNEIDER:    Yeah.  I mean, they have to . . .  It's funny because I've asked everybody and I'll keep asking whenever our next partners' meeting is or risk committee meeting that I'm now on, and I just need to keep asking, but every time I ask, they say "no, no, no, we're not doing anything illegal.  It's fine."  So I say OK.

CONTROLLER:   It's so, wrong.

SCHNEIDER:    That's good.  What he said was...I don't know...

CONTROLLER:   He said we've got to start billing out more stuff ? [*i.e.*, issuing more I/A billings].  Did he mention that? ...

SCHNEIDER:    That implied that that would be the change.

CONTROLLER:   Cause we're not billing everything out now, and that would be the change, and that's going to be a lot more transactions going between countries.  Right now, we're not doing a lot, you know.  So we'd basically be doing a bill for every fax charge.

SCHNEIDER:    Oh, OK.

CONTROLLER:   So that, you know, the performance on the fax charges will be equal to the real bills that go into the books.

SCHNEIDER:    Even if the client doesn't see it that way, we would do that . . .

CONTROLLER:   Yeah, cause it's just us going back and forth between offices.

SCHNEIDER:    So basically, so the bottom line here just so I understand it is, we do a huge search that's billed out of London, because the client's in London.  It's executed entirely in the US, but it's billed out of London because, you can say, because the [inaudible conversation] is in London, but you can also say because the taxes are better if you bill out of London.  So the problem is, if the work's done in the US . . .

CONTROLLER:   So we do a fax charge . . .

64

SCHNEIDER:   So we should be taxed. I mean, so it's income to the US, but we're not treating it that way. We're treating it as income to London even though it's really income to the US.

CONTROLLER:   That's right.

SCHNEIDER:   And it's, internally, you know, we're treating it as income to the US because of the fax charge, but for tax purposes we're not.

CONTROLLER:   Right.

SCHNEIDER:   So for everything except taxes, we're saying this is a US revenue.

CONTROLLER:   So that's a classic two sets of books.

SCHNEIDER:   Yeah. So I know enough about the tax code to know I have no idea how it works and that in some cases you can do stuff like that, but I don't know if this is one of those cases.

CONTROLLER:   No. Absolutely not. Absolutely not.

SCHNEIDER:   OK. So, we should fix that. So then, um . . .

CONTROLLER:   And that's that schedule I gave you to show the . . .

SCHNEIDER:   Yeah. You know what I need for the next time I'm going to a risk committee meeting is a very simple example like the one I just described so I can ask them why it's OK. I mean, I just want to make sure I ask the right example and say, "how is this [pauses] legal?" [He laughs.] You know, I just make sure that, and you know, would you sign this piece of paper that says this is legal. I have it on tape because, all right.

CONTROLLER:   Tomas won't sign anything.

SCHNEIDER:   Yeah.

260.   After these many warnings, EZI USA finally started to think about fixing, but did not actually fix, its problem of under-reporting its revenues for tax purposes. It did not simply fix the problem, as it easily could have, by reporting its fax charge intercompany transactions to its tax preparer.

261.   By that time, EZI AG's offices in Germany had already been forced to address their own issues with under-reporting of revenues based on the disparity between fax charges and

I/A billings. EZI AG fixed the problem in Germany by requiring the German offices to issue an I/A billing for every fax charge.

262.    By April 2012, EZI AG's Risk Advisory Group, which included Schneider and Hurcik, addressed the under-reporting of revenue as a USA risk item described as "Tax internal revenue recognition issues." They assigned a "medium" level of exposure.

263.    Even while concerns about the under-reporting of revenue were finally getting some attention years after the issue was first raised within the company, EZI AG's F&C group was still focused on using I/A billings to manipulate taxes. For example, in a June 13, 2012 e-mail, a member of the F&C group asked the Mexico office not to send I/A billings to offices in certain countries because they "need to pay high taxes on those payments, therefore it is not preferable to charge them."

264.    On or about July 15, 2012, EZI USA signed and submitted federal, New York State, and New York City tax returns for the tax year for November 1, 2010 through October 31, 2011. Those returns were based on a report of "gross receipts or sales" that did not count those revenues from services EZI USA performed in the United States on joint assignments with foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings. In addition, those returns were based on a report of deductions that included global costs listed on the Misc tab of EZI USA's Schedule C spreadsheet.

