**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK ex rel. AMERICAN ADVISORY SERVICES LLC,<br><br>　　　　　　　　*Plaintiff-Relator*,<br><br>　v.<br><br>EGON ZEHNDER INTERNATIONAL, INC. and EGON ZEHNDER INTERNATIONAL AG,<br><br>　　　　　　　　*Defendants*. | Case No. 1:21-cv-06883 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

Dated: October 7, 2021
　　　New York, New York

Randall M. Fox
KIRBY McINERNEY LLP
250 Park Ave., Suite 820
New York, NY 10177
(212) 371-6600
rfox@kmllp.com

*Counsel for Plaintiff-Relator American
Advisory Services LLC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

THE ALLEGATIONS IN THE AMENDED COMPLAINT ...........................................3

    A.    EZI USA's New York Tax Obligations ................................................3

    B.    The False Records and Statements EZI USA Made and Used ...................4

    C.    The Materiality of EZI USA's False Records and Statements ...................5

    D.    EZI USA Acted Knowingly ....................................................................6

ARGUMENT ....................................................................................................................12

    I.    Plaintiff Sufficiently Pled Each Element of the NYFCA Violations .................12

    A.    Plaintiff Sufficiently Pled the "Obligation" Element ..................................13

    B.    Plaintiff Sufficiently Pled the "Falsity" Element ........................................14

    C.    Plaintiff Sufficiently Pled the "Materiality" Element ..................................16

    D.    Plaintiff Sufficiently Pled the "Knowing" Element ....................................20

    II.    Plaintiff Pled Single Damages of $13.25 Million (So Far), Which Exceeds the $350,000 Pleading Threshold ....................................................22

    III.    Plaintiff Has Pled Only Violations that Occurred Within the Statute of Limitations ....................................................................................................23

    IV.    Defendants Claim "Incurable Defects" but Identify None, and the Liberal Rules for Repleading Apply ................................................................25

CONCLUSION .................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ....................................................................12

*Anonymous v. Anonymous*,
   165 A.D.3d 19 (1st Dept. 2018) ...............................................................17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................12

*Elias v. Rolling Stone LLC*,
   872 F.3d 97 (2d Cir. 2017) .......................................................................12

*Lewkowitz v. InterContinental Hotels Grp. Res. LLC*,
   No. 20 Civ. 7759, 2021 WL 2810059 (S.D.N.Y. July 6, 2021) ...............12

*Lynch v. City of N.Y.*,
   952 F.3d 67 (2d Cir. 2020) .......................................................................12

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) .....................................................................15

*N.Y. ex rel. Empire State Ventures, LLC v. Sprint Nextel Corp.*,
   26 N.Y.3d 98 (2015)..................................................................................21

*N.Y. ex rel. TZAC, Inc. v. New Israel Fund*,
   520 F. Supp. 3d 362 (S.D.N.Y. 2021) ......................................................16

*Palin v. N.Y. Times Co.*,
   940 F.3d 804 (2d Cir. 2019) .....................................................................12

*Total Asset Recovery Servs. LLC on behalf of State v. MetLife, Inc.*,
   189 A.D.3d 519 (1st Dept. 2020) .............................................................24

*U.S. ex rel. Feldman v. Van Gorp*,
   674 F. Supp. 2d 475 (S.D.N.Y. 2009) ......................................................22

*U.S. v. Johnson*,
   No. 19-CR-88, 2020 WL 2404909 (E.D. Cal. May 12, 2020) ................16

*U.S. v. Kimberly-Clark Corp.*,
  No. 14 Civ. 8313, 2017 WL 10439690 (C.D. Cal. Nov. 30, 2017)........................................15

*U.S. v. Shun*,
  No. 16-CR-75, 2021 WL 3778932 (W.D.N.Y. Aug. 25, 2021) ...........................................16

*U.S. v. Spectrum Painting Corp.*,
  No. 19 Civ. 2096, 2020 WL 5026815 (S.D.N.Y. Aug. 25, 2020)........................................22

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
  579 U.S. 176 (2016) ..................................................................................................15

**Statutes**

26 U.S.C. § 61(a)..................................................................................................................13

26 U.S.C. § 162(a)................................................................................................................14

N.Y. State Fin. Law §§ 187, *et seq*.......................................................................................1

N.Y. State Fin. Law § 188(3)..............................................................................................20

N.Y. State Fin. Law § 188(5)...........................................................................................6, 16

N.Y. State Fin. Law § 189(1)(d)............................................................................................3

N.Y. State Fin. Law § 189(1)(g)............................................................................................3

N.Y. State Fin. Law § 189(4)(a)..........................................................................................22

N.Y. State Fin. Law § 190(2)(b)..........................................................................................23

N.Y. State Fin. Law § 190(8)...............................................................................................23

N.Y. State Fin. Law § 190(c)(ii)..........................................................................................23

N.Y. State Fin. Law § 190(c)(iii)(B) ...................................................................................23

N.Y. State Fin. Law § 192(1-a)............................................................................................12

**Rules**

13 N.Y.C.R.R. § 400.6 .........................................................................................................23

Federal Rule of Civil Procedure 15(a)(2) .........................................................................25

**Other Authorities**

*Webster's Third New International Dictionary* 904 (1981) .........................................................15

Plaintiff-Relator American Advisory Services LLC ("Plaintiff") submits this memorandum of law in opposition to the motion by Defendants Egon Zehnder International, Inc. ("EZI USA") and Egon Zehnder International AG ("EZI AG," together "Defendants"), made pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss this action.[1]

## INTRODUCTION

In this action, Plaintiff seeks to recover for New York millions of dollars in tax monies that were lost due to EZI USA's and EZI AG's violations of the New York False Claims Act (the "NYFCA"), N.Y. State Fin. Law §§ 187, *et seq*. Plaintiff alleges in extraordinary detail the schemes that EZI USA, at EZI AG's direction, employed to falsely report its revenues and costs to calculate and pay artificially low amounts of taxes to New York. The Amended Complaint, which spans 87 pages and 369 paragraphs and describes internal documents and legally recorded conversations, clearly demonstrates that Defendants made false records and statements about their New York tax obligations, knew at the time that their records and statements were false, and caused EZI USA to keep for itself tax monies that belonged to New York.

