UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                           :

STATE OF NEW YORK ex rel. AMERICAN     :
ADVISORY SERVICES, LLC,                :
                           :

                Plaintiff-Relator,     :         21-cv-6883 (LJL)
                           :

        -v-                     :        OPINION AND ORDER
                           :

EGON ZEHNDER INTERNATIONAL, INC. and EGON :
ZEHNDER INTERNATIONAL AG,      :
                           :

                Defendants.     :
                           :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

    In July 2021, Plaintiff-Relator American Advisory Services LLC ("American Advisory" or "Plaintiff") filed a complaint (the "Complaint") in the Supreme Court of the State of New York, County of New York against Defendants Egon Zehnder International, Inc. ("EZI USA") and Egon Zehnder International AG ("EZI AG" and together with EZI USA, "EZI" or "Defendants") alleging violations of the New York False Claims Act.  On August 16, 2021, Defendants removed this action to federal court; shortly thereafter, Plaintiffs moved to remand this case to New York State court pursuant to 28 U.S.C. § 1447.  Defendants oppose remand.

    For the reasons that follow, the motion to remand is denied.

## BACKGROUND

    The Court accepts the well-pleaded facts of the complaint, shorn of its legal conclusions, as true for purposes of this motion.  *See* Dkt. No. 1-5 ("Compl."); *cf. Qatar v. First Abu Dhabi Bank PJSC*, 432 F. Supp. 3d 401, 406 (S.D.N.Y. 2020) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff." (quoting *Federal Ins. Co. v. Tyco Int'l Ltd.*, 422

F. Supp. 2d 357, 391 (S.D.N.Y. 2006)).

I.     **Factual Background**

A.     **The Parties**

Defendant EZI AG is a Swiss limited liability company with its headquarters in Zurich, Switzerland.  Compl. ¶ 22.  EZI AG is in the executive search business; it finds candidates to fill high-level executive and corporate board of director positions.  *Id.* ¶ 28.  It operates as a global partnership, with sixty-eight offices in forty countries around the world, including in Europe, Asia, Africa, the Middle East, and the Americas.  *Id.* ¶¶ 23, 28.  EZI USA is the United States subsidiary of EZI AG, incorporated in Delaware and with its headquarters in New York and offices across the country.  *Id.* ¶¶ 21, 26, 29.  The United States is the largest market in which EZI AG and its subsidiaries operate, and New York City is the location of EZI USA's largest office.  *Id.* ¶¶ 26, 29.

EZI USA and EZI AG do not view themselves as separate corporate entities but view themselves and apparently conduct themselves as part of one "elite global executive search firm," *id.* ¶ 49, with offices and thousands of employees all over the world, *id.* ¶ 27.  Indeed, EZI USA has marketed itself as part of a global executive search firm with a "one firm" philosophy that is expert at working across borders to find suitable executives and board members for its clients.  *Id.* ¶ 48.  Various EZI AG offices around the world, including the United States EZI USA offices, enter into contracts with clients to find candidates for specific positions, such as executive jobs or seats on corporate boards.  *Id.* ¶ 20.  Clients typically agree to pay a set price, in monthly installments, for these services and to pay EZI's expenses.  *Id.*

Plaintiff-Relator American Advisory Services LLC is a Wyoming limited liability company that brings this case on behalf of the State of New York pursuant to the New York False Claims Act ("NYFCA") to recover monies and interest lost to the State of New York and

the City of New York due to what it alleges is Defendants' knowing misconduct.  *Id.*  American

Advisory's sole member is a resident of the State of New York.  *Id.*

> **B.**      **EZI USA's State and City Tax Reporting**

The case arises out of EZI USA's New York State and New York City income tax

reporting.

Since at least 2003, EZI USA has been subject to New York State corporate franchise

taxes, the Metropolitan Commuter Transportation Mobility Tax (the "MTA Surcharge"), and

New York City general corporation taxes.  *Id.* ¶ 36.  Under federal law, income that EZI USA

receives for providing personal services to its clients is counted as gross income and is subject to

taxation in the United States.  *Id.* ¶ 41.  In turn, federal taxable income is used in calculating New

York taxes.  *Id.* (citing 26 U.S.C. § 861(a); 26 C.F.R. § 1.861-4; N.Y. Tax L. § 208.9(ii)).

Correspondingly, in calculating federal taxable income—and thus, the income used to calculate

New York taxes—an entity can deduct expenses associated with income earned in the United

States and the ratable part of global expenses.  *Id.* (citing 26 U.S.C. § 861(b)).

According to Internal Revenue Service ("IRS") regulations cited in the Complaint,

"[g]ross income from sources within the United States includes compensation for labor or

personal services performed in the United States irrespective of the residence of the payer, the

place in which the contract for service was made, or the place or time of payment."  26 C.F.R.

§ 1.861-4(a).  "In the case of compensation for labor or personal services performed partly

within and partly without the United States by a person other than an individual, the part of that

compensation that is attributable to the labor or personal services performed within the United

States, and that is therefore included in gross income as income from sources within the United

States, is determined on the basis that most correctly reflects the proper source of income under

the facts and circumstances of the particular case."  *Id.* § 1.861-4(b).

Between November 1, 2003 and October 31, 2013, EZI USA worked on thousands of client assignments together with at least one foreign EZI AG office in, among other locations, Amsterdam, Berlin, Belgium, Calgary, Copenhagen, Dubai, Dusseldorf, Frankfurt, Geneva, Hamburg, Helsinki, Hong Kong, London, Melbourne, Milan, Montreal, Mumbai, New Delhi, Paris, Sao Paulo, Shanghai, Singapore, Tokyo, Toronto, and Zurich.  Compl. ¶¶ 51–52.  During this time, the same accounting firm prepared EZI USA's tax records.  *Id.* ¶ 84.  Plaintiff alleges that EZI USA did not provide the accounting firm information about all of EZI USA's revenues from its joint assignments and that the firm thus calculated EZI USA's federal taxable income and prepared its records with incomplete information.  *Id.* ¶¶ 84, 87.  The tax preparer used the federal taxable income amount (which was incomplete) to prepare EZI USA's New York tax returns and statements and to calculate EZI USA's tax liability to New York.  *Id.* ¶¶ 44, 46, 95–99.[1]  Thus, for each tax year from its tax year ending on October 31, 2004 through its tax year ending on October 31, 2013, EZA USA submitted, or caused to be submitted, to the New York State Department of Taxation & Finance or the New York City Department of Finance tax returns and statements concerning the New York taxes, which purported to report income based on a figure for federal taxable income that did not accurately reflect the federal taxable income that EZI AG was required to report.  *Id.* ¶ 42.

### C.    EZI Bookkeeping

EZI AG and its subsidiaries including EZI USA kept two sets of books.  *Id.* ¶ 3.  One set of books was based on the "fax charge" system and was used internally to conduct the company's business and evaluate its actual performance.  *Id.* ¶¶ 3, 58–60.  The other set of books was used to prepare EZI USA's tax returns.  *Id.* ¶¶ 3, 112.

---

[1] For each of the relevant years and quarters, approximately one-third of EZI USA's federal taxable income was subject to taxation under the New York taxes.  *Id.* ¶ 46.

The fax charge system worked as follows.  When EZI USA worked on an assignment for which a foreign affiliate handled billing the client, EZI USA claimed its share of the performance credit for the joint assignment by sending the billing office what the company called a "fax charge."[2]  *Id.* ¶ 58.  The amount of the fax charge was calculated by multiplying the fee billed to the client by the percentage split agreed to between the offices working on the joint assignment.  *Id.* ¶ 59.

EZI AG's financial manual (the "Financial Manual") stated:

Fax charges are used to calculate the real performance of an office.  E.g. local billings plus fax billings net (can be positive or negative) results in performance billings.  Or generally: local plus fax results in performance.

**A real money transfer is not taking place when doing a fax charge.**

Fax charges are intercompany transactions and are being reconciled on a monthly basis (except fax billings backlog).

*Id.* ¶ 64.  Under this system, when two offices worked on a joint assignment, one office—referred to as the billing office—sent invoices to and received payment from the client.  *Id.* ¶ 65.  The other office—referred to as the non-billing office—had to send a fax charge on a form required by EZI AG in order to get credit for its work on the joint assignment.  *Id.*

EZI incorporated fax charge intercompany transactions into business reports and, as indicated by the quotation from the Finance Manual above, referred to these reports as their "performance" records.  *Id.* ¶ 75.  These reports included "Billing Statistics Reports, Performance Key Figures Reports, and Performance Profits & Losses (P&L) reports."  *Id.*  EZI used these reports to make decisions about various offices and personnel, including setting

---

[2] The system gets its name from the fact that when EZI AG developed it in the 1970s, the on-billing office working on a joint assignment claimed performance credit by sending a form using a telex machine.  *Id.* ¶ 72.  When fax machines came into popular usage in or about the 1980s, the name of the procedure was changed to a "fax charge."  *Id.* ¶ 73.

budgets and evaluating office and personnel performance.  *Id.* ¶ 76.  Indeed, for some years, EZI AG announced in press releases its worldwide and United States revenues that were calculated using fax charges.  *Id.* ¶ 79.  EZI USA's revenues reflected in these press releases were millions of dollars more than the revenues it listed on its tax returns.  *Id.* ¶ 80.

