UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                         :

STATE OF NEW YORK *et al.*,            :

                     :

        Plaintiff,         :

                     :                21-cv-6883 (LJL)

      -v-                :

                     :           OPINION AND ORDER

EGON ZEHNDER INTERNATIONAL, INC *et al.*,   :

                     :

        Defendant.       :

                     :

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/31/2022__

LEWIS J. LIMAN, United States District Judge:

      Intervenor, the State of New York ("State"), moves for an order, pursuant to New York

State Finance Law § 190(5)(b)(ii), determining that the State's proposed settlement of the New

York False Claims Act causes of action asserted on the State's behalf in relator American

Advisory Services, LLC's ("Relator") amended complaint (the "Amended Complaint") are fair,

adequate, and reasonable with respect to all parties under all the circumstances.  Dkt. No. 63.

      For the following reasons, the motion is granted.

## BACKGROUND

### A.    Egon Zehnder's Internal Accounting and Federal and State Tax Reporting

      This case arises from the internal accounting systems of a multinational executive search

firm, Egon Zehnder International AG ("EZI AG"), and the federal and state tax reporting of its

United States affiliate Egon Zehnder International, Inc. ("EZI USA" and together with EZI AG,

"EZ" or "Defendants").  The following facts are taken from the Amended Complaint filed by

Relator and are alleged to be as follows.  Dkt. No. 1-5.

      EZ styles itself an "elite global executive search firm" with offices and thousands of

employees all over the world.  Dkt. No. 1-5 ¶¶ 27, 49.  EZI USA, in turn, markets itself as part of

a global executive search firm with a "one firm" philosophy that is expert at working across borders to find suitable executive and board members for its clients. *Id.* ¶ 48.  EZ kept two sets of books. *Id.* ¶ 3.  One set of books was based on what was called the "fax charge" system[1] and was used internally in the conduct of EZ's business and to monitor its actual performance. *Id.* ¶¶ 3, 58–60.  It sought to measure the performance credit due to each office working on a cross-border assignment and was calculated by multiplying the fee billed to the client by the percentage split agreed to between the offices working on the joint assignment. *Id.* ¶ 59.  The second set of books were described as "legal" records and were used to prepare EZI USA's tax returns. *Id.* ¶¶ 3, 112.  The legal books did not include every assignment for which performance credit was provided under the "fax charge" system.   On the legal books, EZI USA included only what EZI AG called "international assistance" or "I/A" billings—it used the same revenue percentage split as used for the fax charges but sent I/A billings only for some of its joint assignments with foreign affiliates and not for every assignment that had a fax charge. *Id.* ¶ 113.

EZ and its affiliates must record taxable income and pay taxes in every jurisdiction in which they do business.  In the United States, EZI USA must include in its gross income (from which taxable income is determined) all of the compensation it receives for labor or personal services performed in the United States regardless of the residence of the payor, the place in which the contract for service was made, or the place or time of the payment, as well as—"for labor or personal services performed partly within and partly without the United States" by someone other than the taxpayer—the compensation "that most correctly reflects the proper

---

[1] The system received its name from the fact that when EZI AG developed it in the 1970s, the billing office working on a joint assignment claimed performance credit by sending a form using a telex machine. *Id.* ¶ 72.  When fax machines came into popular usage in or about the 1980s, the name of the procedure was changed to a "fax charge." *Id.* ¶ 73.

source of income under the facts and circumstances of the particular case."  26 C.F.R. §1.861-4(a), 4(b).  Federal taxable income is used to calculate the New York State and New York City taxes that an entity owes.  Dkt. No. 1-5 ¶ 41 (citing 26 U.S.C. § 861(a); 26 C.F.R. § 1.861-4; N.Y. Tax L. § 208.9(ii)).   New York's tax law defines "entire net income"—used to determine taxes due and owing—to include the income "the taxpayer is required to report to the United States treasury department."  N.Y. Tax L. § 208(9).  Tax rates differ across jurisdictions, providing the opportunity for what might be viewed benignly as "tax planning" or less benignly as "tax fraud."   Dkt. No. 1-5 ¶¶ 120–125.  By performing work in low-tax jurisdictions (the benign view) or allocating income performed elsewhere to low-tax jurisdictions (the less benign view), a corporate enterprise engaged in cross-border work can reduce its aggregate tax exposure.

The Relator takes the less benign view.  Between November 1, 2003 and October 31, 2013, EZI USA worked on thousands of client assignments together with at least one foreign EZI AG office of their offices across four continents.  Dkt. No. 1-5 ¶¶ 51–52.  It used the legal books to calculate the federal taxable income, and in turn state and city income, due for each year during which it performed those assignments, thereby not including every transaction for which there was a fax charge.  *Id.* ¶¶ 88–93.

On January 21, 2017, Relator brought a claim in New York State court under the New York False Claims Act ("NYFCA"), N.Y. Fin. L. § 189(1), which imposes treble-damages liability owed to the State or to a local government if the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government."  N.Y. Fin. L § 189(1)(g).  Under the NYFCA, "[a]ny person may bring a qui tam civil action" for a violation of its provisions and

may—if successful—receive between twenty-five percent and thirty percent of the amounts recovered. *Id.* ¶ 190(2)(a). Relator alleges that, by not including all of the fax charges, EZI USA made and used false statements in its New York State and New York City tax returns, as well as with the Internal Revenue Service ("IRS"), and underreported its taxable income by tens of millions of dollars. *Id.* ¶¶ 4, 94.