265.    In a July 18, 2012 e-mail from a member of the F&C group to the EZI USA Controller, the F&C member wrote to the EZI USA Controller: "I have discussed this with Tomas [Hurcik] today. He agrees that you should charge [i.e., issue I/A billings for] as many fax charges as possible until the end of October. There are some exceptions mainly because of tax reasons. For example China or Brazil need to pay withholding taxes on top of such invoices

which we want obviously to avoid.  In the attachment I enclose a list with the offices which should not be charged with an I/A invoice."

266.    In a September 21, 2012 e-mail, a member of EZI AG's F&C group instructed another office to issue I/A billings because it was showing a loss and could shift that loss to another office that could then use it to lower its own tax liabilities: "Because of your negative operating profit I suggest you charge I/A invoices to other offices in September.  Is that ok?  You could charge Germany, London, Amsterdam, Zurich, USA, Canada, Australia, Singapore, Tokyo."  The office responded that "I already charged as much as I can, but the loss still have around CHF1 million," and the F&C member responded to that by saying "Please charge in any case the US."

267.    The EZI USA Controller continued to be frustrated by the company's continuing disregard of the tax violations, and with Schneider's unfulfilled promises to do something about the issue.  On November 26, 2012, he sent an e-mail to Schneider, once again complaining about the practices.  He stated the following:

> Greig:
>
> FY11 was finally going to be the last year where International Assistance (I/A) invoices were not issued for all fax charges.  After several conversations during FY12 you confirmed that I/A invoices should be issued for all fax charges.  Primarily due to the attached e-mail, this goal was not met [referring to a July 18, 2012 e-mail].
>
> I have stressed many times that the process cannot continue.  We must either:
>
> ·    Match 100% of fax charges with I/A invoices, or
>
> ·    Eliminate fax charges altogether and just issue I/A invoices
>
> The Firm continues to have a legal P&L (includes the I/A invoices) and a Performance P&L (includes fax charges).  Once this practice is stopped, the Firm would:

    ·     Be free to discontinue the use of the Performance P&L, the second set of books

    ·     Be able to change from a financial review to a financial audit

    ·     Be in a position to consider engaging a new accounting firm

    ·     Save time and increase efficiency in the accounting department

    ·     Eliminate the Firm's risk of a transfer pricing issue

I still have not received a copy of [outside consultant] Protiviti's review of our accounting department. I, of course, need to review their recommendations before they can be implemented. I suspect that some of their recommendations are not possible to implement because of the constraints of the Fax Charge process.

All of these items have been discussed in the past and I would like to get your confirmation that this practice will be stopped. The limitations presented in the attached memo are a problem. F&C must eliminate the restrictions of issuing I/A invoices with the countries on the attached document [the attachment to the July 18, 2012 e-mail]. If any country restrictions remain, shared searches between the U.S. and those restricted countries must be prohibited.

When I receive your confirmation that this practice has stopped, I will make the staff aware so these transactions can be recorded properly. This new policy must be implemented immediately so that we do not have even one transaction that does not comply.

I look forward to your response.

268.    The Controller forwarded the e-mail to EZI AG CFO Hurcik on November 29, 2012.

269.    The next day, November 30, 2012, EZI USA fired the Controller and had him escorted out of the building.

270.    At EZI AG's F&C group, the reaction to concerns about under-reporting revenues were dismissed out of hand because the company would have to pay too much in taxes if it fixed the problem.

271.    One member of the F&C group asked in an e-mail to Hurcik, if the company were to stop accepting fax charges that had no I/A billing issued, "How are we supposed to invoice Argentina, Brazil, India and certain other offices, or have them invoiced, for I/A Billings without having to pay huge taxes and/or VAT?"  He added, "We've got to be cautious here, otherwise we'll have a Wikileak on our hands.  Now I know why we had to disable [the EZI USA Controller's] login in [the data system]."  Hurcik responded: "Exactly, you've captured it!"

272.    By referring to having a "Wikileak on our hands," he was referring to the concern that the now-fired EZI USA Controller would blow the whistle on their tax fraud.  Wikileaks is an international organization that describes itself as a whistleblower organization and publishes news leaks and classified media provided by anonymous sources.  About one month before the EZI USA Controller was fired, Wikileaks had been in the news for disclosing files covering United States' rules and procedures for detainees in U.S. military custody.  About a year earlier, Wikileaks was in the Swiss, and global, news because of its role in publishing details of offshore Swiss bank accounts provided by a former executive of Bank Julius Baer.