In their motion to dismiss, Defendants were unable to present a basis for dismissal of Plaintiff's actual claims and factual allegations. Instead, they created a "straw man" claim they attribute to Plaintiff, and they ignored nearly every allegation set forth in the Amended Complaint. Defendants thus created not only a second set of books, but a second set of arguments. When Defendants' subterfuge is stripped away, Defendants have no arguments for dismissal.

Defendants' fallacious argument is that Plaintiff is claiming that EZI USA violated

---

[1] Defendants once again use their brief to speculate about the members of Plaintiff American Advisory Services LLC, to cast aspersions, and to make threats. None of these efforts are relevant to the present motion to dismiss and Plaintiff does not address them here. Plaintiff reserves the right to address these matters at the appropriate time.

federal tax law's "transfer pricing" rules by allocating revenues and costs between EZI USA and its foreign affiliates using values that were not arm's-length values. Having built up this false description of Plaintiff's claims, Defendants then proceed to knock it down like a straw man.

Plaintiff's real claims and allegations are not about allocation of revenues or costs, nor about transfer pricing. In fact, Plaintiff alleged that EZI USA properly allocated the revenues and costs with its foreign affiliates using arm's-length values, and described that both sets of its books used the very same allocations of revenues and costs.

Plaintiff's actual claims are that, *after* it allocated the revenues and costs, EZI USA falsely reported them on its tax returns, knew it falsely reported them, and underpaid New York taxes by millions of dollars. In fact, even though EZI USA had been allocated substantial amounts of revenue for many of its assignments, it pretended for tax purposes to have earned zero dollars for its services on those assignments. It is these tax reporting violations that Plaintiff describes in detail in the Amended Complaint. Tax returns that fail to report revenue or that overstate costs are false.

Without their fallacious straw man argument, Defendants have no motion. All of their arguments flow from this central mischaracterization of Plaintiff's claims. Defendants argue, for example, that Plaintiff did not sufficiently plead the "obligation" element of a NYFCA violation because Plaintiff did not spell out the transfer pricing rules. Of course, that is not the obligation pled in the Amended Complaint because it is not the obligation alleged to have been violated. The real obligations alleged were for EZI USA to pay three separate New York taxes and to report all, not some, of its revenues, and report only its own, and not someone else's, deductible costs in connection with those taxes.

Because Defendants' motion is entirely premised on Defendants' transfer pricing fallacy,

2

it must be denied.

## THE ALLEGATIONS IN THE AMENDED COMPLAINT

In the Amended Complaint, Plaintiff pled each of the elements of its NYFCA causes of action. The NYFCA "(g)" claim is about one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government." N.Y. State Fin. Law § 189(1)(g). The (d) claim is about one who "has possession, custody, or control of property or money used, or to be used, by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property[.]" *Id.* at § 189(1)(d).

In their motion, Defendants do not challenge Plaintiff's claim that EZI AG violated the NYFCA by causing EZI USA to make and use the false records and statements alleged. The discussion here is thus focused on EZI USA's NYFCA violations. (Defendants do make a distinct statute of limitations argument for EZI AG, which is addressed below.)

### A. EZI USA's New York Tax Obligations

At paragraphs 36 to 46 of the Amended Complaint, Plaintiff pled that for each of the tax years addressed by EZI USA's false statements and records,[2] EZI USA had an obligation to pay New York State corporate franchise taxes, Metropolitan Commuter Transportation Mobility Taxes, and New York City general corporation taxes. Plaintiff further pled that, in connection with those taxes, EZI USA was required to report its already-allocated revenues from all, not just some, of its joint assignments with its foreign affiliates, and to report only its own deductible costs, and not costs belonging to others.

---

[2] Plaintiff alleges that, within the 10-year limitations period before this action was filed, EZI USA made false statements and records about its 2004 through 2013 tax years. (Am. Compl. [ECF No. 1-5] ¶ 2; henceforth, references to the Amended Complaint will appear as "¶ __").

3

### B.  The False Records and Statements EZI USA Made and Used

Plaintiff pled that EZI USA made and used false records and statements. (¶¶ 333-41). It alleged that EZI USA's federal, state, and local tax returns were false because they omitted already-allocated revenues from many joint assignments, and that the returns were prepared using false internal reports of EZI USA's "gross receipts and sales." The returns were also false because they inflated EZI USA's deductible costs with costs not belonging to it, and they too were prepared using false reports. (¶¶ 207, 210, 236, 237, 238, 254, 264, 296, 334-35).

The tax returns were not the only false records and statements. Plaintiff also alleged that the revenue and cost documents and data that EZI USA provided to its outside tax preparer were false because they under-reported EZI USA's revenues and over-reported its deductible costs. (¶¶ 85-94). Plaintiff further alleged that EZI USA made false statements to its outside tax preparer to conceal the falsity of its revenue reporting, including by giving false explanations to the outside tax preparer when it asked questions that should have revealed EZI USA's scheme. (¶¶ 280-85, 338). Plaintiff also alleged that EZI USA's monthly and annual "Residual Schedule C Eliminations" spreadsheets were false statements and records, for on them EZI USA falsely recorded global costs as if they belonged to EZI USA, and used that false information for tax preparation. (¶¶ 151-91). Finally, Plaintiff alleged false statements made to IRS auditors to conceal the scheme, including in 2008, 2011, and 2014, when it misled auditors in an effort to conceal its false reporting of revenues. (¶¶ 220-35, 243-44, 251-52, 286-332, 337).