Fax charges were considered to be confidential by EZI AG.  *Id.* ¶¶ 108–110.  The Financial Manual called for strict confidentiality about fax charges, stating: "**Fax charges are internal EZI procedures and must not be shown or communicated to third parties.**"  *Id.* ¶ 105.  The Finance Manual itself was also considered to be strictly confidential and was not to be made "accessible to outside parties, such as auditors, tax inspectors etc."  *Id.* ¶ 106.[3]

EZI USA maintained a different set of books and records that it described as its "legal" records and that it used to prepare EZI USA's tax returns.  *Id.* ¶¶ 3, 112.  Plaintiff alleges that the "legal" books "undercounted EZI USA's revenues and overstated its deductible costs."  *Id.* ¶ 3. In recording its revenue from joint assignments with foreign EZI AG offices in its "legal" books and records, EZA USA included only what EZI AG called "international assistance" or "I/A" billings and did not include fax charges.  *Id.* ¶¶ 111–112.  When a subsidiary recorded an I/A billing, it used the same revenue percentage split as used for the fax charges and thus "the price for EZI USA's services was the same regardless of whether only fax charges were sent or both fax charges and I/A billing were sent."  *Id.* ¶ 114.  However, EZI USA sent I/A billing invoices

---

[3] Plaintiff cites evidence that EZI AG did not want fax charges to be disclosed.  Plaintiff alleges, for example, members of EZI AG's finance and control group (the "F&C group") repeatedly emailed about keeping fax charges confidential, writing that they should not be disclosed to local external auditors "because these transactions are not recognized by the local authorities," *id.* ¶ 108, and that they should not be disclosed during audits or to auditors, *id.* ¶¶ 109–110.  In an October 2003 email, a member of the F&C group advised that "internal fax documents for I/A billings [should never be used] as back-up documents," must "not be shown to externals in any way," and were "only a basis to see the volume."  *Id.* ¶ 141.

for only some of its joint assignments with foreign affiliates and not for every assignment that had a fax charge. *Id.* ¶ 113. Thus, according to Plaintiff, the revenue recorded in EZI USA's "legal" books was incomplete, as it reported revenue for those joint assignments for which I/A billing invoices were sent and not for all those where fax charges were used. *Id.* ¶ 115.

For example, during EZI USA's tax year starting on November 1, 2003 and ending on October 31, 2004, EZI USA sent fax charges to its foreign affiliates for 110 joint assignments with foreign offices, but it did not record any of the revenue associated with these fax charges in its legal records. *Id.* ¶ 88. During the tax year ending on October 31, 2005, EZI USA sent fax charges for 130 joint assignments with foreign offices but counted revenues from only thirteen of them in its legal records. *Id.* ¶ 89. For the tax year ending on October 31, 2006, EZI USA sent fax charges for 194 joint assignments with foreign EZI AG offices but counted the revenue from only sixteen of them in its legal records. *Id.* ¶ 90. The same pattern continued for the tax years ending October 31, 2007, October 31, 2008, and October 31, 2009. *See id.* ¶¶ 91–93; *see also id.* ¶ 145.

EZI AG's offices have been using I/A billing for many years. *Id.* ¶ 119. EZI AG had its offices throughout the world use I/A billings to recognize revenue for tax reporting purposes and to transfer money among offices, *id.* ¶ 116; when an office needed money, EZI AG's finance and control group (the "F&C group") sometimes instructed it to send I/A billings to other offices, *id.* ¶ 118.

EZI USA provided its tax preparer with data using its "legal" records, which contained revenue only from the I/A billings. *Id.* ¶¶ 111, 115. These records did not include the fax charges and did not report all of the revenues reflected by the fax charges. *Id.* ¶ 115. EZI USA thus did not inform the tax preparer of all of its revenues from its joint assignments with foreign

EZI AG offices or of the existence of EZI USA's fax charge intercompany transactions. *Id.* ¶¶ 86, 100. As explained above, Plaintiff alleges that the tax preparer used the records EZI USA provided to calculate EZI USA's federal taxable income. *Id.* ¶ 96.

EZI AG's use of I/A billing was animated by a desire to either (1) reduce the group's overall worldwide tax burden, including by evening out or reducing taxes, shifting revenues to lower-taxing jurisdictions, or (2) make an office's financial records look consistent with prior years so they would not raise red flags with or get the attention of tax authorities. *Id.* ¶¶ 120, 123, 125. For example, "where the office in one country showed a large profit, the F&C group could have an office in a different country that was facing a large loss send I/A billing to the first office." *Id.* ¶ 125. One member of the F&C group wrote in a 2003 email: "Let's be honest. [I/As] are a tax and cash planning instrument and nothing else," *id.* ¶ 137, and, in 2009, another member of the F&C group wrote "we often use IA billings as a 'tax and cash optimizing tool,'" *id.* ¶ 138.

Plaintiff alleges multiple emails that specifically show this practice. In a September 18, 2003 email, a member of the F&C group wrote to EZI USA: "I need to know the maximum amount possible to do some other Fax received at your end . . . and how much would be possible to not have problem with the IRS." *Id.* ¶ 127. In an October 2005 email, a member of the F&C group wrote that Switzerland needed some additional profit and that they "could add some I/A billings with Canada as they have a huge profit." *Id.* ¶ 128. In an email chain from October 2009, an EZI AG F&C group member emailed a controller in the company's Australia office to ask about I/A billings that the United States offices could make, and the Australia controller responded "1.1 million [Swiss Francs] of transactions might raise a few eyebrows regarding 'profit sharing' and the question why there have not been transactions before." *Id.* ¶ 121. And in

a July 14, 2010 email, EZI AG's F&C group authorized I/A billing to be sent by EZI USA to the Toronto office, which was concerned that recording too much revenue on its books would be a "red flag" to tax authorities because "in recent years Canada has bene expensing rather than taking revenue."  *Id.* ¶ 122.  Other emails are to similar effect.  *See id.* ¶¶ 129, 130, 132–135.

### D.    Allocation of Costs

Plaintiff also alleges that EZI USA manipulated its deductible costs by taking deductions that belonged to foreign affiliates, thereby illegally lowering EZI USA's tax liabilities.  *Id.* ¶ 151. The typical policy within EZI AG and its offices was for offices to distinguish between their own local costs and global costs and to "recharge" the global costs to EZI AG; EZI AG would then aggregate global costs and allocate them among the offices—purportedly based on office headcount—so that each office was responsible for its share of the global costs.  *Id.* ¶¶ 153–154. Despite this "usual policy," *id.* ¶ 153, EZI AG allocated global costs in a disproportionate manner, burdening EZI USA with a relatively high share of global costs, *id.* ¶ 156.

Prior to the tax year ending on October 31, 2003, EZI USA did not recharge any of its global costs to EZI AG, instead deducting on its tax returns all of the global costs it incurred.  *Id.* ¶ 165.  In the tax year ending on October 31, 2003, EZI USA began to recharge some global costs to EZI AG but did not recharge certain costs that it should have, such as the costs related to EZI AG's Chief Executive Officer ("CEO") who worked out of EZI USA's New York office (the "ADM Costs").  *Id.* ¶¶ 169–171.  If EZI USA had recharged the ADM Costs, EZI USA would have only been able to deduct a proportionate share of the costs rather than deduct the entire amount, and EZI USA's taxable income would have been higher.  *See id.* ¶¶ 172–177. EZI USA kept all of the ADM Costs, instead of recharging them as it did other global costs, for the tax years ending on October 31, 2003 through October 31, 2007, at which time the CEO working out of the New York office had retired.  *Id.* ¶¶ 177–178.

After the CEO's retirement and at EZI AG's direction, EZI USA continued to exclude global costs for miscellaneous items, such as global travel, global training, global promotion, and global legal fees, from the global costs recharged to EZI AG.  *Id.* ¶¶ 179–171.  EZI AG directed EZI USA to do so notwithstanding the EZA USA Controller's protestations that he could not justify this action to IRS auditors and stating that the practice "could lead one to think that we are purposely not charging back so we have additional expenses, thus less taxes, in the USA."  *Id.* ¶¶ 182–183; *see also id.* ¶¶ 184–186.  An email indicates that the direction to keep global costs in EZI USA's local accounts was "for tax reasons."  *Id.* ¶ 186.  EZI USA continued to "keep for itself" these miscellaneous global costs instead of recharging them back to EZI AG "through at least the end of its tax year ending on October 31, 2011."  *Id.* ¶ 187.  According to the Complaint, for each of the tax years from November 1, 2003 through October 31, 2011, EZI USA provided information to its tax preparer that described the ADM Costs and the miscellaneous global costs as expenses of EZI USA, and the tax preparer used these costs as deductions on EZI USA's tax returns.  *Id.* ¶ 190.  For the tax year ending on October 31, 2012, EZI AG allowed EZI USA to recharge to EZI AG the miscellaneous global costs instead of requiring EZI USA to keep such costs for itself.  *Id.* ¶ 191.

### E.    Internal Concerns about EZI USA Reporting

Through at least 2012, EZI USA's accounting function was led by its Controller.  *Id.* ¶ 31.  The Controller reported to EZI AG's Chief Financial Officer ("CFO") on financial matters, but he also reported to EZI USA's Managing Partner or Co-Managing Partners.  *Id.* ¶¶ 31–32.  In the early 2000s, the EZI USA Controller complained to EZI AG's CFO that the way EZI USA was recognizing revenues from the joint assignments was both wrong and risky; the CFO dismissed the concerns and expressed little faith in the ability of government auditors to discover the issue.  *Id.* ¶ 194.  In the summer or fall of 2006, the EZI USA Controller stated to one of the

EZI USA Co-Managing Partners that EZI USA was cheating on its taxes and putting the company at risk by accepting performance credit for a joint assignment with a foreign affiliate without recognizing the revenue from the project for tax purposes.  *Id.* ¶ 195.  The Co-Managing Partner agreed to take the issue up with EZI AG's CEO but left the company shortly after the conversation.  *Id.*  In or around late 2006, the Controller raised the issue of underreporting taxable revenue directly with the CEO and presented him with a written analysis showing a multi-million-dollar differential between revenues based on fax charges and revenues based on I/A billings; the CEO said he would give the matter some thought but asked that the analysis be destroyed.  *Id.* ¶¶ 196–197.  The Controller again raised the issue in April 2007, *id.* ¶¶ 199–203, in October 2008 connection with a 2008 IRS audit, *id.* ¶¶ 212–218, and again a few years later in connection with a 2010 IRS audit, *id.* ¶¶ 241–250.