## B. The NYAG Investigation

Under the NYFCA, "[t]he state may elect to supersede or intervene and proceed with the action, or to authorize a local government that may have sustained damages to supersede or intervene" within a specified time period. N.Y. Fin. L. § 190(2)(b). Shortly after the Relator filed this action under seal in state court on January 21, 2017, the New York Attorney General ("NYAG") opened an investigation into Relator's allegations. Dkt. No. 65 ¶ 3. In the course of its investigation, the Attorney General reviewed the voluminous documents and digital recordings provided to it by the Relator and, in February 2018, interviewed the sole member of Relator, a former employee of EZI USA with substantial knowledge of EZI's business practices; the New York Attorney General interviewed that person a second time in September 2017 and had numerous and regular communications with Relator's counsel throughout the course of its investigation. *Id.* ¶ 4. The Attorney General also issued two document subpoenas to EZI USA and reviewed roughly 147,000 pages of documents it received in response to those subpoenas. *Id.* ¶¶ 5, 6, 7. It also issued document subpoenas to two professional service firms that had provided tax-related services to EZI USA, reviewed the documents produced by those firms, and took sworn testimony from six witnesses, including (i) EZI USA's Head of Financial Operations from April 2013 until April 2017, (ii) EZI USA's then-current Controller, who had previously been the Assistant Controller for most of the relevant time period, (iii) three EZI USA partners who held executive leadership positions within the company during the relevant time period and

to whom Relator's sole member had raised concerns about EZI's practices, and (iv) the partner in a professional services firm who was responsible for preparing EZI USA's federal and state tax returns until 2013.  *Id.* ¶¶ 8–9.

After a lengthy and thorough investigation into Relator's allegations, on November 13, 2020, the State notified the state court, pursuant to N.Y. State Finance Law § 190(2)(f), that the State had decided neither to supersede and convert the action into a civil enforcement action nor to intervene.  *Id.* ¶ 20.  That decision was reached only after, during the course of its investigation, the Attorney General had consulted regularly with the New York State Department of Taxation and Finance regarding the underlying tax issues involved in the case.  *Id.* ¶ 10.  In June 2020, the Attorney General also hired an expert (at the State's expense) to provide tax advice specifically on transfer-pricing issues.  *Id.* ¶ 11.  Among other things, the State learned that in April 2013, Relator's sole member had made a whistleblower submission to the IRS concerning the practices that are the subject of this action and that, in or around February 2014, the IRS had commenced an audit of EZI USA's tax returns for tax years 2010–11, 2011–12, and 2012–13, which specifically sought information on the practices at issue in the Amended Complaint.  *Id.* ¶¶ 12-13.  The IRS ultimately accepted EZI USA's responses to the audits and concluded the audit without making any adjustments relating to EZI USA's use of fax charges or seeking to re-open any prior tax years.  *Id.* ¶¶ 15–16.  The Attorney General's own analysis of documents produced by EZI USA shows that, while EZI USA sent fax charges totaling $83,188,235.65 without a corresponding I/A billing during tax years 2003–04 through 2013–14 (thereby claiming performance credit for work that was not reflected in the records used to calculate United States taxable income), it also received fax charges totaling $68,889,880.33 without a corresponding I/A billing during that time (thereby including in its taxable income

revenue for which another office claimed performance credit).  *Id.* ¶ 18.  During the relevant time period, EZI USA's annual revenue was typically in the range of $100 million.  *Id.* ¶ 19.

### C.     History of this Case

As noted, Plaintiff initially filed this qui tam action in New York County Supreme Court in January 2017.  After the New York State Attorney General declined to prosecute or intervene in Plaintiff's action, Dkt. No. 1-4, Plaintiff filed the Amended Complaint.  In it, Plaintiff alleged that Defendants violated the NYFCA, N.Y. Fin. L. § 189(1)(d), (g), by knowingly reporting artificially reduced taxable income to New York City and New York State, thereby depriving these entities of millions of dollars of tax monies owed.

Defendants removed the action to this Court on August 16, 2021, Dkt. No. 1, and on August 27, 2021, Plaintiff filed a motion to remand, Dkt No. 11.  The Court received briefing on that motion.  Dkt. Nos. 12, 23, 25.  As further laid out below, Defendants' arguments turned upon the proposition that the calculation of New York State and New York City income turned upon the calculation of federal taxable income and that the calculation of federal taxable income turned upon questions of "transfer pricing"—the allocation of revenue and expenses among affiliates of a multinational enterprise each of which performed work on a cross-border project. Defendants argued that Plaintiff's allegations necessarily raised an actually disputed substantial question of federal tax law: the New York State and New York City taxes were misreported only if EZ incorrectly determined as a matter of federal law how income should be allocated among affiliates of a multinational enterprise, each of which performed work on a project, and that question could be resolved in federal court without disrupting the federal-state balance approved by Congress.  *See Gunn v. Minton*, 568 U.S. 251, 258 (2013).