273.    When the new Head of Financial Operations joined EZI USA in about April 2013, and took over the functions of the prior Controller, he was not told that there had been discussion about whether the company was accounting for cross-border work, that his predecessor had sent a lengthy e-mail raising concerns about the practice of booking revenue for cross-border work, nor that the practice of fax charging was being discussed at senior levels at the company.

274.    The new Head of Financial Operations did not learn that there were fax charges that did not have corresponding I/A billing until the end of 2013 or beginning of 2014, when he finally observed the difference for himself.

275.    After learning about the discrepancy between fax charges and I/A billings, the Head of Financial Operations started to question the F&C group about issuing I/A billings for all fax charges. Like his predecessor, he thought that all fax charges should have matching I/A billing so the company's tax returns and financial statements would be more accurate.

276.    Not until a meeting of EZI AG's Risk Advisory Group in mid-April 2013 was it decided that "basically all fax charges have to be followed by invoices [*i.e.*, I/A billing]."

277.    That decision came more than a decade after the former EZI USA Controller had first raised the company's violations.

278.    Despite the April 2013 decision, on or about July 15, 2013, EZI USA signed and submitted federal, New York State, and New York City tax returns for the tax year beginning on November 1, 2011 and ending on October 31, 2012 that reported "gross receipts or sales" that did not count the revenues from services EZI USA performed in the United States on joint assignments with foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings.

279.    By the end of the tax year, on October 31, 2013, EZI USA still had not sent I/A billings for all of the fax charges it sent.

280.    In November 2013, after EZI USA sent its financial data to its tax preparer for the tax year that ended on October 31, 2013 tax year, the tax preparer noted the sizable increase in EZI USA's "affiliate accounts receivable."

281.    That increase existed because EZI USA had issued substantially more I/A billings than it had done in the prior year.

282.    In explaining the increase in affiliate accounts receivable to the tax preparer, EZI USA continued to hide the existence of fax charges. It gave the tax preparer a false explanation:

"The increase is primarily due to timing of intercompany transactions this year vs. last year.  No new activity and no collectability issues.  We don't have an aging report for the intercompany AR [accounts receivable].  Let us know what other support you would like to see."

283.    The increase in affiliate accounts receivable was not primarily due to the timing of intercompany transactions compared to the prior year, it was due to the substantial increase in I/A billing.  That increase came in the wake of the firing of the former Controller who had repeatedly raised concerns about the issue, and once EZI AG realized it could have a "Wikileak on our hands."

284.    The tax preparer also noted an increase in "related party payables," which was also caused by the substantial increase in I/A billings as compared to the prior year.  EZI USA gave another false explanation:  "The increase is primarily due to timing of intercompany transactions this year vs. last year."

285.    The increase in related party payables was not primarily due to the timing of intercompany transactions compared to the prior year, it was due to the increase in I/A billing.

286.    In February 2014, the IRS announced that it was conducting an audit of EZI USA.  A member of the F&C group responded to the news:  "Well, I believe we all knew its going to happen one day."

287.    On April 21, 2014, the IRS requested from EZI USA "any Policy and Procedure Manuals and Internal Control Manual utilized by the organization with respect to revenue and expense recognition on a worldwide basis."

288.    EZI USA had such a policy and procedure manual: the EZI AG Finance Manual.

289.   Rather than provide the Finance Manual to the IRS auditors, EZI USA followed the instructions EZI AG had included in the manual's first page, and it concealed the manual from the tax agency auditors.

290.   On May 12, 2014, EZI USA sent a letter to the IRS auditor falsely claiming that there was no written policy manual. It stated as follows:

> [IRS request no.] DOM-003 requests that we provide any policy and procedure manuals and internal control manual utilized by the organization with respect to revenue recognition on a worldwide basis. We have an existing policy, while not written, with respect to revenue and expense recognition on a worldwide basis that has been consistently applied throughout the period under audit.