Plaintiff further alleged how EZI USA accomplished its scheme to falsely report revenues by using two sets of books. For each joint assignment, EZI USA and its affiliated office agreed at the start of each assignment on a percentage fee split to divide the revenues. (¶¶ 54-57). After work was completed on the joint assignment, EZI USA recorded the revenues from each and every one in its "performance books" using an invoice mechanism they called "fax charges,"

which were so-named because they were once sent by fax machines. (¶¶ 3, 58-73). EZI USA used its performance books to operate its business, including by evaluating the performance of its offices and personnel, but at EZI AG's direction, it kept them hidden from outsiders. EZI AG similarly used those performance books to evaluate EZI USA and its offices and personnel. (¶¶ 74-80). EZI USA maintained a second set of books, its so-called "legal books," that was incomplete because it recorded the already-allocated revenues from only some of the joint assignments. The "legal books" included the revenues only from those few joint assignments where international assistance billings, or "I/A billings," were issued between the offices, omitting revenues from the many other joint assignments. EZI USA used the incomplete "legal books" to prepare its tax returns, and thus under-reported its revenues. (¶¶ 111-15, 142). Both sets of books relied upon the same fee splits to allocate revenues for the joint assignments; the difference was that the "performance books" reported the revenues for all of the joint assignments, and the "legal books" did not. (¶ 114).

Plaintiff also alleged how EZI USA accomplished the scheme to over-report its deductible costs. Plaintiff described how EZI USA used its "Residual Schedule C Eliminations" spreadsheet to present global costs as belonging to EZI USA for tax purposes. On its tax returns, EZI USA falsely deducted foreign affiliates' costs that were listed on the spreadsheet's "ADM" tab during the time that A. Daniel Meiland was the global CEO and Chairman. After Meiland retired, it continued using the same tab that way, but renamed the tab as "Misc." (¶¶ 151-91).

### C. The Materiality of EZI USA's False Records and Statements

In the Amended Complaint, Plaintiff pled that EZI USA's false records and statements were material to EZI USA's obligation to pay the New York taxes. The false records and statements were about EZI USA's revenues and costs, which are components of the annual calculation of its liability for the New York taxes. (¶¶ 44, 81, 99, 333-34). By under-reporting

revenues and over-reporting deductible costs, EZI USA directly affected, and understated, their liability for those taxes. In the words of the NYFCA, the false records and statements had the "natural tendency to influence, or [were] capable of influencing" the government's receipt of tax money. *See* N.Y. State Fin. Law § 188(5).

In addition, Plaintiff pled that, by falsely reporting its revenues and deductible costs and thereby calculating artificially low tax liabilities, EZI USA retained for itself monies that it knew it was obligated to pay to New York. (¶¶ 342-44).

### D. EZI USA Acted Knowingly

At paragraphs 192 to 332 of the Amended Complaint, Plaintiff pled that EZI USA acted knowingly at the times it made and used the false records and statements and when it kept New York tax monies for itself. Plaintiff referred repeatedly to Defendants' own documents and recorded conversations in which EZI USA's highest officials and EZI AG finance personnel demonstrated actual knowledge that EZI USA was filing false tax returns as part of Defendants' standard policies and practices. At a minimum, this evidence demonstrated Defendants' reckless disregard or deliberate ignorance of the truth.

EZI USA knew it was falsely over-reporting its deductible costs no later than 2002, when EZI USA's most senior financial employee, its Controller, raised with EZI AG's global CFO Tomas Hurcik that global costs incurred by EZI USA should be recharged to EZI AG and not deducted in full on EZI USA's tax returns. Hurcik took several months to respond, but he rejected the idea because the change might catch the attention of the tax authorities. (¶¶ 166-70).

EZI USA knew it was falsely under-reporting revenues no later than the summer or fall of 2006, when the Controller told EZI USA's Co-Managing Partner Marc Schappell that EZI USA was cheating on its taxes and putting the company at risk by failing to count all revenues for tax purposes. (¶¶ 195-98). In late 2006, the Controller raised the same issue with EZI AG's

global CEO and Chairman Meiland, to whom he presented a written analysis showing a multi-million dollar differential between revenues based on a comparison of fax charges and I/A billings. Meiland handed the analysis back to the Controller and said to destroy it. The companies took no action to fix the problem. (¶¶ 196-97).

The Amended Complaint describes numerous subsequent communications where EZI USA's and EZI AG's leadership were informed of and recognized that EZI USA was reporting false revenues and costs on its tax returns. Around early 2007, EZI AG rebuffed the Controller's efforts to accurately report costs because "it is our policy to leave as much expenses in the offices as possible to minimize the tax on profit[]" and "I know what you want, but I don't believe I can give you a justification which you (respectively the tax auditors) are happy with." (¶ 184).

In 2007, the Controller recommended to an EZI USA Co-Managing Partner that the under-reported revenue problem be eliminated by issuing I/A billings for all fax charges, but CFO Hurcik refused to discuss the issue by phone, and the company did not implement the recommendation. (¶¶ 199-202). Later in 2007, a memo to the EZI AG board quantified the under-reported revenues and recommended that the company increase I/A billings as a way to reduce the under-reporting "in order to minimize the possible negative income tax impact." (¶¶ 204-06).

In February 2008, the Controller told global CFO Hurcik that he could not justify to tax authorities keeping the global costs on EZI USA's books and deducting them, but Hurcik required that the practice continue. (¶ 209).

In late 2008, as the first of three IRS audits was getting under way, the Controller raised the under-reported revenue issue again with two EZI USA Co-Managing Partners, this time in

recorded conversations. One said he was happy he did not sign the returns, and he admitted that he "was aware of that before" about "our shifting of billings to the appropriate geography for tax reasons[]" so "we don't have to pay taxes on[]" them. The Co-Managing Partner added, "[s]o I know it goes on. I'm assuming that's what Tomas [CFO Hurcik]—that's what they do in Zurich." The Controller expressed that "we have hardly any of these things [revenues from the joint assignments] booked [*i.e.*, used for tax return purposes]." While the Co-Managing Partner promised to bring the issue up with EZI AG's new global CEO, Damien O'Brien, he did not follow through, and the companies again took no action to fix the problem. (¶¶ 214-16). EZI AG's advice for that upcoming audit was to "keep a low profile" about the unreported revenues, adding "the less you write the better it is." (¶¶ 218-19, 229-30). EZI USA followed EZI AG's instructions, and the IRS auditors did not find the problem. (¶¶ 234-35).