### F.      The IRS Audits

The IRS conducted audits in late 2008 of EZI USA's returns for the tax year ending on October 31, 2007, and in late 2010 of EZI USA's returns for the tax year ending on October 31, 2009 and for its amended earlier-year returns going back to the tax year ending on October 31, 2004.  *Id.* ¶¶ 211, 240.  During each of those audits, the EZI USA Controller raised concerns about EZI USA's reporting of revenues earned on joint assignments.  In a conversation between the Controller and the then Co-Managing Partner of EZI USA, the Co-Managing Partner tried to quantify the amount of revenue that was being "offshored."  *Id.* ¶ 213.  During the conversation, the Co-Managing Partner reported that he had spoken with the incoming sole Managing Partner of EZI USA and told him that EZI AG decided the amount of revenue that EZI USA should report from joint assignments and that the Managing Partner was "very happy" when he was told; the Controller replied "Yeah, that's because he's not gonna be in that meeting [with the IRS auditors]."  *Id.*  In a subsequent conversation with the incoming Managing Partner, the Controller

reported that EZI AG decided the revenue to be reported on joint assignments, and the Managing Partner acknowledged that he was aware of "our shifting of billings to the appropriate geography for tax reasons" but did not know of the magnitude; when he was told that $1 million would be shifted to other offices, the Managing Partner stated that he would prefer the number to be a lot lower. *Id.* ¶ 216. The two then discussed the tax risk of the practice, with the Controller stating that the IRS focused on "transfer issues" and the Managing Partner stating that the risk was the "same in every geography" but agreeing to mention the issue to the EZI AG Chairman and CEO. *Id.* The Controller later gave a heads up in an email to a member of the F&C group, Kurt Gnaegi ("Gnaegi"), that "one of the highest audit priorities of the IRS is to examine transfer pricing," *id.* ¶ 218, and Gnaegi responded with the advice that EZI USA should "keep a low profile" about the I/A billings if the IRS asked and should state that EZI USA was "working primary [sic] for the local market and is providing support on some international assignments," *id.* ¶ 219.

During the 2008 audit, EZI USA explained to the IRS that it used an approximation of the "profit split method" to determine the amount of client revenue to be allocated to each office for work on joint assignments and stated that this was "the best method for determining the intercompany transfer price." *Id.* ¶ 226. It also informed the IRS that the related-party transactions shown on the tax return "represents a sum of all payments that company [sic] received from related parties and payments paid to related parties. . . . the amount represents arm's length transactions at the fair market value." *Id.* ¶ 222. Plaintiff alleges that this statement was accurate insofar as the percentage splits did represent arm's length transactions at fair market value. *Id.* ¶ 223. Plaintiff alleges, however, that the statement was otherwise misleading insofar as it "suggested that the amounts shown on the tax returns showed the totality of the related party transactions, when, in fact, they represented only . . . those where there had been

I/A billing." *Id.* ¶ 224; *cf. id.* ¶¶ 229–230, 234–235.  During the course of the audit, Gnaegi

wrote that EZI USA should respond to IRS questions "that you send and/or receive invoices for

cross-border (international) assignments," and "[t]he less you write the better." *Id.* ¶ 229.  In

November 2008, the Managing Partner signed a representation letter to a Swiss auditing firm

representing that the company had properly recorded and disclosed transactions with other EZI

AG offices, *id.* ¶¶ 232–233, and the audit concluded without the IRS learning of all of the

revenues that EZI USA "earned" on joint assignments with foreign EZI AG offices, *id.* ¶ 235.

The 2010 audit followed the election by EZI USA to carry back a net operating loss

incurred during the tax year ending on October 31, 2009 on its tax returns for the previous five

years. *Id.* ¶ 238.  As a result of carrying back the net operating loss, EZI USA submitted revised

tax returns for each of the previous five years, from the tax return for the tax year ending on

October 31, 2004 onward. *Id.* ¶¶ 238, 240.  The Controller conveyed to Gnaegi that he was

stressed about the audit, and Gnaegi responded that he was "rather optimistic … [a]s long as you

don't show fax charges." *Id.* ¶ 242.  He added, "You know, the legal books are fine.  I don't see

a problem in the legal books." *Id.*  A conversation ensued in which the Controller reported his

concern that the IRS would inquire why EZI USA did so little international work, and the two

discussed the location of the audit and the need to control the information to which the IRS had

access. *Id.*

In a later conversation with a new EZI USA Co-Managing Partner, which was recorded,

the Controller raised his concern that EZI USA did not report all of the revenue that was

reflected by the fax charges, stating that the decision where to report revenue was "all tax rate

driven," that the practice had been "going on for years" and that the IRS "potentially" could

consider it to be fraud because the IRS does not care about taxes being paid abroad. *Id.* ¶ 246.

The new Co-Managing Partner responded that he was not a "tax planner" and obtained the assurance that the CEO of EZI AG knew about the practice.  *Id.*  At one point in the conversation, the Co-Managing Partner offered as a hypothetical that "it could be like, for example, Siemens is an account run out of Germany, and there's global accounts, Bayer, is run out of Germany.  Well, it's easier for our clients if we're billing it out of a central place,"  adding that he did not know what the law was but that he appreciated the Controller's heads-up.[4]  *Id.*  The conversation ended with the Co-Managing Partner expressing his appreciation to the Controller for raising the concern.

During the course of the 2010 IRS audit, EZI USA did not disclose to the IRS the existence or effect of the fax charges, and the IRS did not learn of the revenue for which EZI USA was credited on the fax charges.  *Id.* ¶¶ 251–252.  In a July 6, 2011 email, Gnagei expressed relief that "[t]he tax audit in the USA went smoothly up the stage . . . again survived a year."  *Id.* ¶ 253.

Another conversation between the Co-Managing Partner and the Controller occurred in early October 2011.  *Id.* ¶ 258.  The Controller more explicitly expressed his concern that EZI AG's practice of recording income worldwide was "basically . . . fraudulent."  *Id.*  The Co-Managing Partner asked whether, if work was "being billed out of another office because that's where the clients are—for example British Telecomm," it would not also go in the other "direction"; the Controller confirmed that "[i]t sometimes goes the other way, but it primarily

---

[4] At another point in the conversation, the Controller offered the not-so-subtle hint that he might report the practice to the IRS in order to receive the bounty that the IRS pays whistleblowers.  *Id.* ¶ 246 ("What if you have a spiteful employee someday and they blow the whistle.  You know, the IRS pays money nowadays to report that, report a company, so, you know, that's another concern."); *see also* 26 U.S.C. § 7623 (outlining the IRS whistleblower program).  Defendants have offered evidence that the Plaintiff here is an alter ego for the Controller referred to in the Complaint.  *See* Dkt. Nos. 1-2, 1-3.

goes that direction because we're a high-income-tax country." *Id.* The new Co-Managing Partner then stated that he raised the "tax planning" at the risk committee for EZI AG and was told that it had been looked at and that he should not worry about it. *Id.* After the Controller reiterated his view that the practice was not defensible, the Co-Managing Partner responded that if the Controller was "fairly concerned," that also made him concerned, and that he would raise the issue again and ask for an explanation. *Id.* Yet another recorded call occurred in late October 2011, in which the Controller expressed the view that the practice was wrong, and the Co-Managing Partner reported that when he had raised the issue with EZI AG he had been assured that the practice was not illegal. *Id.* ¶ 259.

Conversations continued among EZI AG and its affiliated offices, including EZI USA, about whether to stop using fax charges. *Id.* ¶¶ 260–266. In late November 2012, the Controller send an email to the Co-Managing Partner—which the Controller then forwarded to the EZI AG CFO demanding that EZI AG either "[m]atch 100% of fax charges with I/A invoices, or [e]liminate fax charges altogether and just issue I/A invoices." *Id.* ¶¶ 267–268. The next day, the Controller was fired. *Id.* ¶ 269.

### G.    The 2014 Audit and the Change in Policy

The IRS audited EZI USA a third time in 2014, which is the same year that EZI USA changed its practices so that, according to Plaintiff, it was accurately recording and reporting its income. *Id.* ¶¶ 286, 311. In connection with the 2014 audit, the IRS requested any manual EZI USA used "with respect to revenue and expense recognition on a worldwide basis," *id.* ¶ 287; *see also id.* ¶ 293, but, in accordance with EZI AG's instructions, EZI USA did not provide the Finance Manual to the IRS and concealed its existence for months. *See id.* ¶¶ 289–290, 295,

297, 310, 319.  EZI USA also provided misleading information that suggested it reported all revenue relevant to the audited time period.  *Id.* ¶¶ 290–292.[5]

On September 29, 2014, EZI USA, through counsel, finally disclosed to the IRS that "there ha[d] not always been consistent oversight to confirm issuance of international invoices for all fax charges"—issuance which would have matched the revenues attributable to EZI USA from international assignments with the revenues reflected in external records.  *Id.* ¶ 306; *see also id.* ¶¶ 58–68 (explaining "fax charges").  EZI USA's letter to the IRS did not disclose that its longstanding practice resulted in underreported income and "falsely suggested that the fax charges corresponded to the revenue the company reported on its tax returns, even though they did not."  *Id.* ¶ 307.  Shortly after sending this letter, EZI USA started requiring that "international assistance" billings be issued for all fax charges, *id.* ¶ 311; this change was motivated by disclosure of international assignments and fax charges to the IRS, *see id.* ¶ 312 ("As EZI AG's [CFO] wrote in an e-mail on October 15, 2014, 'You need to do all invoices [*i.e.*, I/A billing] with the US because the IRS is aware of these assignments.'").