On September 24, 2021, Defendants also filed a motion to dismiss the Amended Complaint for failure to state a claim for relief.  Dkt. No. 20.  Defendants filed a memorandum

and declaration in support of that motion.  Dkt. Nos. 21–22.  Defendants argued that the
Amended Complaint did not allege that EZI USA violated an "obligation" to pay more in New
York State taxes than it actually paid since New York taxable income depended on federal
taxable income and the federal transfer-pricing regime is "discretionary and subjective."  Dkt.
No. 21 at 12–13.  Defendants claimed that "EZI USA's liability to repay any taxes and interest
could arise *only after* the IRS exercise its discretion to impose an adjustment" and that because
the IRS had determined not to make any relevant adjustments, EZI USA did not owe an
obligation to pay any additional money to the United States or, in turn, to New York State.  *Id.* at
13.  Defendants also argued that Relator failed to allege that any of EZI USA's statements were
false, that the alleged false statements were not material to the IRS's analysis, and that the
Amended Complaint failed to allege scienter.  *Id.* at 14–20.  In its memorandum of law in
opposition to the motion to dismiss, Relator responded that when "[s]tripped of their strawman
argument" that Relator was alleging "transfer pricing violations or obligations," Defendants did
not challenge "Plaintiff's obligation allegations," Dkt. No. 28 at 13; in other words, Relator
premised its "obligation" response on the success of its arguments on the motion to remand.  It
also argued that it sufficiently pled, falsity, materiality, and scienter.  *Id.* at 14–22.  Defendants
filed a reply memorandum in further support of the motion to dismiss on October 14, 2021.  Dkt.
No. 29.[2]

The Court heard oral argument on the motion to remand and the motion to dismiss on
February 23, 2022.  The following day, the Court issued an order identifying that Defendants'
motion to dismiss (and, by implication, Plaintiff's Amended Complaint) appeared to present for

---

[2] On October 15, 2021, Plaintiff also filed a motion for leave to file a sur-reply.  Dkt. No. 30.  In
light of the Court's disposition of the motion to approve the settlement, the motion at Dkt. No. 30
is denied as moot.

judicial decision questions regarding the proper allocation of income under the Internal Revenue Code that were committed in the first instance to the IRS and inviting the parties to submit supplemental briefs addressed to the issue.  Dkt. No. 36.  Each party did so on March 4, 2022. Dkt. Nos. 38, 39.  Defendants argued forcefully that it is because the IRS enjoys tremendous discretion under the federal pricing transfer rules that the Relator could not establish that Defendants violated an obligation or established duty to pay more in taxes; as a result, the Court could not and should not address transfer-pricing issues.  Dkt. No. 38.  Relator argued equally forcefully that, while its claims drew upon some federal tax law, they did not draw upon transfer-pricing law, and that taking the issues raised in the Amended Complaint "out of state and local hands would dramatically undermine state and local tax enforcement" when the IRS was "already under-funded to handle its current workload."  Dkt. No. 37 at 2.

On March 22, 2022, the Court issued its opinion on the motion to remand.  *See State of New York ex rel. Am. Advisory Servs., LLC v. Egon Zehnder Int'l, Inc.*, --- F. Supp. 3d ---, 2022 WL 855920 (S.D.N.Y. Mar. 22, 2022).  The Court concluded that a "federal allocation-of-income and transfer-pricing question [was] at the center of the case."  *Id.* at *16.  The Relator alleged that EZI USA chose to hide allocated revenues from many of its joint assignments on its tax returns, but those allegations necessarily rested on and presumed a proposition of federal tax law—that "the transactions for which EZI USA earns 'performance' credit under the fax charge system should be considered in calculating income in the United States or only those transactions for which I/A billings are prepared."  *Id.* at *16.  If not all of the transactions for which EZI USA earned performance credit under the fax charge system were required to have been reported, then there would have been nothing for EZI USA to "hide" and no false statement.  The Court explained, "[a]t the heart [of the case] also is the question whether, after including all of the joint

8

assignment transactions where no income was reported in the United States EZI AG's methodology resulted in EZI USA reporting less than all of the income it should have reported." *Id.* at *16. The Court concluded that it would not be sufficient that Plaintiff had made conclusory allegations regarding "two sets of books" or "underreporting." *Id.* The case necessarily raised the question whether the income reported in the purported second set of books constituted income that was taxable in the United States and thus raised a question of federal tax law. *Id.* After noting that "[a]ll of the income earned by EZI AG on a consolidated basis was reported in one jurisdiction or another," the Court also stated that the disputed question in the case involved "where the income should have been reported and by which entity and how the income should have been calculated" and that such question could not "be answered by simply pointing to Defendants' fax charges or any other internal accounting system" but also rested "upon a conclusion as to what income should, under the [Internal Revenue Code], be reported in the United States by EZI USA and how costs and revenue shared by affiliated corporations should be allocated." *Id.* at *17.

The following day, March 23, 2022, the Court issued an order noting that the case "raise[d] questions of importance with respect to the administration of the federal and state tax systems that potentially transcend[ed] the interests of the parties to the lawsuit and as to which it would be helpful for the Court to have the views of the United States Treasury (or the United States Department of Justice) and the New York State Department of Taxation and Finance (or the New York Attorney General)." Dkt. No. 42 at 1. The Court invited the federal and New York State governments to submit amicus briefs addressed to the following issues, to aid the Court in its consideration of the still-pending motion to dismiss:

1. The scope and content of the permissible review of a federal taxpayer's report of taxable income (and gross income and allowable expenses) on its federal

income tax returns when that report is challenged in a private qui tam action brought under a state false claims act statute based upon a state tax provision that defines "entire net income" by reference to the entire taxable income the taxpayer is required to report to the United States Treasury Department.  N.Y. Tax L. § 208(9).

2.   Whether a qui tam relator may challenge through the vehicle of a state false claims act provision the calculation of federal taxable income that a relator would not be permitted to challenge under the federal False Claims Act pursuant to the Tax Bar, 31 U.S.C. § 3729(e), and Section 7401 of the Internal Revenue Code.