291.   Rather than reveal the existence of the Finance Manual, EZI USA's letter provided the IRS with an example "to explain the existing revenue and expense recognition policy." EZI USA was careful to use as a purported example a transaction where an I/A billing had been issued, and EZI USA attached exhibits that showed the I/A billing to suggest that all of its cross-border transactions were handled the same way.

292.   EZI USA's letter was false, first, because it asserted there was no written policy manual, when EZI USA had the written Finance Manual.  The letter was also false because it purported to describe all of its joint transactions with foreign EZI AG offices with its cherry-picked example, but it actually described only the subset for which EZI USA recognized the income for tax purposes, and it avoided mentioning the many transactions it had ignored for tax purposes.

293.   On June 17, 2014, the IRS made another request, designated "DOM-5," which asked for "Policy and Procedure Manuals, Internal Control Manuals, and/or other documents that relate to the manner in which Egon Zehnder International Inc. and any of its affiliates account for revenue and expenses on a worldwide basis during the 201110 & 201210, including but not

limited to the manner in which it allocated during any such year revenue and/or expense to

particular entities and/or countries for tax purposes or otherwise."

294.    This request called for EZI USA to disclose the Finance Manual to the IRS.

295.    EZI USA still did not disclose the Finance Manual to the IRS, and it still had not

disclosed the existence of the fax charges to the IRS.  EZI USA argued to the IRS that the

request was overly broad, and it offered to provide additional examples to "illustrate" its revenue

recognition practices.

296.    On or about July 15, 2014, EZI USA signed and submitted federal, New York

State, and New York City tax returns for the tax year for November 1, 2012 through October 31,

2013.  Those returns were based on a report of "gross receipts or sales" that did not count those

revenues from services EZI USA performed in the United States on joint assignments with

foreign EZI AG offices where EZI USA had sent fax charges but not I/A billings.

297.    On August 7, 2014, EZI USA sent a letter to the IRS responding to request

number DOM-5.  Once again, EZI USA denied having policy and procedure manuals and

referred to the "example illustrating revenue allocation among affiliates discussed in the May 12,

2014 response."

298.    On August 20, 2014, the IRS issued a new request asking for interviews about

EZI USA's methodology for allocating income from cross-border projects.  The next day, the

IRS issued a delinquency notice to EZI USA for failing to respond to the request DOM-5.

299.    In late August and through September, EZI USA raised the IRS' inquiries with

EZI AG, including with CFO Hurcik, with the Global Chairman and CEO, and with EZI AG's

board.

300.   During the course of the audit, EZI USA's Head of Financial Operations learned that the company's long-time outside tax preparer had never been informed about the existence of the fax charge system nor how the fax charges differed from the I/A billings. The Head of Financial Operations considered and discussed the possibility of informing the tax preparer, but the decision was made not to tell the tax preparer about the fax charge system.

301.   In about August 2014, EZI AG directed EZI USA to fire the outside tax preparer firm from work on the IRS audit, and EZI USA then carried out the instruction. The tax preparer did not learn until after this case was filed that EZI USA used a fax charge system or that EZI USA had revenues that had not been counted toward EZI USA's taxable income.

302.   Shortly before the tax preparer firm was fired, it made a suggestion that EZI USA did not want to hear: that EZI USA respond to the IRS' insistence on a policy manual by offering to allow the IRS to take a sample of engagement letters from the audit period to see if "the existence of intercompany fees match up."

303.   EZI USA knew that the numbers would not match up if the sample included transactions for which there were fax charges but not I/A billings.

304.   EZI USA's Head of Financial Operations responded to the tax preparer that "After much debate I have decided NOT to offer up the option of a report and a related sample selection. For the moment I would like to only offer up the additional explanation of the process and the related consultant evaluation process." [capitals in original].

305.   On September 29, 2014, EZI USA finally disclosed to the IRS the existence of fax charges, though it still did not provide the Finance Manual.

306.   In a September 29, 2014 letter from its counsel to the IRS, EZI USA described the fax charges and stated that "there has not always been consistent oversight to confirm issuance of

74

international invoices for all fax charges." In fact, there had been consistent oversight by EZI

AG's F&C group, which called for the issuance of I/A billings, often for tax reasons.

307.    The September 29, 2014 letter did not inform the IRS of the fact that the failure to

issue I/A billings meant that EZI USA was under-reporting its revenues in specific tax years.

Instead, the letter falsely suggested that the fax charges corresponded to the revenues the

company reported on its tax returns, even though they did not.