As the second IRS audit was getting under way, EZI AG was optimistic that the IRS auditor would not learn about the unreported revenues "[a]s long as you don't show fax charges[,]" because the auditor was an "outsider" who "doesn't really know how we're working." (¶¶ 241-42). In January 2011, the EZI USA Controller reported to new Co-Managing Partner Greig Schneider about the under-reported revenue because "potentially it is fraud because we deliberately understated profit[,]" that "it's all tax rate driven," and that "obviously" it was "not going to be OK with the IRS." He was specific: "Here's the problem. Why are we billing some of the fax charges and not all of them?" When Schneider responded: "That's a good question[,]" the Controller added "[a]nd that's the bottom line." When Schneider asked "did we know we were doing this?", the Controller responded "Oh yeah, it's been going on . . . ," and Schneider interrupted: "This was a conscious effort. This is just a risk we've been taking for years and they've [the IRS] just never figured it out[,]" to which the Controller responded, "And

8

it's a very lucrative risk and we saved millions of dollars in taxes over the years." (¶ 246). Rather

than seek to fix the problem, Schneider mapped out a plan to lie again to the IRS if it discovered

the long-standing problem, stating:

> Of course, of course, and you should. But, um, you know, I'm sure our point of
> view will be, look, we didn't realize that this is not OK and tell us, you know,
> we'll work with you and our lawyers will work with your lawyers to figure out
> what is OK, and then we'll do it that way cause we have no choice. Right. I mean
> that's, uh.

When the Controller responded, "So I'm gonna look like an imbecile?" Schneider responded

"Yeah. Um. Well, you're part of the global system that brainwashed you." Schnedier then

laughed. Schneider thanked the Controller for a "[g]ood head's up." (¶¶ 245-46). Once again, the

IRS auditors did not discover the under-reported revenues and the company did not fix the

problem. (¶ 252).

In October 2011, the Controller gave Schneider a written analysis of EZI USA's tax

exposure from the under-reported revenues for the years 2004-2009, and notified Schneider that

the company could not rely on the prior audit as approval of EZI USA's conduct because "it

would basically be fraudulent. We're understating income." He added "It's not really fine

because there are countries [*i.e.*, Egon Zehnder affiliates] out there that have been audited and

they had to change their methodology. In other words, they had to invoice out [*i.e.*, issue I/A

billing] all their fax charges[]" and "I don't see how you can defend it, honestly." With the recent

audit over, Schneider saw an opportunity to change the company's conduct. He said:

> So we've got time now for—some amount of time where we can kind of scale out
> of this. And so in a year from now we could not be doing it. If we decide to do it,
> now's the time because we won't be audited three months from now . . . Better to
> do that than to be right in the middle of doing it, and you know, so—OK. So we
> need to—I need to talk to [CEO] Damien. He's gonna talk to [CFO] Tomas. So
> here's what's gonna happen. We need to talk about it, obviously. You're fairly
> concerned about it. It makes me a little uncomfortable, but if someone is saying,
> "We shouldn't be talking about this on the phone," [as Hurcik did] it's just silly.

(¶ 258). Schneider spelled out what he would ask the CEO and CFO:

> What I'd ask for is, "Tomas, here's my official request to you. I don't understand
> how it works. Can you show me what we are executing but not billing. So that I
> can just understand how that works and why we're not illegal." And if our CFO
> globally—and I'll bring it up with Damien [O'Brien], too—and say, "I don't
> understand why this is not a problem. I've asked our top finance guy in the U.S.
> and he tells me he's worried about it." I need someone in this firm to explain to
> me—to say why it's fine.

(*Id.*). Referring to the written analysis of EZI USA's tax liabilities, Schneider said, "I don't want
to have that in my possession[]" and he returned it to the Controller. (*Id.*).

Schneider did not fulfill his promise to talk to the CEO and the CFO and to demand an
explanation of how EZI USA's under-reporting of its revenues could be legal. Instead, he spoke
with the same EZI AG finance employee who directed EZI USA to "keep a low profile" with the
IRS auditors, who told Schneider merely that "we're not doing anything we shouldn't be doing,"
and "implied" that the practices would change by issuing I/A billings for every fax charge. (¶¶
219, 259). In a subsequent discussion, the Controller told Schneider that the response was
insufficient and that EZI USA was using a "classic two sets of books." When Schneider asked if
"you can do stuff like that," the Controller said "No. Absolutely not. Absolutely not." (¶ 259).
The company again failed to take action to fix the problem.

The Controller stated in a November 26, 2012 e-mail that was shared with EZI USA's
and EZI AG's leadership, "I have stressed many times that the process cannot continue. We must
either: • Match 100% of fax charges with I/A invoices, or • Eliminate fax charges altogether and
just issue I/A invoices. The Firm continues to have a legal P&L (includes the I/A invoices) and a
Performance P&L (includes fax charges)." (¶ 267). On November 29, 2012, the Controller
forwarded the same e-mail to CFO Hurcik, and on the next day the Controller was fired and
escorted out of the building. (¶¶ 268-69). Almost immediately after that, a member of CFO
Hurcik's EZI AG team asked how they were supposed to invoice offices in several countries

without having to pay "huge taxes" if they had to issue I/A billings for every fax charge. He added, referring to the recently-fired Controller, "We've got to be cautious here, otherwise we'll have a Wikileak on our hands. Now I know why we had to disable [Controller's] login in [the data system]." CFO Hurcik responded: "Exactly, you've captured it!" (¶ 271).

Defendants' misconduct continued after the Controller was fired despite Defendants' clear knowledge from years of warnings about and recognition of the falsity of EZI USA's tax returns and other documents. In November 2013, for example, EZI USA misled its outside tax preparer about increases from the prior year in EZI USA's "affiliate accounts receivable" and "related party payables" to hide that the increases were caused by EZI USA's finally issuing I/A billings for more of its fax charges. (¶¶ 280-85).

Defendants also misled IRS auditors in 2014 during the third audit, which examined EZI USA's 2011-13 tax years. Among other things, EZI USA falsely described to the IRS auditors its process for recognizing revenues, and for an extended time even falsely denied the existence of the Egon Zehnder Finance Manual. (¶¶ 286-320). Within about a week of EZI USA's finally disclosing to the IRS auditors the existence of the fax charges, while still falsely describing them, EZI USA finally started requiring I/A billings for all fax charges. (¶ 311). EZI AG's CFO Hurcik wrote in an e-mail on October 15, 2014, "You need to do all invoices [*i.e.*, I/A billing] with the US because the IRS is aware of these assignments. There is no way around it." (¶ 312).