As a result of the audit of the 2011, 2012, and 2013 tax years, the IRS assessed EZI USA for underpaying taxes on improperly deducted expenses, which Defendants assert are distinct from the issues raised in the Complaint.  *Id.* ¶ 321; Dkt. No. 1 ¶ 16 n. 2.  There is no allegation

---

[5] A letter from EZI USA stated, in response to the IRS's request "that [EZI USA] provide any policy and procedure manuals and internal control manual utilized by the organization with respect to revenue recognition on a worldwide basis," that EZI USA "ha[s] an existing policy, while not written, with respect to revenue and expense recognition on a worldwide basis that has been consistently applied throughout the period under audit."  *Id.* ¶ 290.  The letter also provided as an example of "the existing revenue and expense recognition policy" a transaction where an I/A billing had been issued, suggesting that this was how all cross-border transactions were handled.  *Id.* ¶ 291.

that the IRS considered EZI USA to have underreported its income or that it raised any issue with respect to the use of I/A billing and the failure to report all revenue from fax charges.

The Complaint alleges that, as a result of the 2014 audit, EZI USA saw that it could amend some of its tax returns to claim credits or benefits that it had not originally claimed, but EZI USA chose not to do so for fear that it could draw more attention to underpayments in other countries. Compl. ¶¶ 326–327. The IRS thus closed its audit after "having viewed only the tip of the iceberg," *id.* ¶ 330, and without making a finding that EZI USA's tax returns were accurate, *id.* ¶ 332.

### H.   Plaintiff's Allegations Regarding EZI USA's Misstatements

Plaintiff alleges that the percentage split agreed to in the fax charges reflected the arm's length, fair market value for the services EZI USA performed on the assignment. *Id.* ¶ 57. It also alleges that the fax charges that EZI USA sent to its foreign affiliates are the best and most reliable record for its revenue from providing services in the United States on joint assignments with foreign EZI offices during the period of November 1, 2003 through October 31, 2013, where the assignments were billed by foreign offices, *id.* ¶ 68, and represented the time and effort contributed by EZI USA to the joint assignment, *id.* ¶ 70. Plaintiff further alleges that the I/A billings were not an accurate measure of EZI USA's total revenues from the services it performed in the United States on joint assignments with foreign EZI AG offices. *Id.* ¶ 146. EZI USA also took tax deductions for about $7 million in costs that did not belong to it but belonged to foreign EZI offices and were not properly deductible by EZI USA. *Id.* ¶ 7. Thus, from the tax year ending on October 31, 2004 to the tax year ending on October 31, 2013, Defendant EZI USA submitted or caused to be submitted returns and statements to New York state- and city-based agencies that underreported its actual income. *See id.* ¶¶ 42, 207, 210, 236–239, 254, 264, 278, 296, 334.

When the relationship partner at the tax preparer firm was informed of the existence of fax charges in 2018, he testified that he would have wanted to know about the fax charges for purposes of preparing EZI USA's tax returns and financial statements, that revenue from work done in the United States should be allocated to the United States, and that if he learned that a client had a separate system that booked a number of intercompany engagements previously unknown to him, he would have advised the client that he would have to look into the activity and consider resigning from the engagement. *Id.* ¶¶ 101–103.

## I.     The Alleged False Tax Returns

Plaintiff alleges that the use of the legal records and I/A billing, rather than the fax charges, resulted in EZI USA filing false tax returns and underreporting its income in the United States—and thereby in New York State and in New York City—by not including all of the income it earned in the United States. *Id.* ¶ 2.  It alleges that during at least the ten years prior to this action, EZI USA filed false tax returns and made and used other false records and statements that were material to its obligations to pay New York State and New York City taxes on its business income, keeping for itself approximately $13.25 million it was obligated to pay the government. *Id.*  It avoided counting as taxable income about $86 million of its approximately $128 million in U.S. revenues from client assignments where it worked jointly with foreign EZI AG offices. *Id.* ¶ 4.  For the entire period of November 1, 2003 through October 31, 2013, EZI USA sent fax charges for its joint assignments with foreign EZI AG offices for about $128.2 million in revenue, but EZI USA told its tax preparer of only about $42.5 million (or 33.2%) of it. *Id.* ¶ 94.  Plaintiff further alleges that the revenues EZI USA listed in its press releases, which included revenues represented by fax charges, were millions of dollars in excess of the revenues EZI USA listed on its tax returns, which did not include all of the fax charge revenues. *Id.* ¶ 80.

Plaintiff alleges that EZI USA's income tax returns submitted to New York State and City taxing authorities for the tax years ending on October 31, 2004 through at least its tax year ending October 31, 2013 were false. *Id.* ¶¶ 333–335. It also alleges that EZI USA made and used false statements and records in connection with its communications with government tax auditors, including during the IRS tax audits, and with its own outside tax preparer. *Id.* ¶¶ 337–338. It brings an action against EZI USA for violating Section 189(1)(d) of the NYFCA by having possession, custody, or control of money to be used by New York State and the City of New York and knowingly delivered, or caused to be delivered, less than all of that money by reporting artificially reduced taxable income. *Id.* ¶¶ 362–365. It also brings an action against EZI USA and EZI AG for violating Section 189(1)(g) by knowingly making, using, or causing to be made or used, false records or statements material to EZI USA's obligations to pay or transmit money to New York State and the City of New York. *Id.* ¶¶ 366–369.

## II.     Legal Background

### A.     New York Tax Computation

"The calculation of [New York] state and city taxes owed begins with and is based upon 'entire net income,' which is generally defined as income reported to the federal government." *Bankers Trust Corp. v. N.Y.C. Dep't of Fin.*, 805 N.E.2d 92, 93 (N.Y. 2003); *see also* N.Y. Tax L. § 208(9). New York's tax law defines "entire net income" as:

> total net income from all sources, which shall be presumably the same as the entire taxable income, which, except as hereinafter provided in this subdivision,
>
> (i)     the taxpayer is required to report to the United States treasury department, or . . .
>
> (iv)    in the case of an alien corporation that under any provision of the internal revenue code is not treated as a "domestic corporation" as defined in section seven thousand seven hundred one of such code is effectively connected with the conduct of a trade or business within the United States as determined under section 882 of the Internal Revenue Code.

19

N.Y. Tax L. § 208(9).  The law also excludes a number of amounts from the definition of "entire net income," including certain amounts deductible under the state law, as well as certain income from specified sources.  *See id.* § 208(9)(a); *see also Petrie Stores Corp. v. Tully*, 439 N.Y.S.2d 724, 726 (3d Dep't 1981) (explaining that "entire net income" is presumably the same as the income reported on a corporation's federal tax returns "subject to certain possible modifications" and upholding New York State Tax Commission decision to require use of federal income, which had been subject to Section 482 reallocation, for net income reporting for state franchise tax purpose despite prior differences between state and federal figures).

### B.    Federal Transfer-Pricing Scheme

It is a fundamental principle of taxation that a domestic corporation doing business in the United States is obligated to pay income tax on its taxable income.  26 U.S.C. § 11(a).  Taxable income is calculated by calculating the taxpayer's gross income and subtracting from it allowable deductions.  *Id.* § 63(a).  Gross income is defined to include "all income from whatever source derived, including . . . [c]ompensation for services, including fees, commissions, fringe benefits, and similar items."[6]  *Id.* § 61(a).  Gross income "from sources within the United States" generally includes "[c]ompensation for labor or personal services performed in the United States," *id.* § 861(a)(3), while income "from sources without the United States" includes "compensation for labor or personal services performed without the United States," *id.* § 862.  A corporation is entitled to take deductions for ordinary and necessary business expenses, including for compensation for personal services rendered.  *Id.* § 162.  The general rule of taxation is that income should be taxed to the party that earned it.  *See Lucas v.*

---

[6] In contrast, for foreign corporations, the Code defines gross income as including only gross income that is: (1) derived from sources within the United States and is not effectively connected with the conduct of a trade or business within the United States; or (2) effectively connected with the conduct of a trade or business within the United States.  26 U.S.C. § 882.

*Earl*, 281 U.S. 111, 114 (1930); *Comm'r Internal Revenue v. Culbertson*, 337 U.S. 733, 739–40 (1949) (explaining "the first principle of income taxation: that income must be taxed to him who earns it").