3.   Leaving aside the qui tam nature of this action, whether the New York Attorney General or the New York State Department of Taxation and Finance have the authority to challenge a taxpayer's calculation and report of taxable income on the taxpayer's federal income tax returns (and the allocation of income to the United States as opposed to a foreign affiliate) on the theory that the income on the federal income tax return is misreported and therefore the taxpayer's state income tax under Section 208(9) of the New York Tax Law is misreported or alternatively whether, to the contrary, the taxpayer's calculation of what it is required to report to the United States treasury department is deemed conclusive in the absence of a challenge to that calculation by the federal government.

4.   Any other issues raised by the factual allegations of the complaint.

*Id.*  Amicus briefs were due forty-five days from the date of the Court's order.  *Id.*

### D.   The Settlement Agreement

Following the Court's denial of Relator's remand motion on March 22, 2022 and the Court's order of March 23, 2022, inviting amicus briefing, the State engaged Defendants in discussions regarding the settlement of the action.  Dkt. No. 65 ¶ 21.  On May 4, 2022, the New York Attorney General submitted a letter to the Court noting that it was the real party in interest in the complaint, stating that it had made a settlement demand to Defendants which if accepted would resolve the action, and requesting a 21-day extension of the time to file an amicus brief. Dkt. No. 45.  The United States Department of Treasury and the United States Department of Justice also asked for a 21-day extension in light of the State's request, nothing that it had been

engaged in deliberations over the Court's questions.  Dkt. No. 47.  The Court granted those

requests.  Dkt. Nos. 46, 48.  On May 25, 2022, both the State and the federal government asked

for an additional 21-day extension of time to submit amicus briefs.  The State noted that over the

past three weeks, it had "engaged in numerous good-faith and productive conversations with

counsel for Defendants regarding a settlement of this action" and that it believed that "a

settlement may be achieved, but that a small amount of additional time is necessary."  Dkt. No.

49.  The Court granted those requests and extended the time to file amicus briefs to June 21,

2022.  Dkt. Nos. 51, 52.

On June 13, 2022, the State reached an agreement-in-principle with Defendants to settle

the action in exchange for the payment of $100,000.  Dkt. No. 65 ¶ 22.

The Settlement Agreement is dated as of July 8, 2022 between the State of New York and

Egon Zehnder International, Inc. and Egon Zehnder International AG.  Dkt. No. 65-1.   The

Relator is not a signatory to the Settlement Agreement.  EZ agrees to pay $100,000 (the

"Settlement Amount") in exchange for the State's agreement to file a Notice of Discontinuance

with Prejudice of the action and to release the Defendants from any claims that the State may

have under the False Claims Act alleged in the Amended Complaint.  *Id.* ¶¶ 6, 7.  The sum of

$70,000 is to be paid to the State as an "Initial Payment."  *Id.* ¶ 3.  The remaining $30,000 or

30% is to be held by Defendants for payment to Relator or Relator's counsel (with any remaining

amount of that sum to be paid to the State).  *Id.*  The State specifically does not release any

person or entity, including Defendants, from: any civil, criminal, or administrative liability

arising under State tax law, or from any criminal liability; any civil liability not arising under the

False Claims Act; any liability for conduct other than that alleged in the Amended Complaint;

any liability based upon the obligations created by the Settlement Agreement itself; or any civil

or administrative liability of individuals, except as explicitly provided for in the release. *Id.* ¶¶ 7–8.[3] If Defendants fail to pay any portion of the Settlement Amount, the State may declare the entire Settlement Amount, less any payments already made, immediately due and payable, and/or pursue all available remedies to enforce the Agreement and remedy violations of the Agreement. *Id.* ¶ 11.

The Initial Payment is due within five calendar days of the final approval of the Agreement, defined to occur "(i) when a determination by a court that this Agreement is fair, adequate, and reasonable with respect to all parties under all the circumstances is no longer appealable, or (ii) upon Relator's written notification that it does not have any objection to this Agreement." *Id.* ¶ 3. "If a court determines that th[e] Agreement is not fair, adequate, and reasonable with respect to all parties under all the circumstances or otherwise rejects th[e] Agreement, then when such determination is no longer appealable[,] th[e] Agreement is null and void." *Id.* ¶ 4.

The Attorney General has determined that the State's interests are best served by the Settlement. Dkt. No. 65 ¶ 24.

### E.    The Instant Motion

On July 14, 2022, the Court granted the motion of the State to intervene in order to propose the settlement of the NYFCA claims asserted by Relator. Dkt. No. 61. The Court held that the State was the real party in interest in the action and thus had a "direct, substantial, and legally protectable interest in this action." *Id.* at 5. The Court ordered the State to file with the Court any application for approval of the Settlement Agreement by August 3, 2022, and set

---

[3] The Defendants also release the State from any claims that Defendants could have asserted or may asset in the future related to the State's investigation and prosecution of the action. *Id.* ¶ 9.

deadlines of August 17, 2022 for objections and August 24, 2022 for a reply in support of the Agreement.  Dkt. No. 62.

The State filed this motion on August 3, 2022.  Dkt. No. 63.  On August 17, 2022, the Court received a document styled "Relator's Opposition to the State of New York's Motion for an Order Determining that the Proposed Settlement is Fair, Adequate, and Reasonable, and Relator's Objection to the Government's $100,000 Settlement of this Case," stating that it was "prepared by Relator on a *pro se* basis that counsel submits as a courtesy so that Relator has an opportunity to be heard."  Dkt. No. 66.

## DISCUSSION

New York State Finance Law § 190(5)(b)(ii) provides:

> The state or a local government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after an opportunity to be heard, that the proposed settlement is fair, adequate, and reasonable with respect to all parties under the circumstances.