308.    The letter also stated that the policy for international invoices on fax charges was

"adopted many years ago" with respect to eight countries that imposed "discriminatory or high

developing country fiscal levies."

309.    In fact, the formal policy about the eight countries was not put into place until

July 2012, and the development of the fax charge system was unrelated to those levies, and had

affected transactions with dozens of other countries. Between EZI USA's fiscal years 2007 and

2013, for example, the fax charges EZI USA sent without accompanying I/A billing to those

eight countries accounted for only about 13% (by total dollars) of all such fax charges.

310.    In an October 7, 2014 letter to the IRS, EZI USA continued to deny that it had a

policy manual. It stated as follows:

> The Firm does not have any Policy or Procedure Manuals, Internal
> Control Manuals or other documents of similar import that relate to the
> manner in which the Firm and/or any of its affiliates "accounted for
> revenue and expenses on a worldwide basis" or "allocated revenue and/or
> expenses to particular entities and/or countries" during the years at issue,
> as further amplified in our September 29, 2014 memorandum.

In the letter, EZI USA again referred, again misleadingly, to the eight "off limits" countries as

the exception to its purportedly regular practices.

311.    Little more than a week after it disclosed the existence of fax charges to the IRS,

on October 8, 2014, EZI USA finally started requiring that I/A billings be issued for all of its fax

charges.  The EZI USA Head of Financial Operations wrote an email to all EZI AG offices saying, "Effective immediately, the US will be exchanging and settling IAs with ALL offices. This means that, regardless of past practices, we will be sending IAs to all offices and expect all offices to send IAs to the US."

312.    EZI USA's change of policy was motivated entirely by the facts that EZI USA was, and had been, required to recognize for tax purposes the revenues represented by the fax charges it sent, and that the IRS finally knew about fax charges.  As EZI AG's CFO Hurcik wrote in an e-mail on October 15, 2014, "You need to do all invoices [*i.e.*, I/A billing] with the US because the IRS is aware of these assignments.  There is no way around it."

313.    There had been no change in the tax laws or rules.  The only thing that had changed was that EZI USA's practices had been revealed to a tax agency.

314.    Had EZI USA wished to avoid under-reporting its income for tax purposes as far back as 2003, it could have insisted that I/A billings be issued for all fax charges.  It did not.

315.    EZI USA could also have avoided under-reporting its revenue for tax purposes by reporting on its tax returns its revenue from the joint assignments with foreign offices the same way it tracked them to measure performance—by using the fax charges rather than the I/A billings.  It did not do that either.

316.    By insisting that I/A billings be issued for all fax charges, EZI USA recognized that the fax charges are the most accurate measure of its revenues from its services performed in the United States on joint assignments with foreign EZI AG offices.

317.    EZI USA recognized that the problems that the IRS had finally discovered were the fault of EZI AG.  In an October 29, 2014 e-mail, EZI USA's Managing Partner Schneider

wrote about allocating the costs of the IRS audit: "I say they [EZI AG] eat them all - this is a problem they created, they should pay to clean it up."

318.    Schneider voiced the same view in a November 10, 2014 e-mail: "we see these expenses as necessary but not our fault" and "the vast majority of the work [the outside lawyers] and their teams are doing pertains to dealing with the fallout from global policies, and for that reason we feel it should be a global expense."

319.    On November 12, 2014, EZI USA finally shared the Finance Manual with the IRS. In the cover letter from its lawyers, EZI USA explained that it was producing the document at that time because they had obtained Swiss legal clearance to provide it.

320.    The November 12, 2014 letter was false. No Swiss legal clearance was necessary for EZI USA to produce the Finance Manual to the IRS because the document was already present in the United States, including at EZI USA's New York office.

321.    The IRS limited its audit to the tax years ending on October 31, 2011, 2012 and 2013. For those years under examination, the IRS concluded its audit by, among other things, assessing EZI USA for underpaying taxes on improperly deducted expenses with respect to its operating expense fax charges, and EZI USA concurred with the IRS's position.

322.    In March 2015, EZI promptly agreed to the IRS' assessment, fearing that further IRS investigation could lead to scrutiny of earlier tax years when the discrepancy between EZI USA's fax charges and I/A billings had been much greater.