On the basis of these allegations, Plaintiff asserted in the Amended Complaint a cause of action under NYFCA subsection (g) against both EZI USA and EZI AG, and a cause of action under NYFCA subsection (d) against EZI USA.

# ARGUMENT

## I.    Plaintiff Sufficiently Pled Each Element of the NYFCA Violations

Defendants' 12(b)(6) motion to dismiss must be denied because Plaintiff's Amended Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At issue on a 12(b)(6) motion is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *See also Lewkowitz v. InterContinental Hotels Grp. Res. LLC*, No. 20 Civ. 7759, 2021 WL 2810059, at *2 (S.D.N.Y. July 6, 2021).

In deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809-10 (2d Cir. 2019) (citing *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020) (citing *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)).[3]

As described above, Plaintiff has alleged in detail each of the elements of the NYFCA Section 189(1)(d) and (g) violations asserted in the Amended Complaint.

---

[3] Defendants make passing reference to the particularity requirement of Rule 9(b) (Def. Mem. at 11), but they do not, and cannot, argue that Plaintiff failed to specify the false records and statements, or the who, what, when, where, and why about them. In any event, the NYFCA does not require pleading of specific records or statements if the facts alleged "provide a reasonable indication" that violations likely occurred. *See* N.Y. State Fin. Law § 192(1-a).

## A. Plaintiff Sufficiently Pled the "Obligation" Element

In their motion to dismiss, Defendants argue that Plaintiff has not sufficiently pled the obligation element of a NYFCA violation because, they say, transfer pricing obligations cannot be established until after the IRS exercises its discretion to adjust a taxpayer's allocations with foreign affiliates. (Def. Mem. [ECF No. 21] at 12-14). Defendants' obligation argument is a straw man because Plaintiff did not allege transfer pricing violations or obligations.

As described in Plaintiff's memoranda on its remand motion (ECF Nos. 12 and 25), Plaintiff's allegations are that on its tax returns and elsewhere EZI USA falsely reported its revenues by excluding previously allocated revenues from many of its joint assignments, and falsely reported its deductible costs by including costs already allocated to its foreign affiliates. Plaintiff alleged the allocations were correct, not that they violated transfer pricing rules. Plaintiff incorporates herein the arguments from its memoranda on the remand motion.

Stripped of their straw man argument, Defendants do not challenge Plaintiff's obligation allegations. As Plaintiff alleged, the obligations were for EZI USA to pay the New York taxes and accurately report its revenues and costs. These obligations to accurately report arose from black letter law. For revenues, federal tax law defines "gross income" as including "all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services[] . . . ." 26 U.S.C. § 61(a). EZI USA did not comply with this obligation because it reported less than "all income" when it reported "gross receipts and sales" on its tax returns that left out its revenues for performing its services on many of the joint assignments.[4] Also under the Internal Revenue Code, a business can deduct its "ordinary and

---

[4] Defendants acknowledge that EZI USA's revenues from the joint assignments were not foreign income by arguing that the rules for determining the source of foreign income do not apply. (Def. Mem. at 15-16). Accordingly, all of the revenues that were correctly allocated to EZI USA were U.S. income.

necessary expenses paid or incurred during the taxable year in carrying on any trade or business .

. . ." 26 U.S.C. § 162(a). No provision permitted EZI USA to deduct anyone else's costs.

### B. Plaintiff Sufficiently Pled the "Falsity" Element

In their motion, Defendants entirely ignore the numerous and detailed allegations that

EZI USA made and used false records and statements. Defendants tellingly do not confront, for

example, the specific allegations that the "gross receipts or sales" that EZI USA reported on its

tax returns were false by failing to include revenues from many of its joint assignments. They

similarly do not address the many allegations that EZI USA misled IRS tax auditors by

concealing that there were assignments whose already-allocated revenues were not reported.

To make their falsity argument, Defendants mischaracterize the allegations to assert that

Plaintiff "essentially concludes that the mere existence of fax charges—internal metrics that

roughly tracked the performance of consultants—makes the revenue numbers reported false[,]"

adding that this is an "incorrect assumption." (Def. Mem. at 14). In other words, they make a

factual denial that cannot be resolved on a motion to dismiss. In any event, Plaintiff did not

allege that the existence of fax charges made the reported revenue on the tax returns false. The

tax returns were false, on the revenue side, because EZI USA failed to count its revenues from

many of the joint assignments. (¶¶ 207, 210, 236, 237, 238, 254, 264, 296, 334-35). In fact, the

fax charges for any joint assignment, rather than being the rough tracking of performance, were

in the exact same amounts as the I/A billings (in instances when they were issued) because they

were based on the very same fee split allocations. Accordingly, the fee split allocations were the

same for both sets of books, but the reporting was not.

Defendants offer no argument about the falsity Plaintiff alleged with respect to EZI

USA's deductible costs.

14

Defendants otherwise argue EZI USA's records and statements must not be false because they do not relate to a particular law or rule. According to Defendants, Plaintiff "never identifies any tax statute, rule, or regulation that would render EZ USA's tax returns false." (Def. Mem. at 14-16). Under Defendants' argument, a tax return is not false, and apparently is true, if it reports gross receipts or sales of $100, when the actual gross receipts or sales were $200. Defendants appear to forget that something can be false simply because it is not true, regardless of any reference to a statute or rule. As the Second Circuit has commented with respect to the federal False Claims Act:

> Regarding the third element, the term "false or fraudulent" is not defined in the Act. A common definition of "fraud" is "an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." *Webster's Third New International Dictionary* 904 (1981). "False" can mean "not true," "deceitful," or "tending to mislead." *Id.* at 819.

*Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001), *abrogated on other grounds by Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016). *See also U.S. v. Kimberly-Clark Corp.*, No. 14 Civ. 8313, 2017 WL 10439690, at *8 (C.D. Cal. Nov. 30, 2017) ("To plead falsity, a relator must allege that the facts presented are not true[;]" finding that falsity was sufficiently pled where defendant represented product met industry standards when it did not). Defendants appear to be confusing the distinction that some courts have drawn between claims that are "legally false" and "factually false," but even those cases conclude that both types of claims satisfy the falsity element. *See, e.g.*, *Mikes*, 274 F.3d at 697.

In arguing that falsity can only exist if a law, rule, or regulation is referenced, Defendants again promote their straw man argument about transfer pricing, for they spend most of their argument describing the transfer pricing rules that Plaintiff did not identify. (Def. Mem. at 14-

16). Once again, the claims here are not about transfer pricing, and the falsity of EZI USA's records and statements is unrelated to transfer pricing.

### C. Plaintiff Sufficiently Pled the "Materiality" Element

Under the NYFCA, "'Material' means having a natural tendency to influence, or be capable of influencing the payment or receipt of money or property." N.Y. State Fin. Law § 188(5). Accordingly, the materiality question in this case is whether EZI USA's false statements on its tax returns and elsewhere had the natural tendency to influence or were capable of influencing New York's receipt of tax monies.

Plaintiff alleged that EZI USA's false statements about its revenues and costs were material to New York, for they were about components of the calculation of EZI USA's New York tax liabilities. The relationship between the false statements here and New York's receipt of money is purely mathematical: by under-reporting revenues and over-reporting deductible costs, EZI USA calculated artificially low tax liabilities and underpaid New York taxes. The falsity alleged in this case thus had not only the natural tendency to influence New York's receipt of money, it was certain to influence it. *See N.Y. ex rel. TZAC, Inc. v. New Israel Fund*, 520 F. Supp. 3d 362, 385 (S.D.N.Y. 2021) (finding "501(c)(3) status is material to the benefit it received from the state"). New York and the federal government devote substantial resources to enforcing tax laws against persons who misrepresent the inputs to their tax calculations because such misconduct is material to the government.[5]

Defendants ignore Plaintiff's allegations and the mathematical certitude that EZI USA's false reporting of revenues and costs influenced its New York tax liabilities. Instead, they again

---

[5] *See, e.g.*, *U.S. v. Shun*, No. 16-CR-75, 2021 WL 3778932, at *2 (W.D.N.Y. Aug. 25, 2021) (describing charges that defendant filed false tax returns that understated "gross receipts or sales"); *U.S. v. Johnson*, No. 19-CR-88, 2020 WL 2404909, at *2 (E.D. Cal. May 12, 2020) (same).

promote the transfer pricing fallacy, arguing that purported unidentified statements about transfer pricing allocation obligations were not material to the IRS because the IRS exercised its judgment to find no transfer pricing violations. (Def. Mem. at 17-18). Once again, Defendants' transfer pricing straw man argument is misplaced because the claims here are not about whether EZI USA used arm's-length values in allocating revenues and costs.

Defendants appear to argue that, even outside of its transfer pricing argument, the IRS in the third audit, which examined tax years 2011-2013, for all time "blessed" EZI USA's reporting of false revenues and costs on its tax returns. That factual argument would be misplaced because it is based on Defendants' disputed version of the facts about the third audit. While the IRS did not issue an assessment with respect to revenues from joint assignments, Defendants offer no more than their speculation of the IRS' knowledge and mindset as to why it did not issue an assessment on this topic. In *Anonymous v. Anonymous*, 165 A.D.3d 19 (1st Dept. 2018), on similar facts the state appellate court affirmed a decision refusing to dismiss corporate income tax-related NYFCA claims based on falsely reported deductible costs. The defendant had asserted that tax audit closing agreements freed it from liability. The court concluded, however, that the audit closing agreements "do not conclusively establish that relator has no cause of action . . . ." *Id*. at 29-30. Not only did the closing agreements not clearly release the NYFCA claims, but they also did not address some of the tax years raised in the case. *Id*. The same result applies here, where the IRS' non-assessment, which was not even memorialized in a closing agreement as it was in *Anonymous*, and which did not address most of the tax years at issue here, does not conclusively support Defendants' factual argument that the IRS approved of EZI USA's false reporting of revenues and costs.

17

In this case, in weaving their argument about what the IRS must have intended in the third audit, Defendants also ignore Plaintiff's detailed allegations about this third audit. Plaintiff specifically alleged that the IRS did not bless the under-reporting: "Even though the IRS did not see more than the tip of the iceberg, it nevertheless never approved of, blessed, or condoned any practices that would allow a company like EZI USA to avoid paying United States taxes by 'off-shoring' its revenues or 'on-shoring' the costs of its foreign affiliates[,]" (¶ 331) and "The IRS did not make a finding that EZI USA's tax returns were accurate, and it neither reviewed nor accepted as legal or appropriate EZI USA's historic treatment of fax charges." (¶ 332). As Plaintiff alleged, the IRS auditors limited themselves to the 2011 to 2013 tax years, and thus did not examine those tax years at issue here where EZI USA's violations were the most egregious, for by those late years, EZI USA had started to issue more I/A billings, thereby reducing the amounts of unreported revenues. (¶¶ 321, 323). EZI USA did not disclose to the IRS that in earlier years it had a much higher volume of joint assignments whose revenues were unreported on its tax returns, nor that it had misled the IRS about those revenues in earlier audits. (¶ 324). In fact, in the audit of 2011-2013, EZI USA abandoned its argument for additional tax benefits from purported overpayments made in then-open tax years because it feared that the auditors might otherwise look back at the earlier tax years where its risks were much higher, and EZI USA thereafter let those tax years close without claiming those purported tax benefits. (¶¶ 321-29).