Those seemingly simple propositions, however, betray an underlying complexity.  It is not always easy or straightforward to determine whether income received on a joint assignment was in respect of services performed by the United States taxpayer or by the foreign affiliate also working on the transaction (and in what amount) or whether the income was earned in connection with services performed in the United States.  Tax law looks to the economic reality. "Under the assignment-of-income doctrine, income is taxed to the person who earned it." *Findley v. Comm'r Internal Revenue*, 1991 WL 135502 (T.C. July 25, 1991).  The law thus does not permit a multinational corporation to avoid United States tax on income earned by its United States affiliate by the expedient of having the work billed for and paid to an affiliate in a low-tax jurisdiction.  *See Comm'r Internal Revenue v. Banks*, 543 U.S. 426, 433–34 (2005) ("A taxpayer cannot exclude an economic gain from gross income by assigning the gain in advance to another party.").  Nor does it permit the United States taxpayer to reduce its effective taxes by reporting expenses that were incurred not by it but by the foreign affiliate in a low-tax jurisdiction.  By parity of reasoning, the law also does not require the United States affiliate to report income earned by the efforts of the foreign affiliate based on the simple fact that the project is sourced from the United States or paid to the United States entity.  Again, economic reality governs. "[T]he source of income, United States or foreign, is determined by the situs of the services rendered, not by the location of the payor, the residence of the taxpayer, the place of contracting,

or the place of payment." *Dammers v. Comm'r Internal Revenue*, 76 T.C. 835, 838 (1981).[7]

The obligation falls on the taxpayer, in the first instance, to report its taxable income without regard to the source of its gross income.  That figure is not determined by the invoices issued or receipts received by the taxpayer.  Nor is it determined by origination credit.  With respect to projects where both the United States taxpayer and the foreign taxpayer performed services, the law requires the two companies to charge one another for tax purposes the fees that would be paid in an arms-length transaction.  The relevant regulations provide that "[i]f necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return . . . the results of its controlled transactions based upon prices different from those actually charged."  26 C.F.R. § 1.482-1(a)(3); *see also* Fed. Tax'n Income, Est. & Gifts ¶ 79.1.1 ("Although § 482 is most often invoked by the IRS, a taxpayer may, on a timely original return, report transactions with related persons using arm's length prices, rather than the prices specified by agreements under which the transactions occurred.").  The income tax return must reflect the taxpayer's "true taxable income," a determination which requires application of the arm's length standard for transactions between the related entities.  "A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances."  26 C.F.R. § 1.482-1(b).  Federal regulations specify the methods that

---

[7] The source of the income is relevant to calculating the foreign tax credit, if any, to which the corporation is entitled.  *Cf.* 26 C.F.R. § 1.861-1(c) (explaining that, where a taxpayer has gross income from sources within the United States and without the United States, "the taxable income from sources within the United States shall be separately computed therefrom").  This allows a corporation to avoid double taxation on income that is earned abroad by taking a foreign tax credit for taxes paid on its income to foreign countries, but the amount of such a credit is limited by the relative amount of its taxable income that is foreign sourced.  *See AptarGroup, Inc. v. Comm'r Internal Revenue*, 2022 WL 795666, at *2 (T.C. Mar. 16, 2022); *see also* 26 U.S.C. §§ 901(a), 904.

should be used to evaluate whether transactions between members of a controlled group satisfy the arm's length standard. *See id.* § 1.482-1(b)(2); *see also id.* §§ 1.482-2–1.482-7, 1.482-9.

To protect against tax avoidance by the taxpayer either claiming that it earned no income as a result of services on a particular project or otherwise underreporting the value of the services it performed on a joint project, the Internal Revenue Code ("IRC" or "Code") provides the IRS potent weapons. One of the IRS's tools is the familiar one of an audit. *See* 26 U.S.C. § 7602 (authorizing examination of books and witnesses to "ascertain[] the correctness of any return"). Another is found in Section 482 of the Code. *See Rubin v. Comm'r Internal Revenue*, 429 F.2d 650, 653 (2d Cir. 1970) (Friendly, J.) (remanding case to Tax Court to address misallocated income under Section 482). That provision gives the IRS the power to reallocate gross income among related entities when either the services are performed entirely by a United States taxpayer or the services performed by that taxpayer are not valued at their arms-length value in order to prevent tax evasion or to reflect a company's "true taxable income." 26 C.F.R. § 1.482-1(a)(2). Section 482 provides:

> In any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary [of Treasury] may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or business, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasions of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

26 U.S.C. § 482. "The true taxable income means, in the case of a controlled taxpayer, the taxable income that would have resulted had it dealt with the other member or members of the group at arm's length." 26 C.F.R. § 1.482-1(i)(9). "The purpose of section 482 is [to] prevent artificial shifting of income by placing a controlled taxpayer on a tax parity with an uncontrolled taxpayer." *Amazon.Com, Inc. v. Comm'r Internal Revenue*, 148 T.C. 108, 150 (2017).

Section 482 is thus a remedial tool that provides the IRS with the authority to correct misstated income.  *See* Bittker & Eustice, Fed. Income Tax'n Corp. & Shareholders ¶ 13.20[1][b]; *see also* Bittker & Lokken, Fed. Tax'n Income, Est. & Gifts ¶ 79.1.1 (referring to the IRS's power under Section 482 as "corrective authority").  The law permits the IRS to adjust income when there were prices for goods and services actually charged among affiliates but where those prices were not in accordance with the arm's length standard as well as when that income was initially credited to the incorrect entity.  *See Rubin v. Comm'r Internal Revenue*, 56 T.C. 1155, 1161 (1971) ("[W]here the particular facts of a case are such as to justify a finding that a shareholder operated an independent business and merely assigned to the corporation a portion of the income therefrom, the business activity of the taxpayer may constitute a trade or business to which allocation of all or part of the income attributable to his efforts is authorized under section 482."); *Borge v. Comm'r Internal Revenue*, 405 F.2d 673, 675–76 (2d Cir. 1968) (explaining that "Commissioner's action in allocating a part of Danica's income to Borge was based upon his conclusion that such allocation was necessary in order clearly to reflect the income of the two businesses under Borge's common control" and that such action was "supported by substantial evidence that income of Borge's two businesses has been distorted through Borge's having arranged for Danica to receive a large part of his entertainment income although Danica did nothing to earn that income, and the sole purpose of the arrangement was to permit Danica offset losses from [one business] with income from [the other]"); *Philipp Bros. Chems., Inc. (N.Y.) v. Comm'r Internal Revenue*, 435 F.2d 53, 58 (2d Cir. 1970) (finding no error in reallocation of income to New York business when five of its commonly controlled corporations "did not earn any of the income they reported").

Section 482 thus "rests on the well-settled policy," applicable to the taxpayer's reporting obligation in the first instance, "that income is taxable . . . to the party who earns it and that it is economic reality rather than legal formality which determines who earns income.  Income-splitting devices designed to save taxes cannot be used to undermine the established principle that income is to be taxed to its real owner."  *Philipp Bros. Chems., Inc.*, 435 F.2d at 58.  In this way, "[t]he common-law assignment-of-income doctrine and section 482 overlap considerably, as the latter was devised to provide a 'detailed mechanism to deal with the tax-avoidance problems which spur the assignment of income doctrine.'"  *Ernest S. Ryder & Assocs., Inc., APLC v. Comm'r Internal Revenue*, 2021 WL 2948640, at *28 (T.C. July 14, 2021) (quoting *Keller v. Comm'r Internal Revenue*, 77 T.C. 1014 (1981), *aff'd*, 723 F.2d 58 (10th Cir. 1983)).  "Analysis under the two theories, therefore, should generally not lead to different results," and "[t]ransactions vulnerable to attack under one theory are generally equally vulnerable to the other."  *Id.*; *cf.* Fed. Income Tax'n Corp. & Shareholders ¶ 13.20[1][b] ("In determining the true taxable income of each controlled entity, § 482 seems to amalgamate several pervasive themes and policies of the tax law: tax-avoidance principles, the assignment of income doctrine, general deduction theories, and reflection of net income under the parties' accounting methods.").

Importantly, Section 482 "lays down no principles to determine *when* taxes are being evaded or *when* income is not clearly reflected."  Fed. Income Tax'n Corp. & Shareholders ¶ 13.20 [1][b].  In this way, the section "is clearly subordinate to [26 U.S.C.] § 61(a) and the assignment of income doctrine, which, although vague, at least provides substantive rules for determining what is taxable and to whom it is taxable."  *Id.*; *cf. Continental Equities, Inc. v. Comm'r Internal Revenue*, 551 F.2d 74, 80 (5th Cir. 1977) ("Section 482 is an allocation provision rather than a recognition provision . . . .").  Rather than providing substantive rules

regarding who should claim income on their tax returns, Section 482 prescribes actions that the IRS can take "if amounts that should be reported or deducted are not, in fact, reported or deducted by the proper party."  Fed. Income Tax'n Corp. & Shareholders ¶ 13.20[1][b].  Thus, Section 482 "comes into play only if and when the income reported by related parties does not conform to the threshold substantive rules."  *Id.*

The IRS Commissioner's authority to reallocate income under Section 482 is "broad," and he also has "broad discretion" in applying the section.  *Amazon.Com, Inc.*, 148 T.C. at 149–50.  This discretion is cabined by the requirement that the Commissioner first make a determination that an allocation of income or deductions is necessary.  *The Coca-Cola Co. & Subsidiaries v. Comm'r Internal Revenue*, 155 T.C. 145, 200–01 (2020).  Once the Commissioner makes an adjustment to income under Section 482, an entity can petition the Tax Court for a determination whether the Commissioner's reallocation set forth in the notice of deficiency was correct.  *Eaton Corp. v. Comm'r Internal Revenue*, 140 T.C. 410, 415 (2013).  The Tax Court's jurisdiction "includes reviewing administrative determinations that are necessary to determine the merits of the deficiency determinations," such as the Commissioner's decision with respect to a taxpayer's accounting method.  *Id.*  An entity can also sue directly in a district court in certain circumstances:  "When a notice of deficiency is mailed to a taxpayer he has two options, one is to petition the Tax Court before payment of the tax, and the other is to pay the tax and sue for a refund in a district court or in the United States Claims Court."  *Naftel v. Comm'r Internal Revenue*, 85 T.C. 527, 533 (1985); *Stafford v. Comm'r Internal Revenue*, 1983 WL 14631 (T.C. Oct. 25, 1983) ("While petitioners may petition this Court as they did, they had an option to seek another forum; they could have paid the tax and sued for a refund in

their local U.S. District Court of the U.S. Claims Court.").  The Courts of Appeals have exclusive jurisdiction to review decisions of the Tax Court.  26 U.S.C. § 7482(a)(1).