N.Y. Fin. L. § 190(5)(b)(ii).

The State argues that the Settlement Agreement is fair, adequate, and reasonable with respect to all parties under the circumstances and asks for the Court to approve it.  It claims that the Settlement Agreement guarantees a recovery for the State and avoids the substantial litigation risks from the Court's determination that the claims turn on questions of federal tax law regarding the allocation of income and transfer pricing, ensures that the State will not suffer an adverse decision on issues of importance to the State which could impose costs greatly in excess of the value of the case, and allows the State to avoid burdensome discovery and to devote its resources to higher-priority matters.  *See* Dkt. No. 64.  It further contends that the Settlement Agreement treats Relator fairly and ensures that it will receive a recovery commensurate with the value of its claims.  *Id.* at 3, 19–20.  The State notes that one of the principal arguments raised by

Defendants for dismissal—that the federal transfer-pricing rules are too contingent to create an obligation to pay money within the meaning of the NYFCA—if accepted, would have broad implications for other cases brought under the NYFCA.  *Id.* at 12–13.   The State also argues that there is substantial risk that Relator will not be able to establish that EZI USA's reported net income was false in light of the facts that "transfer pricing typically has a range of correct answers" and that the IRS—with knowledge of Relator's allegations—had not made any changes to EZI USA's reported income nor sought to re-open prior tax years, *id.* at 13–14, and that it is reasonable to believe that the Relator would face litigation risk on elements of scienter and materiality, *id.* at 15.  The State also argues that the recovery for it, were Relator to prevail, would be "relatively small."  *Id.* at 16–17.   On Relator's theory, and after taking into account both the fax charges sent by EZI USA without I/A billings as well as the fax charges received by EZI USA without I/A billings, the net income allegedly omitted from EZI USA's federal tax returns over the relevant 11-year period was roughly $14.3 million (or $1.3 million per year compared to EZI USA's annual revenue of $100 million), which would mean that EZI USA underreported its New York income by roughly $4.5 million and underpaid its New York State and New York City taxes by less than $1 million.  *Id.* at 15–17.   Even taking into account Relator's allegations that EZI USA made improper deductions of global costs, EZI would have underreported its New York income by roughly $6.3 million over an 11-year period and underpaid its New York State and New York City taxes by only approximately $1.4 million.  *Id.* at 17 n.4.

The NYFCA itself does not set forth the standards by which the Court is to determine whether a settlement is "fair, adequate, and reasonable" to all parties under the circumstances. The Appellate Division, First Department, has adopted the standard articulated by the Eleventh

Circuit for determining whether a settlement is "fair, adequate, and reasonable." *Weiner v. City of New York*, 141 N.Y.S.3d 9, 10 (1st Dep't 2021) (citing *United States v. Everglades Coll., Inc.*, 855 F.3d 1279 (11th Cir. 2017)). "Under this standard, to determine whether a proposed settlement is 'fair, adequate, and reasonable,' the court must determine (1) 'whether the government has advanced a reasonable basis for concluding the settlement is in the best interests of the [government]'; and (2) 'whether the settlement unfairly reduced the relator's potential *qui tam* recovery.'" *Id.* (quoting *Everglades*, 855 F.3d at 1289). In *Everglades*, the Eleventh Circuit recognized that there is a "material[]" difference between the factors relevant to the court's determination that a class action settlement is "fair, reasonable, and adequate" under Federal Rule of Civil Procedure Rule 23, *see* Fed. R. Civ. P. 23(e)(2), and a determination whether to accept a settlement proposed by the government as "fair, reasonable, and adequate" under the federal False Claims Act. 855 F.3d at 1277–78. A court must approve a class action settlement as "fair, reasonable, and adequate" under Rule 23 when "the proposal would bind [absent] class members," Fed. R. Civ. P. 23(e)(2), but "unlike with class-action settlements, when the government settles a *qui tam* case, it is agreeing to compromise with respect to its own injuries only, not those of the relator or other absent parties." 855 F.3d at 1288. Moreover, "unlike with private plaintiffs, the government's interests are not confined to maximizing recovery against the defendant." *Id.* It may also wish to consider (1) "whether the maximum recovery is proportional to the seriousness of the misconduct"; (2) "public policy consequences or political ramifications"; (3) whether "limited prosecutorial resources are . . . worth spending on continued monitoring of the case, which it often must do even when the relator is proceeding with the action"; and (4) "the precedential impact of a potentially adverse . . . decision," including whether such a decision "would ultimately translate into lower recoveries across the board." *Id.*

at 1288–89.  Thus, although the court may not "just rubber-stamp the government's justifications," "there must be considerable deference to the settlement rationale offered by the government." *Id.* at 1288 –89.  The review "must account for the reasonableness of the rationale offered by the government as well as the potentially prejudicial impact on the relator." *Id.* at 1289.