323.    The tax years examined by the IRS were years when EZI USA had started to issue more I/A billings for its fax charges, and thus were years when its violations were not as egregious as in earlier years.

324.    EZI USA did not disclose to the IRS that it had a much higher volume of unreported fax charges from tax years before the one ending on October 31, 2011.

325.    EZI USA and EZI AG feared that the IRS might try to expand its audit to examine earlier years, and they strenuously argued against that expansion, for they knew it would lead the IRS to seeing a much higher volume of unreported revenues.

326.    As a result of the audit, EZI USA saw that it had the opportunity to amend some of its tax returns to claim certain credits or benefits that it had not claimed when it originally filed the returns.

327.    EZI USA, however, chose not to amend those returns to claim those credits or benefits.  In a May 6, 2015 email, EZI USA's Head of Financial Operations recommended against amending the returns because it could bring attention to corresponding underpayments in other countries.

328.    On June 4, 2015, the Head of Financial Operations expressed concern that admitting during the audit to any misstatements could open the door to the IRS' looking back at earlier years.

329.    To avoid those risks, EZI USA chose to consent to the IRS's audit result without challenge.

330.    The IRS did not expand the years under audit and closed the audit while having viewed only the tip of the iceberg.  The vast majority of EZI USA's unreported fax charge revenue had been kept from the IRS.

331.    Even though the IRS did not see more than the tip of the iceberg, it nevertheless never approved of, blessed, or condoned any practices that would allow a company like EZI

USA to avoid paying United States taxes by "off-shoring" its revenues or "on-shoring" the costs of its foreign affiliates.

332.    The IRS did not make a finding that EZI USA's tax returns were accurate, and it neither reviewed nor accepted as legal or appropriate EZI USA's historic treatment of fax charges.

## V.   EZI USA AND EZI AG MADE AND USED FALSE RECORDS AND STATEMENTS MATERIAL TO EZI USA's OBLIGATIONS TO PAY NEW YORK TAXES

333.    As described above, EZI USA and EZI AG made numerous false statements and records that affected, obscured and related to the amount of EZI USA's New York tax liabilities.

334.    Among the false records were EZI USA's tax returns for the New York taxes, which falsely reported EZI's taxable income and were material to the obligation to pay the New York taxes, and interest on the underpayment of the taxes, because they caused EZI USA to calculate tax liabilities that were lower than the amounts they owed.  These false records included EZI USA's annual and quarterly submissions to the New York State Department of Taxation & Finance and to the New York City Department of Finance.  These false records each included within them EZI USA's false statements, including its false statements of its gross receipts or sales and its deductions.  These false statements related to EZI USA's tax returns for all EZI USA tax years from its tax year ending on October 31, 2004 through at least its tax year ending October 31, 2013.

335.    EZI USA's false records also included its federal tax returns, which were submitted to the New York tax authorities along with the state and local returns.  Because the New York tax returns incorporated false information from the federal returns, the false statements that EZI USA made in its federal returns were material to its obligation to pay the New York taxes.  These false records included EZI USA's returns on IRS Form 1120 and IRS

Form 5472. These false records also included numerous false statements of EZI USA's revenues and deductions.

336.    Even though EZI USA made some of its false statements on its federal tax returns, its violations and EZI AG's violations do not raise any disputed or substantial federal issues, for there is no question that falsely understating revenues, overstating deductions, and underpaying taxes are violations under both federal and New York law. The State of New York and its courts are vested with the authority to enforce or adjudicate tax disputes even where they are related to statements made in federal tax returns.

337.    EZI USA also made and used false statements and records in connection with its communications with government tax auditors. As described above, throughout the course of the several tax audits, EZI USA made and caused to be made numerous false statements, many of which were to hide the existence of the fax charges and withhold from tax authorities the EZI AG Finance Manual.

338.    EZI USA also made and used false statements and records in connection with its communications with its own outside tax preparer. As described above, EZI USA each year reported false revenue and cost data to the tax preparer, while it knew that the tax preparer would use that data to prepare EZI USA's tax returns. Moreover, EZI USA gave false answers to the tax preparer when the tax preparer asked questions about apparent discrepancies in EZI USA's financial data.

339.    EZI AG caused all of EZI USA's false statements and records to be made and used. EZI USA's misconduct was the direct result of instructions from EZI AG, including EZI AG's global policies such as the ones embodied in its Finance Manual.