The only way that Defendants are able to make their arguments about the third IRS audit is by distorting Plaintiff's allegations. They insist, for example, that a September 29, 2014 letter referenced in the complaint fully disclosed the under-reported revenues to the IRS, and they even attach the letter to the declaration accompanying their motion. Defendants do not, however,

address Plaintiff's allegations that the same letter was false and misleading to the IRS, and that it

did not make the full disclosure that Defendants repeatedly claim. As Plaintiff alleged:

> 305. On September 29, 2014, EZI USA finally disclosed to the IRS the existence
> of fax charges, though it still did not provide the Finance Manual.
>
> 306. In a September 29, 2014 letter from its counsel to the IRS, EZI USA
> described the fax charges and stated that "there has not always been consistent
> oversight to confirm issuance of international invoices for all fax charges." In
> fact, there had been consistent oversight by EZI AG's F&C group, which called
> for the issuance of I/A billings, often for tax reasons.
>
> 307. The September 29, 2014 letter did not inform the IRS of the fact that the
> failure to issue I/A billings meant that EZI USA was under-reporting its revenues
> in specific tax years. Instead, the letter falsely suggested that the fax charges
> corresponded to the revenues the company reported on its tax returns, even
> though they did not.
>
> 308. The letter also stated that the policy for international invoices on fax charges
> was "adopted many years ago" with respect to eight countries that imposed
> "discriminatory or high developing country fiscal levies."
>
> 309. In fact, the formal policy about the eight countries was not put into place
> until July 2012, and the development of the fax charge system was unrelated to
> those levies, and had affected transactions with dozens of other countries.
> Between EZI USA's fiscal years 2007 and 2013, for example, the fax charges EZI
> USA sent without accompanying I/A billing to those eight countries accounted for
> only about 13% (by total dollars) of all such fax charges.

(¶¶ 305-09).

Defendants also ignore Plaintiff's many allegations of Defendants' contemporaneous

recognition of the illegality of their practices. As Plaintiff alleged, immediately after EZI USA

disclosed the existence (but not the full facts) of its fax charges in the September 29, 2014 letter,

EZI USA immediately closed the gap between the fax charges and the I/A billings by starting to

require I/A billings be issued for all fax charges, thus eliminating most unreported revenues.[6]

"As EZI AG's CFO Hurcik wrote in an e-mail on October 15, 2014, 'You need to do all invoices

---

[6] This was the same action proposed by the EZI USA Controller in 2007 to end the fraud. (¶¶ 199-200).

[*i.e.*, I/A billing] with the US because the IRS is aware of these assignments. There is no way around it.'" (¶ 312).

### D. Plaintiff Sufficiently Pled the "Knowing" Element

In the Amended Complaint, Plaintiff laid out a lengthy timeline of EZI USA's (and EZI AG's) contemporaneous knowledge of the falsity of the records and statements it made between 2007 and 2014.[7] The Amended Complaint described numerous instances where the EZI USA Controller told company leaders, and where company leaders recognized, that they were under-reporting revenues, over-reporting costs, underpaying taxes, and committing fraud. (¶¶ 192, 194, 195, 196-97, 199-202, 203, 209, 213, 216, 241-42, 245-46, 258, 259, 267-72). It also described numerous instances where company leaders promised to take action to address the problems, but did not. (¶¶ 195, 200-202, 216-17, 246-49). The Amended Complaint also described the many times that the companies misled IRS auditors for the purpose of concealing its falsely reported revenues and costs. (¶¶ 220-35, 243-44, 251-52, 286-332, 337). EZI USA's Co-Managing Partner Reinken even admitted in 2008 that he had already known "about our shifting of billings to the appropriate geography for tax reasons[] . . . that we don't have to pay taxes on." (¶ 216). Defendants entirely ignore these allegations that overwhelmingly plead EZI USA's knowledge.

In their motion, Defendants observe that mere mistakes are not part of the NYFCA's definition of "knowing and knowingly." (Def. Mem. at 18-19). They do not, however, argue that EZI USA's false records and statements were made by mere mistake.

Defendants next argue that EZI USA could not have acted with knowledge when it made its false records and statements between 2007 and 2014 because in 2016 the IRS did not assess EZI USA with respect to the joint assignments (though it did assess EZI USA for deducting

---

[7] The NYFCA defines "knowing and knowingly" to include actual knowledge, or reckless disregard or deliberate ignorance of the truth. *See* N.Y. State Fin. Law § 188(3).

affiliates' costs through the use of operating expense fax charges). (Def. Mem. at 19-20).

Defendants' argument has a fatal timeline problem because EZI USA could not have known

what the IRS would do years later. As described above, Plaintiff alleged repeatedly that EZI

USA consistently was informed of and recognized the falsity at the time the false records and

statements were made, and EZI USA, in particular, recognized that the IRS would not approve of

its falsely reporting revenues and costs. As the New York Court of Appeals held in the NYFCA

case *New York ex rel. Empire State Ventures, LLC v. Sprint Nextel Corporation*, 26 N.Y.3d 98,

112 (2015), a defendant cannot defeat the knowledge element by later coming up with an

interpretation of applicable rules that it did not hold at the time: "This is not the stuff that a

CPLR 3211 dismissal is made of." The same is true for a 12(b)(6) dismissal. In any event, as

described above, in the third audit, the IRS did not bless the false reporting of revenues and costs

for the 2011-2013 period examined or for any other years.

Finally, Defendants argue that an inference must be drawn in their favor to conclude that

EZI USA lacked knowledge because there were some transactions for which it claimed to have

over-reported revenues. Defendants say the existence of such transactions "suggests a company

grappling with the complexity and judgment-laden nature of transfer pricing determinations—not

a company out to defraud the IRS or New York." (Def. Mem. at 20). On this motion to dismiss,

however, the inferences are to be drawn in Plaintiff's favor. Moreover, Defendants make this

argument only by ignoring Plaintiff's allegations. While Plaintiff referred to some transactions

for which EZI USA could have claimed lower revenues, but did not, it alleged that they were few

in number. As alleged, the false revenue "primarily goes that direction [referring to EZI USA

under-reporting revenues] because we're a high-income-tax country." (¶ 258). In early 2011, EZI

USA leader Schneider, immediately after saying "This was a conscious effort. This is just a risk

we've been taking for years and they've [the IRS] just never figured it out[,]" was told that "And it's a very lucrative risk and we saved millions of dollars in taxes over the years[,]" even accounting for the over-reported revenues. (¶ 246). In the same conversation, Schneider was given an analysis that showed EZI USA failing to pay taxes on $19 million for a subset of the years at issue here, but Schneider did not want to keep the analysis in his possession. (*Id.*).