A court will uphold the Commissioner's allocation determination made under Section 482 "unless the taxpayer shows it to be arbitrary, capricious, or unreasonable," *Amazon.Com, Inc.*, 148 T.C. at 150, and a "determination whether the Commissioner has abused his discretion generally turns upon questions of fact," *The Coca-Cola Co.*, 155 T.C. at 202.  "[I]f there is substantial evidence supporting the determination, it must be affirmed."  *Id.*; *see also Advance Mach. Exch., Inc. v. Comm'r Internal Revenue*, 196 F.2d 1006, 1008 (1952); *Philipp Bros. Chems., Inc.*, 435 F.2d at 57 (affirming Commissioner's allocation of net income from foreign corporations to affiliated New York-based corporation when the income was earned in New York, not by the foreign corporations, and explaining that "Section 482 was designed to grant the Commissioner authority to reallocate income among controlled businesses in just such a situation as this").  If, however, "the taxpayer demonstrates that the Commissioner's allocation is arbitrary, capricious, or unreasonable, but fails to prove an alternative allocation that meets the arm's-length standard, the Court, using its best judgment, 'must determine from the record the proper allocation of income.'"  *The Coca-Cola Co.*, 155 T.C. at 203 (citing *Sundstrand Corp. v. Comm'r Internal Revenue*, 96 T.C. 226, 354 (1991)).

### C.     New York False Claims Act

Under the New York False Claims Act ("NYFCA"), a defendant is liable to a state or local government if the defendant "has possession, custody, or control of property or money used, or to be used, by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property," N.Y. Fin. L. § 189(1)(d), or if the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government," *id.*

§ 189(1)(g).  Unlike the federal False Claims Act, the NYFCA allows, under certain circumstances, claims related to violations of tax laws.  *See id.* § 189(4)(a).[8]

Under the NYFCA, "[a]ny person may bring a qui tam civil action for a violation of section one hundred eighty-nine of this article on behalf of the person and the people of the state of New York or a local government."  *Id.* § 190(2)(a).  "The state may elect to supersede or intervene and proceed with the action, or to authorize a local government that may have sustained damages to supersede or intervene" within a specified time period.  *Id.* § 190(2)(b).  "When the State 'declines to supersede or intervene in the action, the NYS FCA allows the *qui tam* plaintiff to continue its claims on behalf of the government and entitles the plaintiff to receive between 25 percent and 30 percent of the amount recovered if the action is successful,'" thereby incentivizing private persons to "act against fraudulent schemes against the government."  *New York ex rel. TZAC, Inc. v. New Israel Fund*, 520 F. Supp. 3d 362, 374 (S.D.N.Y. 2021) (alteration adopted) (quoting *New York ex rel. Khurana v. Spherion Corp.*, 2016 WL 6652735, at *9 (Nov. 10, 2016)).

## PROCEDURAL HISTORY

Plaintiff initially filed this *qui tam* action in New York County Supreme Court in January 2017.  After the New York State Attorney General declined to prosecute or intervene in Plaintiff's action, Dkt. No. 1-4, Plaintiff filed an amended complaint (referred to herein as the Complaint).  In it, Plaintiff alleged that Defendants violated the NYFCA, N.Y. Fin. L. § 189(1)(d), (g), by knowingly reporting artificially reduced taxable income to New York City

---

[8] The federal False Claims Act does not apply to claims, records, or statements made under the Internal Revenue Code.  31 U.S.C. § 3729(e); *see also United States ex rel. Lissack v. Sakura Global Cap. Markets, Inc.*, 377 F.3d 145, 146 (2d Cir. 2004) ("[T]he False Claims Act contains a proviso known as the 'Tax Bar,' which excludes from the Act's coverage all 'claims, records, or statements made under the Internal Revenue Code of 1986.'" (quoting 31 U.S.C. § 3729(e))).

and New York State, thereby depriving these entities of millions of dollars of tax monies owed. *See generally* Compl.

Defendants removed the action to federal court, asserting that the district court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1340 because the claims "arise under" the IRC and related regulations.  Defendants contend that the Plaintiff's action implicates "significant federal issues" and that, under the analysis set forth in *Grable & Sons Metal Products Inc. v. Darue Engineering and Manufacturing*, federal jurisdiction exists.  545 U.S. 308 (2005).  Specifically, Defendants argue that, because New York income taxes are calculated based on the net income reported on a taxpayer's federal tax return, any liability EZI USA has under New York tax law "necessarily turn[s] on a determination of the Company's compliance with federal tax law."  Dkt. No. 1 ¶ 15.  Determining whether EZI USA complied with federal tax law, Defendants continue, requires consideration of EZI USA's filing and reporting requirements under the IRC's transfer-pricing rules that apply to companies that have cross-border operations.  *Id.* ¶¶ 16–18.

## DISCUSSION

Under 28 U.S.C. § 1441, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be removed to federal court except as otherwise provided by Congress.  "Where, as here, jurisdiction is asserted by a defendant in a removal petition, . . . the defendant has the burden of establishing that removal is proper." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994).  "[O]ut of respect for the limited jurisdiction of the federal courts and the rights of states," the Court will "resolve any doubts against removability."  *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d

112, 124 (2d Cir. 2007).  In resolving a motion to remand, the Court will treat all facts alleged in the Complaint as true.  *See First Abu Dhabi Bank PJSC*, 432 F. Supp. 3d at 406.

Defendants assert that the Court has federal question—or "arising under"—jurisdiction over this case.  "Congress has given the lower federal courts jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 27 (1983).  Federal question jurisdiction thus "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  "It is not enough that the complaint anticipates a potential federal defense."  *New York v. Shinnecock Indian Nation*, 686 F.3d 133, 138 (2012).

Claims that "find[] [their] origins in state rather than federal law" may be amenable to "arising under" jurisdiction.  *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  When considering whether a case that pleads a state-law cause of action is properly before a court on a theory of federal question jurisdiction, "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S. at 314.  Accordingly, a court can exercise jurisdiction over a state-law claim if the federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn*, 568 U.S. at 259.

The parties dispute that each of the *Grable–Gunn* factors has been met.  Plaintiff argues that the Complaint does not necessarily raise any federal question, that there are no disputes over a federal issue that is substantial, and that the case can be decided in state court without upsetting the federal-state balance.  The Court will consider each factor in turn.

## I.    Necessarily Raised

"A state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law."  *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016) (citing *Grable*, 545 U.S. at 314).  "Where a federal issue is present as only one of multiple theories that could support a particular claim, . . . this is insufficient to create federal jurisdiction."  *Broader v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005); *see also New York ex rel. Rasmusen v. Citigroup Inc.*, 220 F. Supp. 3d 523, 527–28 (S.D.N.Y. 2016) ("As Rasmusen theoretically could prevail on this claim [based on one of multiple theories] without determination of any federal question, the complaint does not *necessarily* raise a federal issue.").

Defendants argue that Plaintiff's NYFCA claims "necessarily" raise a federal issue because the action alleges that the net income as reported on EZI USA's federal tax return—which was then used for establishing the New York state and city tax obligations—was incorrect.  Dkt. No. 1 ¶¶ 14–15.  According to Defendants, this case therefore requires the Court to resolve whether EZI USA complied with federal tax law in order to determine whether Defendants violated the NYFCA.  *See id.* ¶ 15.  Assessing compliance in turn requires the Court to "interpret[] and apply[] federal transfer pricing rules and regulations," Dkt. No. 23 at 1, and evaluate "what constitutes appropriate revenues *under the federal rules and regulations*," *id.* at 2.

Plaintiff disagrees.  According to Plaintiff, Defendants have not articulated a discrete federal question that needs to be resolved in this case and, instead, have only pointed to a

"generalized body of federal law" that is implicated in the NYFCA claims.  Dkt. No. 12 at 11.

Plaintiffs dispute that the Complaint raises transfer-pricing issues, asserting that these rules are

"irrelevant" in this context.  Dkt. No. 25 at 2.  Plaintiff states that the IRC provision governing

transfer pricing allows the IRS to "adjust allocations of revenues from cross-border transactions

between related entities where 'necessary in order to prevent evasion of taxes or clearly to reflect

the income of any of such organizations, trades, or businesses,'" which focuses on whether

prices charged to related entities were at an arm's length value—something that, in its view, is

not in dispute in this case.  *Id.* at 3; *see also* Compl. ¶¶ 222–223 (alleging that EZI USA's

statement to IRS representatives that payment amounts "represent[] arm's length transactions at

the fair market value" was "accurate").  According to Plaintiff, "[t]he violations [claimed in this

case] lay in EZI USA's reporting, not in its allocation" of revenues among affiliates, Dkt. No. 25

at 3; its claims are rooted in EZI USA making false statements *after* the allocations had been

made, *id.* at 4.