The State has advanced a reasonable basis for concluding the settlement is in the best interest of New York.  There was considerable risk to this case from the perspective of the Relator and the State.  Relator challenges the EZI USA's New York State and New York City tax returns, but those returns were based on the calculation of federal taxable income that itself was subject to audit by the IRS and was determined by the IRS not to require adjustment.  The New York tax law defines "entire net income" to be the amount "the taxpayer is required to report to the United States treasury department," N.Y. Tax L. § 208(9), and the NYFCA is addressed to "a false record or statement material to an *obligation* to pay or transmit money or property to the state or local government," N.Y. Fin. L. § 189(1)(g) (emphasis added), or a person who "has possession, custody, or control of property or money . . . to be used[] by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property," *id.* § 189(1)(d).  Thus, in order to prevail, Relator would have had to establish that information that the IRS ultimately deemed not to be material to the obligation to pay taxes to the United States Treasury Department (the "fax charges") was nonetheless material to the obligation to pay taxes to New York State or New York City or reflected money that was meant to be used by New York State or New York City.  It would have to do so, moreover, in the face of federal law such as the Tax Bar, 31 U.S.C. § 3729, which is intended to leave to the IRS in the first instance, and not to private litigants bringing state false claims act cases, the

"discretion" to prosecute tax violations and "to prevent private litigants from interfering with the IRS's efforts to enforce the tax laws." *United States ex rel. Lissack v. Sakura Global Cap. Markets, Inc.*, 377 F.3d at 153, 156 (2d Cir. 2004); *see* Franziska Hertel, *Qui Tam for Tax?: Lessons from the States*, Note, 113 Colum. L. Rev. 1897, 1918–19 (2013).  Relator also would have had substantial challenges in establishing falsity, materiality, and scienter.  Recognizing that the Amended Complaint contains allegations that EZ USA's controller was concerned that the company was not reporting all of the revenue that was reflected by the fax charges, those allegations were all reviewed by the IRS, which determined that the federal returns—which included the taxable income based upon which Relator's state and city tax return allegations are based—did not require revision and thus were neither false nor materially so.

Moreover, the State is correct in its understanding that the decision here would have implications not just for this case but ultimately "for a whole lot of other cases."  Dkt. No. 39 at 10:12–16.  The case turns on unsettled questions regarding the allocation of authority over tax reporting between the federal government and state and local governments of enormous significance.  On the one hand, Defendants emphasize the interest that the federal government has in the uniform application and interpretation of the Internal Revenue Code by the IRS as a general matter and the specific interest that the federal government has with respect to issues regarding the allocation of income among affiliates of a multinational corporation.  As the Court has recognized:

> [T]here is a critical federal interest in having issues regarding the rules for the allocation of income and the appropriate pricing for tax purposes of affiliates of a multinational corporation decided in a federal forum with a single answer provided by adjudicators with a duty solely to the laws of the Untied States of America and not separately to any particular state within the Union. . . . [I]t is the United States, and not individual states, that negotiates international tax treaties that address and help resolve disputes regarding allocation of income and transfer pricing. . . . It is also the United States whose foreign policy interests will be implicated if, as a result

> of the incorrect interpretation of the federal income taxation question underlying
> Plaintiff's state tax law claim, a United States entity is required to report income
> that is properly reported elsewhere.

*Egon Zehnder*, 2022 WL 855920, at *18.  On the other hand, "state governments too have a

significant interest in the integrity and security of their own fisc and in ensuring that all taxes

owed to them are in fact reported and paid."  *Id.* at 38 n.11; *see also* Dkt. No. 37 at 2.  As Relator

emphasized at an earlier stage of this proceeding, a ruling agreeing with Defendants and finding

that there was no enforceable "obligation" to pay an amount of taxes to state and city

governments where the unpaid amount of taxes was based on an erroneous (and perhaps

fraudulent) calculation of federal taxable income could also have profound consequences.

According to Relator, it would take these "issues out of state and local hands [and] dramatically

undermine state and local state enforcement" when the IRS was "already under-funded to handle

its current workload."  Dkt. No. 37 at 2.

Furthermore, continued litigation would have the Court address these issues in the

context of a relatively novel state false claims act where a decision in favor of Relator could lead

to the concern that every other state—jealous of its own tax revenues—would pass similar

statutes leading to a patchwork of state and local investigation of federal taxable income (and the

interpretation of federal rules regarding transfer pricing), instigated by private persons intrigued

by the prospect of personal recovery.  And it would do so in a litigation environment that could

be characterized as inhospitable, where the federal government was not just silent in the face of

allegations that taxable income was misreported but conducted an audit and determined not to

require any adjustments.

For that reason, and because the pending motion to dismiss would have required the

Court to consider the issues, the Court invited the State and the federal governments to submit

amicus briefs on what it characterized as "questions of importance with respect to the

administration of the federal and state tax systems that potentially transcend the interests of the parties to the lawsuit."  Dkt No. 42.

Under these circumstances, where "Relato[r's] case hinged on a proposition that is not settled," the State "was not unreasonable in hedging its bets."  *Everglades*, 855 F.3d at 1289.  An adverse decision on the questions raised by Defendants could potentially have impacted not only the administration of state and city tax codes against multinational corporations but also the ability of the State and local governments and private relators in their stead to use the NYFCA whenever the purported underreporting is based on a miscalculation or fraudulent reporting of federal taxable income.  *See City of New York v. Siemens Elec., LLC*, 107 N.Y.S.3d 827, 836 (Sup. Ct. N.Y. Cnty. Aug. 7, 2019) (concluding that proposed settlement was fair, adequate, and reasonable where, *inter alia*, "an adverse decision in th[e] matter may limit the City's enforcement efforts").  Issues of transfer pricing are not the only ones committed to the discretion of the IRS in the first instance.