340.    EZI USA and EZI AG also made and used, or caused to be made or used, other false records or statements that were material to EZI USA's obligation to pay New York taxes.

341.    Plaintiff-Relator estimates that EZI USA and EZI AG have made or caused to be made approximately 1,000 knowingly false records or statements that were material to EZI USA's obligation to pay taxes to New York State and New York City.

## VI.    EZI USA KEPT NEW YORK TAX MONEY FOR ITSELF

342.    By falsely reporting its taxable income and calculating lower tax liabilities than it actually owed, EZI USA retained for itself monies that it was obligated to pay to the State of New York and the City of New York.

343.    EZI USA had the opportunity after filing its tax returns and other tax documents to amend those materials to accurately reflect its true revenues and costs.  Nevertheless, EZI USA chose not to do that.

344.    The time that EZI USA had available to it to amend its tax returns for the tax years at issue in this case has passed, and it is now precluded from amending those tax returns.  It is similarly precluded from asserting any arguments it may have for claiming additional reductions to its tax liabilities that it could have made had it amended its returns in a timely manner.  It cannot erase the fraud that was committed.

## VII.    EZI USA AND EZI AG ACTED WITH KNOWLEDGE

345.    EZI USA and EZI AG made the false records and statements with knowledge of their falsity, and EZI USA kept money with knowledge it belonged to the government.

346.    They had actual knowledge of the falsity.

347.    Under the New York False Claims Act, "knowledge" means any of actual knowledge, reckless disregard for the truth, or deliberate indifference to the truth.  EZI USA and EZI AG had knowledge under this standard.

348.     As described above, EZI USA and EZI AG engaged in overt schemes to cheat on EZI USA's taxes.

349.     EZI AG set specific policies for all its offices and subsidiaries, including for EZI USA, that served to allow them to understate revenues and to shift profits to other jurisdictions either to minimize taxable profits across different countries or to shift profits to lower-taxing jurisdictions.  EZI AG then administered those policies centrally for tax purposes.

350.     EZI USA implemented practices that overtly caused it to under-report its revenues and overstate its deductible costs.  It was careful to keep its own outside tax preparer in the dark about the false data it provided for the preparation of its tax returns, and it lied to government tax auditors to shield its violations from discovery.

351.     EZI USA and EZI AG continued their violations for years, despite the repeated warnings and their knowledge that they were hiding taxable income.

352.     In 2014, only after it became readily apparent to EZI USA and EZI AG that the IRS finally knew about its practices, did EZI USA discontinue its practices, though at the same time it continued to falsely describe the practices to the government tax auditors.  It was only then that EZI AG's CFO Hurcik announced: "You need to do all invoices [*i.e.*, I/A billing] with the US because the IRS is aware of these assignments.  There is no way around it."

353.     Throughout the more than 10 years that EZI USA and EZI AG were conducting their schemes, they could have, and they knew they could have, put an end to their violations quickly and easily.

354.     To stop the off-shoring of revenues scheme, all EZI USA had to do was provide the fax charge data to its tax preparer.

355.     To stop the on-shoring of global costs scheme, all it had to do was to give its tax preparer the information on the "ADM" or "Misc" tab of the company's Schedule C spreadsheet.

356.     Each year, EZI USA and EZI AG chose not to fix the problem, but to continue with the violations because otherwise, they would have had to pay more in taxes.

## VIII.   EZI USA AND EZI AG HAVE DAMAGED NEW YORK STATE AND NEW YORK CITY

357.     As a result of EZI USA's and EZI AG's misconduct, New York State and New York City have suffered millions of dollars of damages. They have lost not only tax revenues to which they were entitled, but they have also lost, and continue to lose, the use of that money as a consequence of EZI USA's non-payment and EZI AG's complicity in that non-payment.

358.     Up through the date hereof, New York State and New York City have been damaged by the conduct raised herein in the current amount of approximately $13.25 million, which amount is required to be trebled under the New York False Claims Act. In addition, EZI USA and EZI AG are liable for penalties under the New York False Claims Act.

359.     On its tax returns, EZI USA could have, but did not seek to reduce its taxable income by counting fax charges it received from EZI offices in foreign countries. EZI USA had no obligation to claim that tax benefit.