## II.    Plaintiff Pled Single Damages of $13.25 Million (So Far), Which Exceeds the $350,000 Pleading Threshold

Defendants argue for dismissal because Plaintiff "has failed to plead damages," but Plaintiff met the NYFCA requirement to plead damages in the action of more than $350,000 by alleging damages of $13.25 million. (¶¶ 2, 358, 365, 369).[8]

Defendants argue otherwise based on a novel and facially incorrect interpretation of the pleading threshold requirement in the NYFCA, which states:

> This section shall apply to claims, records, or statements made under the tax law only if (i) the net income or sales of the person against whom the action is brought equals or exceeds one million dollars for any taxable year subject to any action brought pursuant to this article; (ii) the damages pleaded in such action exceed three hundred and fifty thousand dollars . . . .

N.Y. State Fin. Law § 189(4)(a). According to Defendants, a NYFCA plaintiff must plead separate damages of $350,000 for each tax year, and they come to this reading by insisting that when Section 189(4)(a) referred to "such action" in clause (ii), it really meant "for each year." (Def. Mem. at 22-23). Defendants thus try to re-write the NYFCA just as they tried to re-write Plaintiff's claims with their transfer pricing straw man.

---

[8] Apart from that pleading threshold, damages are not an element of a NYFCA cause of action. *See U.S. v. Spectrum Painting Corp.*, No. 19 Civ. 2096, 2020 WL 5026815, at *14 (S.D.N.Y. Aug. 25, 2020) (applying the analogous federal statute); *U.S. ex rel. Feldman v. Van Gorp*, 674 F. Supp. 2d 475, 481-82 (S.D.N.Y. 2009) (same).

The NYFCA itself disproves Defendants' contention. In plain English, the words "such action" refer back to the words "the person against whom the action is brought," and all of those words refer to the action as a whole, not to specific years. In addition, the New York Legislature demonstrated that the words "such action" referred to the action as a whole, and not to each year, by using the words "such action" four other times to refer to the entire action. *See* N.Y. State Fin. Law §§ 190(2)(b), 190(c)(ii), 190(c)(iii)(B), and 190(8).

Defendants also launch a factual challenge to Plaintiff's $13.25 million damages calculation, apparently to argue that Plaintiff has not pled damages of more than $350,000 for each tax year. Defendants argue that Plaintiff should have done an annual calculation that included certain "offsets" for tax overpayments to which Defendants now claim entitlement. (Def. Mem. at 21-22). Defendants fail to acknowledge, however, that EZI USA abandoned the opportunity to claim those same tax benefits while the tax years were still open and amendments were still permitted, and that EZI USA cannot claim the tax advantages now. (¶¶ 343-44).

Defendants also ignore that NYFCA damages are pled before any [valid] offsets are applied. Under NYFCA regulations, offsets are made only after damages are trebled, which does not happen at the pleading stage. *See* 13 N.Y.C.R.R. § 400.6 (trebling of damages pursuant to the NYFCA is to be done before "any subtractions are otherwise made, because of any offset or credit received by the government by any source, including but not limited to the defendant").

## III. Plaintiff Has Pled Only Violations that Occurred Within the Statute of Limitations

As alleged in the Amended Complaint: "Plaintiff-Relator seeks damages in this action for the False Claims Act violations by each Defendant within the False Claims Act's ten year statute of limitations." (¶ 361). As Defendants recognize, the period starts when the false records or statements were made or used. (Def. Mem. at 23).

All of the false records and statements described in the Amended Complaint were made and used within the 10-year limitations period. Defendants, however, argue that the false amended tax returns for tax years 2004 and 2005 that EZI USA made and used in 2010 (¶¶ 238-39) fall outside of the limitations period because they *repeat* false statements that were made before the limitations period. (Def. Mem. at 23-24). The NYFCA offers no support for this novel theory that later false records or statements can be inoculated by earlier ones. Defendants do not claim that it does. Defendants' only purported support is a misreading of the decision in *Total Asset Recovery Services LLC on behalf of State v. MetLife, Inc.*, 189 A.D.3d 519 (1st Dept. 2020). The court there did not grant, or even consider, inoculation to new false statements based on repetition of old false statements. Rather, it addressed when the limitations clock began for ongoing *failures* to report unclaimed property that should first have been reported before the limitations period. It concluded that NYFCA claims applied only where the first report required to disclose the omitted unclaimed property was made within the 10-year period.[9]

Defendants also argue that EZI AG is not liable for its causing EZI USA to make false statements and records more than 10 years before it was added as a Defendant in the Amended Complaint on July 12, 2021. (Def. Mem. at 24). Plaintiff did not claim otherwise. That is why Plaintiff stated in the Amended Complaint that it was seeking damages from "violations by each Defendant within the . . . ten year statute of limitations [period]." (¶ 361). Defendants are asking for dismissal of something not claimed.

---

[9] The implications of Defendants' argument are dire. If the inoculation theory applied, all defendants who have continued their schemes for significant periods of time would seek to escape liability by claiming they engaged in the same conduct before the limitations period.

**IV.    Defendants Claim "Incurable Defects" but Identify None, and the Liberal Rules for Repleading Apply**

As the final shot in their motion, Defendants insist that Plaintiff should not be permitted to cure any defects that are found in its pleading. While Defendants argue that there are "incurable defects," they identify none. Defendants' arguments in this motion are about supposedly "insufficient" pleadings, not impossible ones. In addition, the fact that Plaintiff amended its complaint once before it was public and before it was served on Defendants, does not bar repleading. The present motion is the first challenge that has been made against any pleading in this case. Accordingly, should any part of Plaintiff's claims be dismissed, Plaintiff respectfully requests that it be afforded an opportunity to re-plead, consistent with Federal Rule of Civil Procedure 15(a)(2) ("The court should freely give leave when justice so requires.").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss must be denied.

Dated: New York, New York
       October 7, 2021

Respectfully submitted,

Randall M. Fox
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600
rfox@kmllp.com

*Counsel for Plaintiff-Relator American Advisory Services LLC*

25