      Plaintiff's arguments are mistaken.  Plaintiff's claim that EZI USA misreported its

income necessarily rests on the determinations of EZI USA and EZI AG about how to allocate

revenue—including for tax purposes—among the many countries in which EZI AG and its

affiliates do business.  According to the factual allegations of the Complaint, EZI AG does

business in numerous countries, and many if not all of its affiliates work with other of its

affiliates on projects that cross borders.  Executive search for firms that do business across

borders invariably involves cross-border work.  As the dialogue quoted in the Complaint

highlights, EZI USA might, for example, perform work for a company incorporated and

headquartered in Germany.  The work might be billed in Germany and credit might go to

Germany for having sourced the work, but the services would be rendered by the United States

company.  Another of EZI AG's foreign affiliates might do work on an assignment for a company located in the United States and where the work is sourced by and billed by the United States entity.  On any particular assignment, the entity which performed the work and thus which earned the income might not be the same as the one that billed the work.  *See, e.g.*, Compl. ¶¶ 53, 246.  As the Complaint also highlights, this happens "both ways."  There may be circumstances where the United States affiliate received performance credit without rendering services just as there may be circumstances where the foreign affiliate receives performance credit without rendering services.  *Id.* ¶ 246.  To say that EZI AG misreported its income thus assumes the very question of law that is at the heart of this case:  the question whether the transactions as to which EZI AG received performance credit or issued fax charges without there being I/A billing were ones that under the Internal Revenue Code were required to be reported as income of EZI USA. *See, e.g.*, *id.* (EZI USA Co-Managing Partner explaining that "[t]he tricky part . . . is everything we do is global" and "[w]hen I get in a huddle and I have people in ten different countries, what are we supposed to bill that time").

Plaintiff argues that the "allocation splits are not where Plaintiff claims that Defendants made the false statements and records that violated the NYFCA" and that "[t]he false statements arose after the allocations had already been made, when EZI USA chose to hide the allocated revenues from many of the joint assignments on its tax returns," Dkt No. 25 at 4, but that is a distinction without a difference.  Defendants' returns would be equally misstated—and principles of federal allocation of income and transfer pricing implicated—by the decision to improperly credit all of the income on a particular joint project to a foreign affiliate as it would by a decision to improperly credit just some of that income to the foreign affiliate.  The issue is the same.  The only question is whether, as Plaintiff alleges in the case of the discrepancy between I/A billing

and fax charges, the implicit allocation to the United States is zero or it is some other number that does not accurately reflect the work that was performed by EZI USA.  In other words, Plaintiff's allegations presume the answer to a question of federal law—that at least some of the income earned on the transactions that were not included for purposes of calculating federal taxes should have been allocated to the United States.  That is the very federal allocation-of-income and transfer-pricing question at the center of this case.

It follows then that the Complaint raises a federal question.  At its heart is the question whether all of the transactions for which EZI USA earns "performance" credit under the fax charge system should be considered in calculating income in the United States or only those transactions for which I/A billings are prepared.  At the heart also is the question whether, after including all of the joint assignment transactions where no income was reported in the United States, as well as those that "went the other way" where all of the income was reported in the United States, EZI AG's methodology resulted in EZI USA reporting less than all of the income it should have reported.  Those questions do not turn on allegations such as Defendants maintaining "two sets of books" or even on conclusions such as Defendants' "underreporting." Nor does it turn upon Plaintiff's allegation that Defendants did not include some transactions that were recorded by fax charges.  Dkt. No. 12 at 10-11.  They turn upon an interpretation of the Internal Revenue Code and a determination of what it means to earn income that is taxable in the United States and whether, with respect to the specific facts of the taxpayer's business, the income constitutes gross income, such as "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items."  26 U.S.C. § 61(a)(1); *see also id.* §§ 861(a)(3), 862(a)(3), 863(b)(1).[9]

_____

[9] As further discussed below, the case raises another substantial federal question: whether a

This case is therefore unlike *Uintah County v. Perdue Pharma, L.P.*, 2018 WL 3747847 (D. Utah Aug. 7, 2018), in which a court in the District of Utah concluded that "arising under" jurisdiction did not exist over a case that asserted state-law claims and provided bases for those claims that did not necessarily depend on the interpretation of a disputed provision of federal law. In *Uintah County*, the plaintiffs identified non-federal sources of the legal duties they claimed they were owed, and any federal issues that were raised where therefore not "necessarily" raised. Here, in contrast, under New York law, the question of what income should be reported requires the Court to interpret and apply a question of federal law—whether that income is reportable under the IRC.[10] The Complaint thus satisfies the first element of the *Grable–Gunn* test for the existence of federal jurisdiction.

## II.    Actually Disputed

The second inquiry is whether the federal question is "actually disputed." The Second Circuit has stated that "there can be no doubt that the 'actually disputed' factor of the test is satisfied when the federal issue is 'the only' or 'the central' point in dispute." *Jacobson*, 824 F.3d at 316 (quoting *Grable*, 545 U.S. at 315, and then *Gunn*, 568 U.S. at 259).

Plaintiff also argues that any federal issue is not "actually disputed." It reasons that EZI USA's claim that it did not underreport its federal taxes raises a "factual defense" and does not

---

Plaintiff can use a state FCA claim to bypass the restrictions on review of federal income tax reporting created by the Tax Bar to the federal FCA and Section 7401 of the IRC. *See Lissack*, 377 F.3d at 153 (holding that Tax Bar prevents not only private actions that seek to recover taxes but any false claims act claim where the claims "are false claims insofar as the Government is concerned precisely because (and only because) they violate the Tax Code" and where "the IRS has authority to recover the precise amounts" sought in the false claims action).

[10] Plaintiff argues that Defendants have not pointed to a particular question of federal law that must be decided to resolve Plaintiff's NYFCA claims and suggests that Defendants instead "rely on a generalized body of federal law." Dkt. No. 12 at 11. This argument misunderstands Defendants' position, which is that the case implicates numerous provisions of the IRC that relate to how a company that engages in cross-border transactions calculates its taxable federal income, including 26 U.S.C. §§ 61, 482, 861–863.

turn upon a legal argument.  Dkt. No. 12 at 12.  But that argument misunderstands the nature of

the defense and what must be decided to rule upon it.  As both parties agree, there is no dispute

in this case regarding the income earned by EZI AG and its affiliates, including EZI USA, as a

whole.  All of the income earned by EZI AG on a consolidated basis was reported in one

jurisdiction or another.  There was no unreported income.  The question is where the income

should have been reported and by which entity and how the income should have been calculated.

That question cannot be answered by simply pointing to Defendants' fax charges or any other

internal accounting system.  It must be decided also upon a conclusion as to what income should,

under the IRC, be reported in the United States by EZI USA and how costs and revenue shared

by affiliated corporations should be allocated.  It is not enough that a fax charge reflects

performance credit earned by the United States office; if it does not constitute income earned as a

result of services performed by the United States taxpayer, it is not reportable.  And that is the

nub of the dispute between the parties.  Plaintiff necessarily claims that federal law required

Defendants to include the revenue reflected in the fax charges and deduct only a portion of

global costs in calculating its income; Defendants necessarily dispute that conclusion, including

by asserting that EZI USA correctly reported its income in the first place and that EZI USA's

federal income calculations are correct in the absence of a Section 482 reallocation.  *See* Dkt.

No. 21 at 13.

Plaintiff raises no alternative theory for how the NYFCA was violated outside of EZI

USA's allegedly improper recording of its federal income.  How and if sums from fax charges

and global-cost deductions should be considered in the calculation of EZI USA's federal income

in order for the federal taxable income to be accurate turns upon an interpretation of federal law

that is "obviously disputed."  *See Jacobson*, 824 F.3d at 317 (concluding that first two elements

of the *Grable-Gunn* test were met where, in order to establish a false statement or record that formed the basis for a violation of the NYFCA, the plaintiff needed to prove that trusts did not qualify for a certain status under federal law).

## III.    Substantial Issue

The final two inquiries of the *Grable–Gunn* test—whether the federal issue is substantial and capable of resolution in federal court without disrupting the federal-state balance—overlap in large part.  "Absent a special state interest in a category of litigation, or an express congressional preference to avoid federal adjudication, federal questions that implicate substantial federal interests will often be appropriately resolved in federal rather than state court."  *Jacobson*, 824 F.3d at 316.

Plaintiff claims that even if the federal issues were disputed, they are not substantial.  It asserts "Defendants have not explained how any interpretation of federal tax law here will affect the federal system as a whole," including because the state-law claims relate to EZI USA's failure to include the values and costs associated with particular joint assignments on its tax returns.  Dkt. No. 12 at 13.  That argument, too, mistakes the federal interests at stake in this case.  The third factor of the *Grable-Gunn* tests asks if the case "present[s] a legal issue that implicates 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum,'" *Jacobson*, 824 F.3d at 316 (quoting *Grable*, 545 U.S. at 313), and looks not to whether the federal issue is significant to the particular parties in the instant suit but "instead to the importance of the issue to the federal system as a whole," *id.* (quoting *Gunn*, 568 U.S. at 260).

There is no question that the federal interest is substantial.  The allocation of income among affiliates of a multinational corporation raises among the most serious and sensitive questions of international taxation.  Income that is allocated to a corporation in a lower-tax

jurisdiction will not be allocated to its affiliate in the United States and the United States may not realize any tax revenue from that income, just as income that is allocated to a United States corporation will not be allocated to a corporation based in some other country and that other country may miss out on such revenue. The issue thus implicates two of the most central issues for any sovereign entity—its ability to raise revenue to conduct the affairs of state and the sovereign entity's foreign relations with other sovereigns. *Cf. Attorney Gen. Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 111 (2d Cir. 2001) ("Tax laws embody a sovereign's political will. . . . They mirror the moral and social sensibilities of a society."); *McCulloch v. Maryland*, 17 U.S. 316 (1819). Revenue raised by one country will be revenue not raised by the other. All one has to do is to glance at the headlines and see the battles between the United States and Ireland or other lower-tax jurisdictions to understand both the sensitivity and the question and the substantial federal interest. *See, e.g.*, Liz Alderman, *Ireland's Days as a Tax Haven May Be Ending, but Not Without a Fight*, N.Y. Times (Oct. 7, 2021); Paul Hannon & Richard Rubin, *Corporate Taxes Poised to Rise After 136-Country Deal*, Wall St. J. (Oct. 8, 2021).