Against all of these considerations, the Court determines that the Settlement Agreement is fair, reasonable, and adequate.  The State is correct to assert that if the Court were to have the jury consider fax charges sent by EZI USA (but not included in I/A billings) as taxable income, it would also have to have the jury consider fax charges received by EZI USA from other jurisdiction (but not included in I/A billings) as an offset.  "There may be circumstances where the United States affiliate received performance credit without rendering services just as there may be circumstances where the foreign affiliate receives performance credit without rendering services."  *Egon Zehnder*, 2022 WL 855920, at *15.  Taking into account that the discrepancy between performance credit and I/A billing was "true in the other direction as well," as acknowledged by EZI USA's then-Controller, the State would not stand to recover tens of

millions were it to prevail on every theory and its victory (or Relator's) to be sustained on appeal.  It would recover no more than about $1 million.   Dkt. No. 64 at 15–17 & n.4. Even taking into account that such number would be trebled, the certain $100,000 settlement the State will be receiving is not unreasonable given the costs it is avoiding in terms of the "precedential impact" of an adverse decision, and the resources it would have to expend "in monitoring the case as it proceeds" through trial and appellate processes.  *Everglades*, 855 F.3d at 1289; *see also United States ex rel. Balko v. Senior Home Care, Inc.*, 2017 WL 3268200, *3 (M.D. Fl. Aug. 1, 2017) (approving settlement as fair, adequate, and reasonable where settlement amount was $325,000.00 and relator's estimate of potential recovery was $20,000,000.00); *cf. United States ex rel. Horsley v. Comfort Care Home Health, LLC*, 2020 WL 4002005, at *5 (explaining that "[t]he reasonableness of the government's decision to settle a matter does not necessarily depend on whether the settlement maximizes the monetary recovery for the parties" and rejecting the argument that "any settlement . . . cannot be deemed reasonable because the government cannot evaluate the merits of the case without the benefit of discovery").

For the same reasons, the settlement does not "unfairly reduce" Relator's recovery.  In fact, it ensures it.

Relator objects to the settlement.  Dkt. No. 68.[4]   Relator does not dispute that under New York law the Court must apply the standard set forth in *Everglades*.  The thrust of Relator's

---

[4] Counsel for Relator initially filed on the docket a statement with an attachment that counsel stated was an "objection prepared by Relator on a *pro se* basis that counsel submits as a courtesy so that Relator has an opportunity to be heard." Dkt No. 66.   The first sentence of the objection stated that it was "written by Relator's sole member, a non-attorney who accordingly asks the Court for its forbearance, and it was signed by 'Martin Fonseca' as Member, Relator American Advisory Services LLC." Dkt. No. 66 at 25.  After it was pointed out to Relator's counsel that Federal Rule of Civil Procedure 11(a) requires an attorney of record to sign each paper presented on a client's behalf, *see* Fed. R. Civ. P. 11(a), counsel filed a Corrected Memorandum which counsel states "does not change the substantive arguments raise in the original version, but it is

argument is that the Attorney General "minimized this case's merits in its effort to justify a de minimis settlement" and that "a mountain of evidence supports allegations of a decade-long tax fraud," *id.* at 4, that the case does not involve issues of transfer-pricing and that Relator "is confident that no bad precedent would be created by this Court if the issues could be fully addressed," *id.* at 4, 6, that the State has miscalculated the damages that would be available in this case, *id.* at 21–22, and that it is too early to tell what time and resources of the State would be required to proceed with the case, *id.* at 23. Relator would like to convince the Court that the case is valuable and is worth substantially more than $100,000 and requests discovery to make that point. *Id.* at 15.

Relator's arguments provide no reasons for the Court not to approve the settlement. *Everglades*, which the Court must follow, has cautioned that "the FCA settlement hearing [not be 'ballooned'] into a mini-trial on the merits." 855 F.3d at 1290. The real-party-in-interest "often settles a case precisely to avoid such a fight." *Id.* By the same token, the defendant also often agrees to pay the settlement consideration it offers for the same reason. "[T]he statutory right to a hearing . . . include[s] no more than a right to highlight existing evidence and make arguments, based on that evidence, that the proposed settlement is unreasonable or improper." *Id.*

Relator has presented no evidence that would call into question the State's judgment that the settlement is fair, reasonable, and adequate to the taxpayers of New York. Relator relies for the most part on the allegations of his Amended Complaint and on the testimony and evidence before the Attorney General. Dkt. Nos. 68-1–68-14. There is no reason to believe that the Attorney General overlooked that evidence—it took the testimony and it subpoenaed the records.

---

clearly signed by an attorney of record for Relator. Dkt. No. 69. The States does not ask the Court to disregard the Corrected Memorandum. Dkt No. 70 at 1, n.1. Accordingly, the Court considers the "Corrected Memorandum."

Its investigation lasted for four years.  It twice interviewed Relator's sole member—the person who drafted the objection—and had numerous conversations with his counsel.  Dkt. No. 65.  After that thorough investigation, it determined neither to supersede nor to convert the action into a civil enforcement action.  Dkt. No. 65 ¶ 20.  Relator has offered no reason to believe that the Attorney General—who invested years into the investigation and who had the greatest interest in a recovery—would compromise the case on the cheap if the Attorney General thought it had great merit.  In short, Relator has given the Court no reason to second-guess the Attorney General's judgment.

Indeed, from the necessarily preliminary understanding the Court has of the case at this stage, it is evident that Relator would have faced significant obstacles.  Leaving aside the legal question whether there could be an "obligation" to pay New York taxes on amounts that the IRS has not determined (after an audit) to constitute taxable income in the United States and the further question whether a relator can use a NYFCA case to address what the Court has already determined constitute federal transfer-pricing issues ordinarily committed in the first instance to the IRS, Relator would have had to prove falsity, materiality, and scienter.  As indicated above, Defendants have substantial arguments at any stage.  The IRS—the entity with the greatest interest in the reporting of federal income—accepted EZI USA's responses to the audits and required EZI USA to make no adjustments relating to its use of fax charges.  And the State would be reasonable to take into account that the case might not even reach the discovery stage—Defendants made powerful arguments on the motion to dismiss.