360.     For each tax return, EZI USA had three years within which to amend its returns to take advantage of that reduction. EZI USA let those three year periods expire without amending its returns to claim the reduction. Having allowed that time to expire, EZI USA can no longer assert any right to the reduction.

361.     Plaintiff-Relator seeks damages in this action for the False Claims Act violations by each Defendant within the False Claims Act's ten year statute of limitations.

## FIRST CAUSE OF ACTION

### Violation of New York False Claims Act
### N.Y. State Fin. Law § 189(1)(d)
### (against EZI USA)

362.    Plaintiff-Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

363.    Defendant EZI USA violated State Finance Law § 189(1)(d) in that it has had possession, custody, or control of money to be used by the State of New York and the City of New York and knowingly delivered, or caused to be delivered, less than all of that money. Specifically, EZI USA, by knowingly reporting artificially reduced taxable income and paying taxes based on the artificially reduced figures, has retained the possession of, and has not paid tax money that was due to be paid in New York State corporate franchise taxes, MTA Surcharges, and New York City general corporation taxes for use by the State and local governments.

364.    As a result of this conduct, Defendant EZI USA has retained monies belonging to New York State and New York City and deprived the State and City governments of tax monies and interest thereon.

365.    The thresholds set forth in State Finance Law §§ 189(4)(i) and (ii) are satisfied because EZI USA has had net income or sales in excess of one million dollars for one or more of the tax years at issue, and the damages pleaded in this action exceed three hundred and fifty thousand dollars.

## SECOND CAUSE OF ACTION

**Violation of New York False Claims Act**
**N.Y. State Fin. Law § 189(1)(g)**
**(against EZI USA and EZI AG)**

366.   Plaintiff-Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

367.   Defendants EZI USA and EZI AG violated State Finance Law § 189(1)(g) in that they knowingly made, used, or caused to be made or used, false records or statements material to EZI USA's obligations to pay or transmit money to the State of New York and the City of New York.  Specifically, Defendants, with knowledge, made or used, or caused to be made or used, false tax returns and other statements and records that were false in that they misreported EZI USA's revenues, deductible costs and taxable income.  Such forms, statements, and records were material to Defendant EZI USA's obligations to pay New York State corporate franchise taxes, MTA Surcharges, and City of New York general corporation taxes.

368.   As a result of this conduct, Defendants have damaged New York State and New York City by depriving them of tax monies that were due to be paid, plus interest thereon.

369.   The thresholds set forth in State Finance Law §§ 189(4)(i) and (ii) are satisfied because Defendants have had net income or sales in excess of one million dollars for one or more of the tax years at issue, and the damages pleaded in this action exceed three hundred and fifty thousand dollars.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of the State of New York and itself, demands and prays that judgment be entered against Defendants EZI USA and EZI AG, for violations of the False Claims Act as follows:

A.    Declaring, pursuant to CPLR § 3001, that Defendants' practices and conduct have violated N.Y. State Finance Law § 187, *et seq.*;

B.    Enjoining and restraining Defendants from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme, artifice, or device similar to, or having a purpose and effect similar to, the conduct complained of above;

C.    Directing that Defendants, pursuant to the False Claims Act, N.Y. State Finance Law § 189, pay an amount equal to three times the amount of damages sustained as a result of Defendants' violations of the New York False Claims Act;

D.    Directing that Defendants, pursuant to N.Y. State Finance Law § 189, pay the maximum penalties for each violation of the New York False Claims Act;

E.    Awarding Plaintiff-Relator the maximum amount available under N.Y. State Finance Law § 190(6) for bringing this action;

F.    Awarding costs of $2,000 against each Defendant pursuant to CPLR § 8303(a)(6);

G.    Directing that Defendants pay Plaintiff-Relator's fees and costs, including attorneys' fees as provided by law;

H.    Directing such other equitable relief as may be necessary to redress Defendants' violations of New York law; and

I.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff-Relator hereby demands a trial by jury of any issue of fact triable of right by a

jury.

DATED:    New York, New York
             July 12, 2021

                               Respectfully submitted,

                               KIRBY McINERNEY LLP

                               By: _____
                                 Randall M. Fox
                              250 Park Avenue, Suite 820
                              New York, New York 10177
                              (212) 371-6600
                              rfox@kmllp.com

                              *Counsel for the Plaintiff-Relator*