In this context, it cannot be gainsaid that there is a critical federal interest in having issues regarding the rules for the allocation of income and the appropriate pricing for tax purposes of affiliates of a multinational corporation decided in a federal forum with a single answer provided by adjudicators with a duty solely to the laws of the United States of America and not separately to any particular state within the Union.[11] It is the government of United States that is charged

---

[11] To be sure, state governments too have a significant interest in the integrity and security of their own fisc and in ensuring that all taxes owed to them are in fact reported and paid. But this case raises not an issue of allocation of income among the several states but among the United States and other countries.

by the Constitution with the responsibility for the foreign affairs of the country as a whole.  *See,*

*e.g.*, U.S. Const. art. II, § 2; *id.* art. I, § 8.  And it is the United States, and not individual states,

that negotiates international tax treaties that address and help resolve disputes regarding

allocation of income and transfer pricing.  *See, e.g.*, Convention Between the Government of the

United States of America and the Government of Ireland for the Avoidance of Double Taxation

and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, Ir.-

U.S., July 28, 1997, Treaty Doc. 105-31.  It is also the United States whose foreign policy

interests will be implicated if, as a result of the incorrect interpretation of the federal income

taxation question underlying Plaintiff's state tax law claim, a United States entity is required to

report income that is properly reported elsewhere.

The federal issue implicated here is not insubstantial just because the ultimate

determination of whether EZI USA misstated its income requires an examination of the

underlying facts.  In *NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1024

(2d Cir. 2014), the Second Circuit considered whether NASDAQ's actions in connection with an

initial public offering ("IPO") complied with its obligations under the Securities and Exchange

Act of 1934 and internal rules mandated by federal law to provide a fair and orderly market in

conducting the IPO.  In that case, the court determined that the case "necessarily raise[d]

multiple disputed issues of federal law, including the contours of NASDAQ's federal duty to

maintain a fair and orderly market, the scope of that duty, and whether the failure of NASDAQ's

systems during the . . . IPO amounted to a breach of that duty."  *Id.* at 1023.  It then determined

that this contested federal issue was "sufficiently significant to the development of a uniform

body of federal securities regulation to satisfy the requirement of importance to 'the federal

system as a whole.'"  *Id.* at 1024.  In so concluding, the Circuit highlighted "the importance of

stock exchanges and securities markets to the national economy," *id.*, and distinguished a dispute regarding a stock exchange's adherence to disciplinary rules with respect to its personnel as not "implicat[ing] one of the most fundamental functions of a national securities exchange," echoing the SEC's explanation that "the orderly initiation of secondary market trading after an IPO is one of the most fundamental functions of a national securities exchange, and affects not only the market for those individual companies but also investor confidence in the market as a whole," *id.* at 1027 (internal quotation marks omitted) (alteration adopted).  The Circuit also found it noteworthy—for the purposes of both its substantiality and federal-state balancing analysis—that "Congress has attempted to place disputes alleging violations of federal securities law obligations exclusively in a federal forum."  *Id.* at 1028.

As in *NASDAQ OMX Group*, the federal question at issue here centers on the scope of a corporation's duty under a highly complex, specialized system of federal law applicable to entities with foreign related entities; implicates one of the most fundamental principles of that federal system—how cross-border income is allocated and thus, what countries may obtain the benefit of tax revenue—and concerns a topic for which "Congress has attempted to place disputes . . . exclusively in a federal forum."  *Id.*  "Such circumstances compel the conclusion that [Plaintiff's] state law claims raise substantial, disputed federal issues—issues important to the federal system as a whole."  *Id.* at 1029.  The third factor is met.

## IV.   Division of Labor

Finally, the *Grable–Gunn* test turns upon an assessment whether the exercise of jurisdiction would "upse[t] the state-federal law drawn (or at least assumed) by Congress" and be "consistent with congressional judgment about the sound division of labor between state and federal courts governing [federal question jurisdiction]."  *Grable*, 545 U.S. at 313–14.  The state-federal balance is "defined by 'the nature of the claim, the traditional forum for such a claim, and

the volume of cases that would be affected.'" *Tantaros v. Fox News Network, LLC*, 12 F.4th 135, 146 (2d Cir. 2021) (quoting *Jacobson*, 824 F.3d at 316).

There are forceful arguments on both sides.  Defendants assert that "federal transfer pricing issues are more appropriately adjudicated in federal court because of their potential impact on revenues reported in foreign countries."  Dkt. No. 1 ¶ 27.  Plaintiff argues that there is no federal private right of action that they could have brought to resolve the dispute under federal law.  Dkt. No. 12 at 14.  They also argue that Defendant's argument admits of no limiting principle because it would encompass not only NYFCA cases but also cases about New York State and New York City personal income taxes and income-related taxes imposed by nearly every state and many localities across the country that similarly use federal taxable income as the basis for calculating state and local tax liabilities.  *Id.* at 14–15.

Defendants have the better of the argument.  The exercise of federal jurisdiction to determine international tax issues under the IRC embedded in a state tax claim appears to be consistent with congressional judgment.  In 1986, Congress enacted the Tax Bar to the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, precisely to centralize determination of tax issues with the IRS in the first instance.  That law provides explicitly that the FCA "does not apply to claims, records, or statements made under the Internal Revenue Code of 1986."  *Id.* § 3729(e). The Tax Bar "was intended to codify case law existing before the 1986 amendment, which reserved discretion to prosecute tax violations to the IRS and barred FCA actions based on tax violations."  *Lissack*, 377 F.3d at 152–53.[12]  Congress affirmatively intended to leave "discretion

---

[12] As the Second Circuit has explained it, "[t]he conclusion that the IRS has exclusive jurisdiction over tax matters stems in part from § 7401 of the Tax Code, which provides: 'No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced.'"  *Id.* at 153 (quoting 26 U.S.C.

to prosecute tax violations to the IRS," *id.* at 153, and "to prevent private litigants from

interfering with the IRS's efforts to enforce the tax laws," *id.* at 156.  Indeed, the Second Circuit

has explained that Congress intended to prevent not only private actions that seek to recover

taxes but any FCA claim where the claims "are false claims insofar as the Government is

concerned precisely because (and only because) they violate the Tax Code" and where "the IRS

has authority to recover the precise amounts" sought in the false claims action.  *Id.* at 153.  In

other words, through Section 7401—which generally prohibits private rights of actions—and the

Tax Bar, Congress vested discretion in the IRS to determine a taxpayer's compliance with the

Tax Code.  It also recognized the interest in having the federal income tax issues (such as those

underlying Plaintiff's Complaint) to be addressed, in the first instance, by a federal agency with

experience and expertise in the area that could provide a uniform nationwide answer—based on

principles that would apply to all multinational corporations—subject to review only either in

Tax Court or, after payment, in a refund action in federal district court.  *See Franziska Hertel,*

*Qui Tam for Tax?: Lessons from the States*, Note, 113 Colum. L. Rev. 1897, 1918–19 (2013)

("Section 7401 can ultimately be characterized as embodying a judgment regarding institutional

competence.  It reflects the conclusion by the legislature that the IRS, in conjunction with the

DOJ, should be left in charge of deciding when to pursue an action for alleged tax fraud,

presumably because the legislature has decided that the Service and DOJ as in the best position

to make this determination . . . Giving the Service the last say over whether certain

circumstances constitute a violation and whether such a violation warrants enforcement ensures

that tax laws are interpreted and applied consistently to taxpayers in similar situations.").

---

§ 7401)).

The Tax Bar, on its face, only applies to the federal FCA.  It does not expressly preclude state false claims act actions where the claim of falsity rests only and entirely on a claim that the IRC has been violated.  But, against this backdrop, it is inconceivable that the same Congress that legislated to ensure that the enforcement of the federal tax provisions governing international taxation be enforced only by the IRS, as the federal agency responsible for the public fisc, would not have wanted a federal court to determine the scope and content of a state FCA provision when that provision is being used—as Plaintiff attempts to do here—to prosecute a claim that turns only and entirely upon an interpretation of the IRC.  Indeed, Plaintiff's argument that "nearly every state and many localities across the country use[s] federal taxable income as the basis for calculating state and local tax liabilities" cuts against Plaintiff.  Dkt. No. 12 at 14-15.  The NYFCA is virtually unprecedented in the fact that it permits claims based on a false tax return.  Hertel, 113 Colum. L. Rev. at 1915 ("While a number of states . . . implicitly allow qui tam actions against tax fraud in at least some instances, New York is the only state with a false claims act that *explicitly* includes tax fraud in its ambit.").  But it need not be unique; other states could adopt similar laws.

Thus, accepting Plaintiffs' argument, the federal income tax owed by a multinational corporation would be subject to attack and second-guessing not just by private relators in New York, but potentially by private relators in state court in every state in the United States, as each sought for the United States, and thereby for the state, the largest allocation of income.  That may be the result that the law requires.  But it is appropriate and does not undermine the federal-state balance contemplated by Congress for a federal court determine the answer to that question in the first instance.[13]  This conclusion will not open the floodgates of federal court to state qui tam

---

[13] Defendants have filed a motion to dismiss the Complaint for failure to state a claim for relief

actions—the highly complex and specialized nature of the question presented, which relates only to the income calculated by corporations with multinational affiliates earned on cross-border projects, will prevent such an outcome. As in *Grable*, the exercise of jurisdiction by a federal court here "will portend only a microscopic effect on the federal-state division of labor." *Grable*, 545 U.S. at 315. Remanding the matter to state court would portend an enormous effect.

## CONCLUSION

The motion to remand is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 11.

SO ORDERED.

Dated: March 22, 2022
       New York, New York                    _____
                                                    LEWIS J. LIMAN
                                              United States District Judge

that raises some of these issues. Dkt. No. 20. The Court will address that motion in due course.