Relator disputes that the case raises transfer-pricing issues, reprising the arguments that its lawyer made in support of the motion to remand.  The Court disagreed.  EZ reported all of the income it earned in one jurisdiction or another; when the case turned on questions of how to

allocate income for federal income tax purposes between offices in more than one country each of which performed work on a transaction (or on the methodology of allocating revenue on joint cross-border projects), the Court concluded that the case necessarily involves questions of international taxation and transfer pricing.  The State was not unreasonable to take into account the probability that the Court would adhere to those views.

For similar reasons, the Court cannot give weight to Relator's argument that it is confident that no bad precedent would be created in this case.  The case indisputably involves issues of general importance and relevance to both state and federal taxing authorities, where the interests of the two sovereigns could potentially conflict.  Although the Attorney General could not (and did not) foreclose the possibility that those issues would be resolved in a manner that would not affect the State's ability to use its false claims act to pursue claims that turned on the alleged underreporting of federal income, it could not responsibly ignore the risk that those issues would be decided in a manner that would affect its enforcement authority.  And Relator himself has acknowledged the impact such a decision would have.   Dkt. No. 37 at 2.  Relator also argues that the Court could have decided the pending motion to dismiss without addressing the issues as to which the State has expressed concern, thus obviating the State's interest in having the case settled before that motion is decided.  For that matter, the Court also could have decided the motion to dismiss in favor of Relator.  But the Court might not have—the motion itself raised novel issues implicating the enforcement powers of the State (and of the federal government).  There was and is risk to both sides.  That is a reason why parties settle cases.  It is not wrong for the State to believe the case should be decided before the Court reached the issues raised by the motion, after which it might have been too late to protect the State's interest.

While Relator believes that the State miscalculated damages by including the amounts by which EZI USA overpaid taxes as a result of its tax-reporting practices, as well as the amounts by which it underpaid taxes, that is not how the Court viewed the case in its opinion on the motion to remand.  Where the question was whether a particular methodology resulted in the underpayment of taxes by an entity as a whole, it was not appropriate to look only at the transactions that under that methodology would have resulted in an underpayment but also those that would have resulted in overpayment.  *See Egon Zehnder*, 2022 WL 855920, at *16.  At oral argument held in this matter, counsel for Relator acknowledged that there was no case law under the NYFCA that would compel a calculation of damages other than what was actually lost to the State by the misreported income, and counsel for the State offered that any recovery in an action would be based on the injury actually suffered by the State—calculated on the net income that should have been reported, taking into account both revenues that *should have been* attributed to the United States as well as revenues that *were* attributed to the United States but should have been attributed elsewhere.

Further, the claim that the settlement should not be accepted because, prior to a decision on the motion to dismiss, "it is too early to tell what time and resource of the State would be required to proceed with the case," Dkt No. 68 at 23, proves too much.  The claim could be made with respect to every case that is settled before the viability of the allegations have been tested. Although Relator might be correct that the State would not be burdened with significant discovery, the settlement gives the State the certainty of a settlement without the risk that, after the motion is heard, the Court will determine it (and Relator) are entitled to nothing.  That also is reason to believe that the settlement is fair, reasonable, and adequate both to the State and to Relator.

Finally, Relator argues that the settlement is unfair to it "and its sole member, who accepted the incentive structure of the False Claims Act to pursue these claims on behalf of the taxpayers and placed himself at risk of retaliation and devoted thousands of hours of time to assisting the OAG investigation and pursuing the claims itself."  Dkt. No. 68 at 3.  As the Court previously has observed, Relator has no "vested interest in the prosecution of or recovery from a NYFCA action" and "the State's decision not to intervene . . . does not give the person who initiated the action the unfettered right either to prosecute the action or to obtain a certain amount of a *qui tam* recovery."  *New York ex rel. American Advisory Servs., LLC v. Egon Zehnder Int'l, Inc.*, 2022 WL 2758023, at *4 (S.D.N.Y. July 14, 2022).  Relator always was subject to the risk that the State would choose to intervene or that it would choose to settle.  N.Y. Fin. L § 190(5)(a), (b)(ii).  Relator also was subject to the risk that the Court would dismiss its case or—if the case proceeded—that, after pouring more resources into the case, Defendants would prevail either at summary judgment or at trial.  The Court does not know for certain whether Relator's recovery would be greater or lesser if the case proceeded, nor does Relator.  The Court is able to say, however, that after analyzing the record, the State—which has the greatest interest in maximizing recovery—has made a reasonable judgment and that the settlement is fair, reasonable, and adequate to all parties.

## CONCLUSION

The motion is GRANTED; the Court determines that the Settlement Agreement is fair, adequate, and reasonable.  The motions to dismiss the Amended Complaint and to file a sur-reply are DENIED AS MOOT in light of the Settlement Agreement.

The Court will retain jurisdiction to decide the share of the settlement to which Relator is entitled as well as to address any issues with respect to fee-shifting.  The State and Relator are

ordered to report to the Court no later than September 28, 2022 whether they have reached an agreement on the Relator's share and, if not, to propose a briefing schedule to address that issue.

The Clerk of Court is respectfully directed to close Dkt. Nos. 20, 30, and 63.

SO ORDERED.

Dated: August 31, 2022
      New York, New York

                                          LEWIS J. LIMAN
                                  United States District Judge